**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

KINDHEARTS FOR CHARITABLE )
HUMANITARIAN DEVELOPMENT, INC., )
)
)   **COMPLAINT**
Plaintiff, )
)
v. )
)
HENRY M. PAULSON, in his official capacity as the )
Secretary of the Treasury, )
ADAM J. SZUBIN, in his official capacity as the )   Civil No. _____
Director of the Office of Foreign Assets Control, and )
MICHAEL B. MUKASEY, in his official capacity as the )
Attorney General of the United States, )
)
Defendants. )
)

3:08 C V 02400

JUDGE JAMES G. CARR

### Introduction

1.      This lawsuit arises out of an order by the Office of Foreign Assets Control

("OFAC") that has resulted in the freezing of all assets of a Toledo-based charity for more than

two and a half years—without any notice of the basis for the freeze, any hearing, any finding of

wrongdoing, or any meaningful opportunity to respond to the freeze.  OFAC froze the assets of

plaintiff KindHearts for Charitable Humanitarian Development, Inc. ("KindHearts"), an Ohio non-

Complaint – Page 1

profit charitable organization, on February 19, 2006, pursuant to a USA PATRIOT Act provision

that authorizes such freezes "pending investigation" to determine whether the entity should be

designated as a "Specially Designated Global Terrorist" ("SDGT").  The statute sets forth no

substantive criteria for when such a freeze pending investigation is permitted, requires no notice

or opportunity to respond, and sets no time limit on the freeze.  As of this date, more than 31

months after KindHearts' assets were frozen, OFAC has effectively closed it down on the basis of

a letter that states merely that KindHearts is under investigation.

       2.      More than a year after OFAC froze KindHearts' assets, OFAC told KindHearts

that it had completed its investigation and had "provisionally determined" to designate KindHearts

as an SDGT.  To this day, however, KindHearts has not been designated as an SDGT, and its

assets remain frozen "pending investigation."  The authority to designate is unconstitutionally

vague and the process that resulted in the threatened designation also fails to afford KindHearts

adequate notice of the charges against it or a meaningful opportunity to respond.

       3.      KindHearts, founded after several other Muslim charities were shut down in the

wake of the terrorist attacks of September 11, 2001, did everything it could to ensure that it

complied with Treasury Department guidelines, and conducted its operations in a transparent

manner.  It provided humanitarian relief to refugees, displaced persons, and victims of poverty,

war, and natural disasters around the world, but especially in Palestine and Lebanon.  It did not

support terrorism or terrorist organizations in any way.  Yet for more than two and a half years,

its assets have been frozen, unavailable to it, or to the victims for whose aid it was provided.

       4.      This lawsuit challenges OFAC's freeze pending investigation and the threatened

designation as violations of the First, Fourth and Fifth Amendments, and as arbitrary and

capricious under the Administrative Procedures Act.  In addition, it seeks a temporary restraining order and preliminary and permanent injunctive relief barring OFAC from designating KindHearts until it has been provided due process in connection with any future designation.  Official designation as an SDGT will inflict irreparable harm on KindHearts, and should not be permitted absent constitutionally adequate procedures and a substantial evidentiary basis, neither of which has been provided.  Thus far, despite informing KindHearts that it has "provisionally" decided to designate it, OFAC has not designated KindHearts, nor has it unfrozen its assets.  OFAC has not provided KindHearts with a statement of the factual and legal basis for its provisional designation, has impermissibly relied on classified evidence and hearsay that denies KindHearts a meaningful opportunity to defend itself, and has failed to pursue alternative procedures that could provide KindHearts a fairer opportunity to defend itself without cost to the security interests of the United States.  Defendants have further undermined KindHearts' ability to defend itself by restricting its ability to spend its own funds on its defense, and by seizing all its records and then imposing unreasonable restrictions on KindHearts' access to those documents, which are necessary to prepare a defense.  These actions violate KindHearts' rights under the Fourth and Fifth Amendments.

## Parties

5.      Plaintiff KindHearts for Charitable Humanitarian Development ("KindHearts") is an Ohio non-profit corporation, incorporated on January 22, 2002.  Its headquarters are in Toledo, Ohio, where it conducted its business.  It also had offices in Palestine and Lebanon.

6.      Defendant Henry M. Paulson, Jr., is sued in his official capacity as Secretary of the Treasury.  He is responsible for designating individuals and entities as Specially Designated Global

Terrorists in consultation with the Secretary of State, the Attorney General, and the Secretary of Homeland Security, is responsible for administering and enforcing the Global Terrorism Sanctions regulations, 31 C.F.R. Part 594 against designated individuals and entities.

7.  Defendant Adam J. Szubin is sued in his official capacity as the Director of the Office of Foreign Assets Control.  He is responsible for designating individuals and entities as Specially Designated Global Terrorists in consultation with the Secretary of Treasury, the Secretary of State, the Attorney General, and the Secretary of Homeland Security, and is responsible for administering and enforcing the Global Terrorism Sanctions regulations, 31 C.F.R. Part 594 against designated individuals and entities.

8.  Defendant Michael R. Mukasey is sued in his official capacity as the Attorney General of the United States.  He is responsible for designating individuals and entities, in consultation with the Secretary of the Treasury, the Secretary of State, the Secretary of Homeland Security, and for investigating and prosecuting criminal violations of federal laws, including the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1707.

### Jurisdiction and Venue

9.  This action arises under the U.S. Constitution, IEEPA, 50 U.S.C. §§ 1701-1707, and the Administrative Procedures Act, 5 U.S.C. § 551 *et seq.*  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1361.

10.  This Court may grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.,* and Fed. R. Civ. P. Rule 57.  This Court may grant injunctive relief pursuant to Fed. R. Civ. P. Rule 65.

11.  Venue lies in the Northern District of Ohio, Western Division, the federal judicial

Complaint – Page 4

district in which plaintiff KindHearts is incorporated and headquartered and where the actions

complained of occurred.

## Factual Background: The Statutory and Regulatory Framework

12.     The International Emergency Economic Powers Act authorizes the President to

declare a national emergency with respect to "any unusual and extraordinary threat, which has its

source in whole or in substantial part outside the United States, to the national security, foreign

policy, or economy of the United States."  50 U.S.C. § 1701(a).  When the President has declared

such an emergency, he "may, under such regulations as he may prescribe, by means of

instructions, licenses, or otherwise . . . block . . . , regulate, . . . nullify, void, prevent or prohibit,

any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or

exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or

transactions involving, any property in which any foreign country or a national thereof has any

interest, or with respect to any property, subject to the jurisdiction of the United States . . . ."  50

U.S.C. § 1702(a)(1)(B).

13.     On September 23, 2001, President George W. Bush issued Executive Order

13,224, 66 Fed. Reg. 49079 ("E.O. 13,224"), declaring a national emergency in connection with

the September 11, 2001 terrorist attacks.  Section 2(a) of the Executive Order states that "any

transaction or dealing by United States persons or within the United States in property or interests

in property blocked pursuant to this order is prohibited, including but not limited to the making or

receiving of any contribution of funds, goods, or services to or for the benefit of those persons

listed in the Annex to this order or determined to be subject to this order."  The Executive Order

initially designated 27 individuals and entities, and also authorized the Secretary of the Treasury

Complaint – Page 5

to designate other groups or individuals for engaging in terrorism, for providing material support to anyone on the designated list - regardless of the purpose of the support - and even for being "otherwise associated" with an entity or individual on the list. OFAC has admitted to designating individuals or groups based solely on a finding that they were "otherwise associated" with other groups on the list. On information and belief, OFAC has also relied on the "otherwise associated" provision in conjunction with other provisions to designate groups or individuals. Because OFAC issues no formal statement of reasons for any of its designations, KindHearts does not know the legal or factual basis for its pending designation.

14. An amendment to IEEPA made by the USA PATRIOT Act, Pub. L. No. 107-56, 115 Stat. 272 (2001), authorizes the Secretary of the Treasury to freeze the assets of an individual or entity pending investigation for an indefinite period of time, without specifying any standard of suspicion necessary for such a freeze, and without requiring that the entity be provided with notice or a meaningful opportunity to contest the freeze. *See* IEEPA, 50 U.S.C. § 1702.

15. There is no definition in IEEPA of the term "Specially Designated Global Terrorist."

16. Regulations implementing E.O. 13,224 were promulgated by the Department of the Treasury on June 6, 2003. *See* 68 Fed. Reg. 34,196. These regulations, entitled the "Global Terrorism Sanctions Regulations," are located at 31 C.F.R. Part 594, and follow the model of the Executive Order with little added detail. Neither IEEPA, the regulations, nor the Executive Order require the Secretary of the Treasury to provide any statement of reasons for a freeze pending investigation, or for a designation. OFAC's practice has been to simply issue a press release announcing its actions; it has not provided statements of reasons for its freeze orders pending

Complaint – Page 6

investigation, or for its ultimate designations of individuals or entities. IEEPA, the regulations, and the Executive Order do not require that entities or individuals be provided with notice of the specific provisions under which they are being investigated or have been designated. Thus, entities targeted by OFAC must guess at the basis for its actions, and must effectively defend themselves in the dark. Neither IEEPA, the regulations, nor the Executive Order specify what, if any, basis for suspicion the Secretary of the Treasury must have to freeze assets pending investigation.

17.    31 C.F.R. § 594.204 states that transactions involving property of blocked persons described under section 594.201 are prohibited, "including but not limited to the making or receiving of any contribution of funds, goods, or services to or for the benefit of persons whose property or interests in property are blocked pursuant to § 594.201(a)."

18.    31 C.F.R. § 594.406 states that the "prohibitions on transactions or dealings involving blocked property contained in sections 594.201 and 594.204 apply to services performed in the United States or by U.S. persons, wherever located," and states that "U.S. persons may not . . . provide legal, transportation, public relations, educational, or other services to a person whose property or interests in property are blocked." 31 C.F.R. § 594.409 expressly bars humanitarian aid to blocked parties: "no charitable contribution or donation of funds, goods, services, or technology, including those to relieve human suffering, such as food, clothing, or medicine, may be made to or for the benefit of" a person whose property is blocked.

19.    Section 206 of IEEPA states that a "civil penalty not to exceed $10,000 may be imposed on any person who violates, or attempts to violate, any license, order, or regulation issued under" IEEPA, 50 U.S.C. § 1705(a), and that "[w]hoever willfully violates, or willfully

attempts to violate, any license, order, or regulation issued under [IEEPA] shall, upon conviction, be fined not more than $50,000, or, if a natural person, may be imprisoned for not more than ten years, or both; and any officer, director, or agent of any corporation who knowingly participates in such violation may be punished by a like fine, imprisonment, or both." *Id.* § 1705(b); *see also* 31 C.F.R. § 594.701.

## KindHearts' Status and Operations

20.     On January 22, 2002, KindHearts was incorporated as a nonprofit public benefit corporation under Ohio law. KindHearts' incorporation papers specify that "the purpose for KindHearts shall be strictly for charitable procurement and distribution of funds/donations." KindHearts has never been a subsidiary of any other corporation or other entity. KindHearts was certified by the Internal Revenue Service as a 501(c)(3) tax exempt organization in October 2002.

21.     KindHearts was headquartered in Toledo, Ohio. It provided individuals with the ability to provide charitable support in a manner that would fully comply with the law. Opened after several other Muslim charities were shut down in 2001, KindHearts' officers and board took careful measures to ensure that it abided by Treasury Department guidelines and all federal and state laws. KindHearts reviewed potential charitable recipients and partners against OFAC's list of designated terrorists, adopted the Treasury Department's "Voluntary Guidelines" to ensure full compliance, and sought guidance directly from the Treasury Department regarding its activities. From its incorporation through early 2006, KindHearts provided millions of dollars of humanitarian aid, principally directed towards assisting needy Palestinians in the West Bank, Gaza, and refugee camps in Lebanon. In its final year, it also raised substantial amounts of money for earthquake relief in Pakistan. KindHearts also supported relief efforts in the United States

after Hurricane Katrina, and in many other parts of the world.  It divided its aid roughly into five

categories:  (1) Sponsorship, in which donors in the United States would undertake to provide

regular donations to poverty-stricken families and individuals abroad; (2) Emergency and Health,

including running health clinics in the West Bank and Gaza and responding to earthquakes,

tsunamis, and other natural disasters; (3) Eid and Seasonal, which involved providing gifts of

food, clothing and toys to poor families around the Muslim holiday of "Eid," when gifts were

traditionally given to children; (4) Education and Development, which included providing needy

schoolchildren with uniforms and backpacks, and running summer camps; and (5) General

Sadaqah, which encompassed general charitable support, and included emergency aid.

  22.  KindHearts provided clean drinking water to schools, hospitals, and a clinic for the

mentally disadvantaged in Gaza, ran a center for deaf and mute children in Lebanon, provided

food packages during Ramadan to needy families, and delivered meat to families and gifts of

clothes and toys to children during Eid.  It also provided disaster relief after the tsunami in

Indonesia. In its last year, before OFAC blocked its assets and the government seized its assets

and documents, KindHearts was planning to build a hospital in Gaza, to open in January 2007.

  23.  KindHearts' assistance was provided to the poor and needy without regard to

political affiliation or belief.  It identified recipients based on need alone, not ideology or

association.  And it generally provided in-kind aid to the needy, rather than in cash, to ensure that

its resources were in fact used for charitable humanitarian purposes.  The principal exception to

the in-kind distribution was the needy family and orphan sponsorship program, which let people in

the United States sponsor a needy child or family in Palestine or Lebanon, and provided

approximately $50 a month to that person.  Other than that program, KindHearts' aid was

Complaint – Page 9

virtually always distributed in-kind.

24.    KindHearts took extraordinary care not to fund any designated entities or otherwise violate federal regulations and laws regarding designated terrorists. On January 2003, the Board discussed the need to ensure that its office in Gaza was kept fully informed as to the Board's decisions regarding the Treasury Department's Voluntary Guidelines. The Board continued discussing the implementation of these Voluntary Guidelines at its June 2003 meeting, and confirmed that the Gaza office had a copy of the guidelines. The Board's directive to comply with the Voluntary Guidelines was renewed at the December 2003 board meeting. The Board specified that Dr. Mohammed Elhady, a Board member, "must be informed of any associations, individuals, names, entities, etc., which KindHearts wishes to do business with so that he can thoroughly search the relevant web sites of prohibited entities from the U.S. Government," since "all such entities, including partnerships, must be thoroughly investigated." The Palestine office "confirmed [to the Board] that it had been carefully and fully implementing the voluntary guidelines established by the U.S. government."

25.    KindHearts' general counsel, Jihad Smaili, drafted a memo for KindHearts on Best Practices Guidelines (Nov. 25, 2002), which was designed to ensure that KindHearts would "fully comply with the Voluntary Best Practices Guidelines." This memo stated that KindHearts will "support nonpolitical agendas and will only support humanitarian and charitable efforts," and requires strict recordkeeping and a general ban on aid in the form of cash disbursements. The memo required that each recipient be checked against the federal government's list of designated terrorists to ensure that no support went to proscribed recipients. KindHearts' Employee Handbook specifically instructed all employees to "take great care in carefully reading and

Complaint – Page 10

instituting the following guidelines and policies, *especially the Voluntary Guidelines Memorandum authored by KCHD's Attorney,* Mr. Jihad M. Smaili." When the Treasury Department revised its voluntary guidelines in 2005, KindHearts' attorney drafted another memo for all KindHearts personnel on "Compliance with Treasury Department Voluntary Guidelines" (Dec. 12, 2005), adopting these voluntary guidelines as mandatory for KindHearts.

26.     KindHearts rejected proposals from organizations and entities that had political affiliations or otherwise would be unsuitable for charitable donations. On November 3, 2003, KindHearts rejected a proposal from an association on the ground that it "may have affiliations with a political party. Therefore, it is highly advisable not to conduct work with them." On April 29, 2003, KindHearts rejected a proposal from El-Wafa Rehabilitation Hospital because "it is similar to the association in Rafah regarding its political roots," and on April 17, 2003, KindHearts rejected a proposal from the Islamic Association, Rafah Branch, to sponsor a children's library or computer laboratory, after checking the OFAC lists, on the ground that it is "KH policy not to deal directly with any organization that has explicit political affiliation or direction."

27.     Other controls were put in place to ensure that funding did not reach proscribed recipients. The Board gave the Chief Executive Officer, Khaled Smaili, authority to make disbursements of up to $5,000 in accordance with KindHearts' mission, but required all such transactions to be reported to the Treasurer. Under the Bylaws, Art. IV, § 2, any disbursements greater than $5,000 required approval of the Executive Committee of the Board. The power of attorney provided to the head of KindHearts' office in Gaza, Ghalib Abushaban, specifically provided that he shall not support in any way any entity or individual listed as designated on

Complaint – Page 11

OFAC's website.

28.    In January 2004, when the KindHearts Board received unconfirmed reports that Mahir Sabra, an employee, was allegedly associated with Hamas, the Board conducted an investigation and interviewed Mr. Sabra. Although Mr. Sabra denied the allegations, and the Board was unable to obtain further corroboration, the Board decided on January 18, 2004, that Mr. Sabra should resign his employment with KindHearts, and further decided that "a full investigation on the background of all board members, employees, and the like should be conducted in order to ensure that KindHearts' non-political humanitarian goals and ideals are preserved."

29.    KindHearts raised funds in part by hiring independent contractors as fundraisers, on a commission basis. The contracts made clear that the fundraisers had no control over KindHearts' decisions as to the use of funds raised, and the fundraisers were expressly directed to raise funds only for projects formally approved by KindHearts itself.

30.    On February 28, 2004, KindHearts offered to cooperate fully with the U.S. Senate Finance Committee when it learned that this committee was going to investigate Muslim charities. After nearly two years, the Senate Finance Committee announced that it was taking "no public action."

### The Government's Blocking and Seizure of KindHearts' Assets

31.    On Sunday, February 19, 2006, OFAC announced that "all property and interests in property" of KindHearts "are blocked pending investigation into whether Kindhearts is subject to designation pursuant to Executive Order 13224 (66 FR 49079) ... for being controlled by, acting for or on behalf of, assisting in or providing financial or material support to, and/or

otherwise being associated with Hamas." Other than this unsupported assertion regarding

unspecified support to or association with Hamas, OFAC provided no statement of reasons, no

evidence, and no findings in support of this blocking order. OFAC issued a press release stating

that "although the entity is not now an SDGT, its name has been integrated into OFAC's SDN list

with the descriptor "BPI-PA" to indicate that all of its property and interests in property are

currently blocked." That same day federal agents conducted a search of the Toledo office of

KindHearts, and of the residence of Khaled Smaili, and removed all of KindHearts' records,

computers, and a number of boxes of publications and documents. OFAC blocked all the funds of

KindHearts, including about $1 million in bank accounts.

32.      The week before the blocking and seizure of KindHearts' assets, the U.S.

Department of Justice obtained two grand jury subpoenas from the U.S. District Court for the

Northern District of Ohio. These subpoenas commanded (1) Ernst & Young (the outside

accountant for KindHearts) to produce documents relating to KindHearts, including those from

its office in Gaza, Palestine (Feb. 15, 2006), and (2) Dr. Hatem Elhady to produce all records of

KindHearts from January 1, 2002 through the present (Feb. 17, 2006).

33.      On February 24, 2006, Jihad Smaili, the outside counsel for KindHearts, wrote to

OFAC to request information on paying the wages owed to KindHearts' employees, inquiring as

to the status of KindHearts' offices in Palestine and Lebanon, requesting that the frozen donations

be conveyed to the Pakistani earthquake relief efforts pursuant to the donors' intent, and

requesting information on payment of attorneys' fees. Mr. Smaili sent two follow-up letters on

March 1, 2006 and March 9, 2006. In the March 1 letter, he submitted a license application for

the release of funds for employee compensation and legal counsel, and further requested

information on the donations received through KindHearts' website subsequent to the blocking and through the postal mail. In the March 9 letter, he renewed his request for the release of funds, and emphasized that "KindHearts *has no source of funding whatsoever* after its accounts were frozen and there are *no prospects* for raising any funds for legal representation" (emphasis in original).

34.     On March 23, 2006, OFAC responded to Mr. Smaili. It issued a license authorizing Mr. Smaili to provide legal services to KindHearts, but OFAC Acting Director Barbara Hammerle stated that "your request to be paid for legal services from blocked funds is therefore denied at this time," and that KindHearts could only make payments for legal services if those payments did "not originate from a source within the United States or within the possession or control of a U.S. person, including its overseas branches, and must not be made from a blocked account or blocked property." OFAC stated that KindHearts could set up "legal defense funds to enable the channeling of non-blocked funds from U.S. persons for the purpose of supporting legal representation." OFAC recognized that if KindHearts "is unable to raise sufficient [overseas] funds pursuant to the attached license or through a licensed legal defense fund, OFAC will consider other licensing options … [which] might include authorization for KindHearts' access to its own blocked *overseas* property to pay for legal services" (emphasis added).

35.     OFAC has in the past allowed the use of blocked funds to pay attorneys fees in similar cases brought by other designated entities. KindHearts has not been able to raise sufficient funds to pay for its legal defense, and as a result, it has not been able to pay its attorneys.

36.     On March 27, 2006, Mr. Smaili wrote to OFAC Acting Director Hammerle, reiterating that since KindHearts had no prospect of raising funds, the OFAC License was useless,

Complaint – Page 14

and requested again that KindHearts be permitted to pay for its legal defense out of its own frozen funds.

37.     On April 24, 2006, Mr. Smaili wrote to OFAC Acting Director Hammerle, to request that KindHearts "be delisted from the SDGT List (Pending Investigation)," since over two months had passed since the government blocked its assets and closed its office, yet "not one single official factual allegation has been levied against KindHearts by any governmental entity." Mr. Smaili reiterated his request that KindHearts be allowed "to utilize its own resources to present a defense," and OFAC's refusal was contrary to "due process," since KindHearts, as a domestic corporation, was a constitutional person "entitled to due process." OFAC did not even respond to this letter until more than one year later.

38.     Meanwhile, on May 24, 2006, OFAC Acting Director Hammerle responded to Mr. Smaili's March 27 letter. Ms. Hammerle stated that KindHearts' "request to be paid for legal services from blocked funds continues to be denied at this time," since KindHearts had not submitted a request to establish a legal defense fund or submitted a report of all its property and property interests. Shortly thereafter, Mr. Smaili informed OFAC that he was withdrawing his representation of KindHearts.

39.     On June 23, 2006, Lynne Bernabei of The Bernabei Law Firm, PLLC (Washington, D.C.) (now Bernabei & Wachtel, PLLC), wrote to OFAC to request that OFAC issue a license to her law firm to allow it to represent KindHearts in the government investigations and blocking of its assets, and to authorize KindHearts to pay its legal fees and expenses.

40.     On July 17, 2006, OFAC issued a license (No. SDGT-651) to The Bernabei Law Firm to allow it to provide legal services to KindHearts and to receive payment for those services,

Complaint – Page 15

but stipulated that payments "must not originate from a source within the United States or within

the possession or control of a U.S. person, including its overseas branches."

41.     On July 27, 2006, David D. Cole, of the Georgetown University Law Center

(Washington, D.C.), wrote to OFAC Acting Director Hammerle to request a license to represent

KindHearts "in any challenge it may bring to the freezing of its assets or to its designation."  As

OFAC did not respond, Mr. Cole renewed his request on September 29, 2006.

42.     On August 14, 2006, the U.S. Attorney's Office, Department of Justice, obtained

two grand jury subpoenas, issued to Dr. Elhady and to KindHearts, requesting "all documents,

records or information, in any form ... located within the United States or its territories and in the

care[,] custody or control of KindHearts ... (an OFAC blocked entity)."

43.     On October 20, 2006, OFAC modified OFAC License No. SDGT-651, issued to

The Bernabei Law Firm, PLLC.  The amended license, No. SDGT-651a, included a new

provision that KindHearts could use its overseas assets, if any, to pay for its legal expenses.  The

license was renewed on December 20, 2007, and expires on December 31, 2009.

44.     Also on October 20, 2006, OFAC issued license No. SDGT-673 to David D. Cole,

to provide legal services to KindHearts, and to be paid from those services, but stipulated that

payments could come only from overseas, either from non-blocked sources, or from KindHearts'

own overseas funds, if any.  In fact, KindHearts has no existing overseas funds that it knows of.

45.     On November 29, 2006, KindHearts' counsel wrote to OFAC to request a copy of

the full administrative record being used by OFAC in its investigation of KindHearts.

46.     On December 5, 2006, KindHearts' counsel provided OFAC with a statement by

Dr. Elhady, pursuant to OFAC's request under 31 C.F.R. 501.603, as to KindHearts' property

and assets. Dr. Elhady provided the names and addresses of the two banks in Toledo in which KindHearts had accounts. Dr. Elhady stated that he had no personal knowledge of the names of the banks that were used by the KindHearts offices in Lebanon and Palestine, let alone any ability to determine if those bank accounts still had assets. He stated that he believed, to the best of his knowledge, that after KindHearts was blocked, "the resources of the affiliates dissipated," and that the organizations that received funds from KindHearts would have expended those funds.

47. On May 25, 2007, thirteen months after Mr. Smaili sent his April 24, 2006 letter requesting reconsideration of OFAC's decision to block KindHearts' property pending investigation, OFAC Director Szubin finally responded. Mr. Szubin stated that "OFAC has completed its investigation into whether KindHearts should be designated as an SDGT and has provisionally determined that designation is appropriate." A "provisional" determination to designate has no legal effect, and KindHearts continues to this day to have its assets frozen "pending investigation," as it has not been designated.

48. With his May 25, 2007 letter, Mr. Szubin provided KindHearts' counsel with thirty-five "unclassified and non-privileged documents upon which OFAC relied in reaching this provisional determination." Mr. Szubin also stated that "OFAC also relied upon other classified and privileged documents obtained to date which are not authorized for disclosure, including material obtained or derived pursuant to the Foreign Intelligence Surveillance Act, 50 U.S.C. § 1801 *et seq.*" Although OFAC had had over fifteen months to review the documents and computers seized on February 19, 2006, and KindHearts had no access to the seized material in that period, and still had no access to its own seized documents, OFAC allowed KindHearts only thirty days to submit its response to OFAC's production of the administrative record.

Complaint – Page 17

49.     Only a few of the documents that OFAC disclosed to KindHearts actually
mentioned KindHearts.  They included several OFAC and Department of Justice press releases
relating to other individuals and entities, two criminal indictments that made no mention of
KindHearts, several court decisions that did not mention KindHearts, and several newspaper
articles.  The OFAC documents also included KindHearts' organizational documents, and various
contracts or agreements that KindHearts had entered into relating to fundraising on behalf of
KindHearts, or to the distribution of KindHearts donations for humanitarian purposes.  Nothing in
the unclassified administrative record provides any evidence that KindHearts has done anything
that would warrant designation under E.O. 13224.

50.     OFAC's May 25, 2007 disclosure also included a three-page "Unclassified
Summary" that made various allegations regarding support KindHearts allegedly provided to
Hamas in Lebanon.  However, this summary contains no indication of the source or sources of the
information, or any information as to the reliability of those source or sources, making it virtually
impossible to respond to in a meaningful way.  For example, the "Unclassified Summary"
purported to describe in a general way several oral communications, but did not provide the
transcripts or notes of those communications, their date and locality, or the identity of all parties
to those communications.  The "Unclassified Summary" stated that a KindHearts official in
Lebanon had sent funds to Hamas, but provided insufficient details to enable a meaningful
response.  The summary stated that one of KindHearts' officials had been indicted for his
involvement with the Holy Land Foundation from 1998 to 2000, but failed to note that the
conduct in question predated KindHearts' existence.  The "Unclassified Summary" stated that
KindHearts had transferred funds to Lebanon through the Sanabil Association, an SDGT, but

failed to note that the transfer in question occurred before the Sanabil Association was designated

in August 2003. The "Unclassified Summary" noted that Mohammed El-Mezain, an independent

contractor fundraiser for KindHearts, was indicted for his work with the Holy Land Foundation in

the late 1990's, long before KindHearts was founded, and that he allegedly made statements about

supporting Hamas at a fundraiser, but failed to acknowledge that KindHearts had terminated Mr.

El-Mezain upon learning of his indictment, or that under KindHearts' contracts, independent

contractor fundraisers had no authority to determine how money was used. OFAC had not

submitted the classified materials to a declassification review to determine whether they were still

properly classified. Nor did it respond to KindHearts' counsel's request that they be permitted to

review any classified evidence subject to appropriate security clearances.

     51.     On June 14, 2007, KindHearts' counsel wrote to OFAC to renew the November

29, 2006 request for "the full administrative record, both classified and unclassified, used by

[OFAC] as a basis for designating KindHearts." KindHearts' counsel also requested "a full set of

the records that were seized by the U.S. government … in February 2006," noting that "since

OFAC included some of these documents in the administrative record, it is clear that OFAC has

had access to all the seized documents." Counsel explained that it would deprive KindHearts "of

its due process rights to allow OFAC to use only those documents that it believes supports the

agency's position, while preventing KindHearts from using its own documents, to which it no

longer has access, to rebut OFAC's designation." Counsel also requested an extension of time to

respond to OFAC's unclassified submission, since "the allegations made in OFAC's unclassified

summary are of such a general nature that KindHearts is obliged to do substantial work to attempt

to respond meaningfully." OFAC did not respond to KindHearts' request for an extension of time

until the late afternoon of June 25, 2007, the date the response was due. By that time, KindHearts had already couriered its response to OFAC.

52. Since OFAC did not timely respond to KindHearts' request for an extension of time, KindHearts' counsel submitted a 28-page preliminary response on June 25, 2007. In its preliminary response, KindHearts' counsel opposed the designation on both legal and factual grounds. In summary, as to the legal grounds, KindHearts objected on the grounds that OFAC failed to provide KindHearts with the constitutionally required notice and opportunity to respond, since OFAC improperly relied on classified evidence and unreliable hearsay, and that OFAC failed to submit the classified evidence for a declassification review or to grant a security clearance to KindHearts' counsel. KindHearts objected that the "unclassified summary" was vague and conclusory, and failed to provide sufficient information to enable a meaningful response. Counsel also objected that OFAC had not included any specific charges, or even provided notice as to which of the various provisions of E.O. 13224 it alleged KindHearts had violated. KindHearts also objected that OFAC's failure to provide KindHearts with a copy of its seized documents improperly forced KindHearts to defend itself without access to its own records, and objected to OFAC's restrictions on its ability to spend its own funds in its defense.

53. KindHearts' counsel then attempted to address the unclassified administrative record. As a threshold matter, counsel noted that most of the documents made no reference to KindHearts and/or involved events that predated KindHearts' formation. KindHearts' counsel discussed the relatively few documents that did mention KindHearts, noting that most of them did not evidence any illegal or unauthorized activities. The one document that could be so construed actually involved attempts by a former KindHearts employee to divert KindHearts funds, and

Complaint – Page 20

KindHearts' vigorous response to ensure that its operations were legally conducted. KindHearts' counsel then discussed the "Unclassified Summary," and explained how OFAC had misconstrued, or taken out of context, the aforementioned limited contractual interactions that KindHearts had with the Sanabil Association before it was designated, and with El-Mezain before he was indicted. The remaining allegations in the "Unclassified Summary" pertained to evidence about other organizations, some of which were closed before KindHearts was formed. None of the allegations showed that KindHearts had any prohibited transactions or relationships with those organizations.

54.     On June 27, 2007, KindHearts' counsel wrote to Brain Wilson of OFAC, in response to his telephone call on the late afternoon of June 25, 2007, in which Mr. Wilson had stated that OFAC would grant the extension of time, and that OFAC would respond to the other matters raised in KindHearts' counsel's June 14, 2007 letter. In the June 27 letter, counsel renewed their requests for: (1) the full administrative record, both classified and unclassified; (2) a full set of the records seized from the KindHearts office and from the residence of Khaled Smaili, its President; and (3) for OFAC to submit all classified evidence to declassification review and provide KindHearts' counsel with a security clearance so that they could review the classified documents.

55.     On July 13, 2007, KindHearts' counsel renewed the request that KindHearts, its officers, and its attorneys, be provided with full access to the records, documents, and computers that were seized during the February 19, 2006 searches of the Toledo office and Khaled Smaili's residence, so that it could use them to defend itself. KindHearts' counsel also advised OFAC that in order for KindHearts to defend itself, it would be necessary to interview former KindHearts

Complaint – Page 21

employees and to ask them to search their own records for any documents that might assist in KindHearts' defense. KindHearts employees had expressed concern that such cooperation might be viewed as prohibited support to KindHearts, so counsel asked OFAC for assurance that former KindHearts employees and officers had the right to assist in KindHearts' defense without fearing retribution or prosecution from the federal government.

56.     On July 27, 2007, KindHearts' counsel followed up by asking OFAC if its failure to respond to KindHearts' meant that OFAC had consented to former KindHearts employees and officers assisting in KindHearts' defense. KindHearts' counsel also complained that OFAC's failure to respond to its June 14 and June 27 letters precluded KindHearts from having a meaningful opportunity to provide a full response by August 15, 2007 to OFAC's administrative record. KindHearts' counsel renewed the requests for a specification of the charges against KindHearts, and a specification of the specific provisions in the Executive Order or any other regulation that OFAC was considering as a basis for designating KindHearts.

57.     On August 10, 2007, OFAC Acting Director Hammerle belatedly responded to KindHearts' counsel's letters of June 14 and 27, 2007. OFAC stated, for the first time, that it would submit the classified information in the administrative record to the originating agencies for a declassification review. OFAC denied KindHearts' request for security clearances for its counsel. OFAC postponed any response to KindHearts' request for a full set of the seized documents. OFAC did not provide any specification of the charges or alleged violations of E.O. 13224, and did not address the remaining issues raised in the June 14 and 27, 2007 letters.

58.     On August 13, 2007, KindHearts' counsel responded, noting that OFAC had still not addressed KindHearts' repeated requests for a specification of the charges against it. Counsel

Complaint – Page 22

also requested that, given the unknown duration of the declassification review, KindHearts be given an extension of time of 45 days until after the declassification review was completed to provide any supplemental response to OFAC's public administrative record.

59.    On August 14, 2007, OFAC Associate Director John Smith responded to the July 13 and July 27 letters from KindHearts counsel, but only addressed the access to document issue raised in those letters, and did not address the remaining issues.  Mr. Smith claimed that OFAC had only those documents that had been produced to KindHearts, and stated that the U.S. Attorney's office had the remaining documents.  He therefore directed KindHearts to contact the U.S. Attorney directly.

60.    On August 16, 2007, OFAC Associate Director Smith responded to the July 27, 2007 letter with respect to the ability of KindHearts' counsel to interview former employees and obtain their documents.  Mr. Smith stated that any such documents "are considered blocked property," which would require a separate OFAC license, and that all such documents would have to be identified to OFAC with information on "the owner, the property, its location, any reference necessary to identify the property. . . ."

61.    On August 17, 2007, KindHearts' counsel requested, from the U.S. Attorney's Office for the Northern District of Ohio, a copy of the documents and files, including those in electronic format, that were seized in February 2006 from the KindHearts office in Toledo and from Khaled Smaili's residence.

62.    On September 7, 2007, KindHearts' counsel wrote to OFAC Acting Director Hammerle to confirm that OFAC had provided KindHearts with an oral extension of time to respond to OFAC's provisional determination to designate KindHearts, granting KindHearts

thirty days to respond after receiving the results of the pending declassification review.

      63.    On September 7, 2007, KindHearts' counsel renewed the request to the U.S. Attorney's Office for a copy of the seized documents.

      64.    On September 11, 2007, Assistant U.S. Attorney Moroney responded to KindHearts' counsel's August 17, 2007 and September 7, 2007 letters requesting access to the seized documents.  AUSA Moroney stated that the evidence was seized pursuant to a search warrant, and that his office would deny the request for a copy of the seized documents.  AUSA Moroney stated that the documents could only be released to counsel of record in the criminal investigation, not to civil attorneys, and that KindHearts "is a target of the criminal investigation," and access to seized information would not be provided before an indictment to a target or a target's counsel.  Although AUSA Moroney stated that KindHearts could file a Rule 41(g) motion for return of property, he added his office would oppose that motion, and claimed that KindHearts could not show that it had been "aggrieved ... by the deprivation of property."

      65.    On October 26, 2007, KindHearts' counsel wrote to OFAC to object to its requirement that any interviews by counsel of former KindHearts employees would require both KindHearts counsel and the former employees to identify to OFAC all KindHearts documents in their possession.  Counsel wrote that this demand (1) impermissibly interfered with KindHearts' due process right to a meaningful defense by restricting the ability as lawyers to represent KindHearts since it creates a conflict of interest in making KindHearts' counsel agents for the government; (2) violated the Fifth Amendment privilege against self-incrimination; and (3) improperly sought to use the OFAC proceeding to obtain discovery for a parallel criminal proceeding.

66.     Since OFAC did not respond to KindHearts' counsel's October 26, 2007 letter, counsel wrote anew to OFAC on December 20, 2007, to renew the request that OFAC rescind its demand that KindHearts' counsel identify all documents in the possession of former KindHearts employees.

67.     On December 26, 2007, OFAC issued License NO. SDGT-899 to Bernabei & Wachtel, PLLC, to allow it "to receive copies of blocked documents and records (the 'Blocked Property') of KindHearts … including from former officers and employees of KindHearts necessary to provide legal services to KindHearts…"  In an accompanying cover letter, OFAC Associate Director Smith stated that "only blocked property *of* KindHearts—and not, as you claim, any documents in the possession of former officers and employees … is subject to the reporting requirement," and asserted that KindHearts was not required to "describe the contents of any blocked documents or records" or "to identify the source from which you obtained the documents."  However, OFAC did not explain how it would determine whether a document was an individual's property or the property of KindHearts, who would make that determination, or whether documents with unclear provenance were required to be identified or produced to OFAC.

68.     On April 11, 2008, AUSA Duncan Brown of the U.S. Attorneys' Office for the Northern District of Ohio provided KindHearts' counsel with a DVD containing "materials concerning the designation of KindHearts … as a Specially Designated Terrorist Organization," including "the paper documents seized pursuant to a 2006 search warrant of KindHearts' offices located at 245 West Central Avenue, Toledo, Ohio," and a copy of a protective order issued by Magistrate Judge Vernelis K. Armstrong.  That Protective Order, *In re* Search of KindHearts for

Complaint – Page 25

<u>Charitable Humanitarian Development</u>, No. 3:06 MJ 7019 (N.D. Ohio Apr. 9, 2008), expressly

stated that the "materials may be viewed only by KindHearts' counsel and such members of its

staff" and that "Members and officers of KindHearts shall not under any circumstances be

permitted to access or view any of the materials without petition to and further order of the

Court; however, members and officers of KindHearts may access and view non-image data

pertaining to the materials for the purpose of assisting in the preparation of their defense in the

designation proceeding in the presence of counsel and under the direct supervision and control of

counsel." The Protective Order prohibited even printing out the documents or any electronic

copying of the documents.

69. Neither the April 9, 2008 protective order nor AUSA Brown's April 11, 2008

letter made any mention of the documents seized during the search of Khaled Smaili's residence,

and did not indicate whether all electronic files, or only paper documents, were included in the

production of materials seized from the KindHearts office in Toledo.

70. On April 17, 2008, KindHearts' counsel wrote to AUSA Brown, in response to

the April 11 letter and April 9 Protective Order. Counsel explained that the terms of the

Protective Order made it impossible for all of KindHearts' counsel to review the materials and for

KindHearts' members and officers to assist in the defense. KindHearts' counsel and former

officers are scattered among several states and three countries (the United States, the United

Kingdom, and Lebanon), thus requiring significant travel by both counsel and clients to review the

materials, some of which are in Arabic, and many of which pertain to financial and organizational

activities that would require the clients to review in order for counsel to understand their

significance. Counsel stated that it would be necessary for counsel to have KindHearts

Complaint – Page 26

employees, board members, and officers review the documents themselves to explain their meaning and significance. Further, counsel stated there is no basis to continue denying KindHearts full access to its own documents, particularly where the government already has had exclusive access to those documents for over two years, and KindHearts had still not been found to have engaged in any wrongdoing.

71.     In April 2008, the U.S. Department of State notified Khaled Smaili, who had returned with his family to his ancestral home in Lebanon, that his U.S. passport was revoked pursuant to 22 U.S.C. § 212 and 22 C.F.R. § 51.62, which provide for the revocation of passports when, for example, a grand jury has issued a subpoena to the passport holder. The passport revocation prevents him from leaving Lebanon.

72.     On April 24, 2008, AUSA Brown responded to KindHearts' counsel's April 17 letter regarding the scope of the Protective Order governing the use of the DVD containing scanned images of the documents seized from KindHearts' Toledo office. AUSA Brown stated that the government would "not agree to any modification of the terms of the protective order," notwithstanding "the logistics of having Dr. Elhady in Toledo and officers of KindHearts outside the United States." AUSA Brown claimed that counsel would already have discussed all the relevant documents with Dr. Elhady, even though neither KindHearts' counsel nor Dr. Elhady had access to those documents in the intervening two years. AUSA Brown concluded his letter by stating that "I look forward to proceeding with the OFAC designation proceeding without undue delay."

73.     On June 4, 2008, OFAC Associate Director Smith advised KindHearts' counsel of OFAC's new policy "to authorize the release of a limited amount of blocked funds for the

Complaint – Page 27

payment of legal fees and costs." That policy limits payment for services to "only two attorneys for KindHearts," and limits the payment to "$7,000 per attorney, for up to two attorneys, for the administrative stage of the proceeding," and accords OFAC the final say as to whether KindHearts can be reimbursed from its own funds for its attorneys' fees and expenses.

74.    On June 5, 2008, Fritz Byers, Esquire, an attorney in Toledo, Ohio, requested a license from OFAC to serve as local counsel for KindHearts. OFAC issued License No. SDGT-1000 to Mr. Byers on June 26, 2008; this license expires on June 30, 2010.

75.    On June 25, 2008, AUSA Brown wrote to KindHearts' counsel, to "clarify" his April 24, 2008 letter, by asserting that "the former directors and officers of KindHearts are allowed to view the DVDs' contents in the presence of counsel." However, AUSA Brown did not explain how his letter could contravene the clear terms of the Court's Protective Order, which expressly forbids such conduct absent a petition to the Court and modification of the Protective Order.

76.    On July 16, 2008, OFAC Assistant Director Smith issued Amended License No. SDGT-899a to Bernabei & Wachtel, PLLC. This license previously authorized KindHearts' counsel to receive copies of blocked documents and records ("blocked property") from current or former KindHearts officers and employees. The Amended License has a new provision that permits "the current or former officers or employees of KindHearts to review the Blocked Property [seized documents] in connection with the Licensees' representation of KindHearts," and provides that any such review "take place under the supervision of representatives of the Licensees." However, Mr. Smith's cover letter admitted that OFAC's Amended License "does not excuse compliance with any other laws, regulations, or court orders that may govern the

Complaint – Page 28

handling of the blocked documents in Licensees' protection," and that "the appropriate forum in which to address such concerns is the United States Attorney's Office or the Court that issued the Order," thereby conceding that OFAC's Amended License had no effect absent modification of the Protective Order by the Court.

77.     In August and September 2008, AUSA Brown and/or AUSA Moroney filed two motions with the U.S. District Court for the Northern District of Ohio, in the search warrant proceeding, No. 3:06-MJ-07019-VKA. According to the Court's docket, Magistrate Judge Vernelis Armstrong granted the first motion on August 4, 2008 (the same day it was filed), whereupon the government filed a second motion later that same day, and the court issued its ruling on that motion on September 18, 2008.

### IRREPARABLE INJURY

78.     Thus far, OFAC has not designated KindHearts as a "Specially Designated Global Terrorist." If KindHearts is so designated, the designation will do irreparable harm to its reputation, and therefore to its ability to function as a charitable institution. A charity's most valuable asset is its reputation, as it depends on trust to give its donors confidence that their donations will be used properly. To be officially designated as a "Specially Designated Global Terrorist" would do irreparable damage to KindHearts, damage that could not be fully repaired even if the designation were subsequently successfully challenged and lifted.

79.     Because KindHearts' assets remain frozen, defendants' interests will not be harmed by an injunction barring designation of KindHearts until it has been afforded both specification of the charges against it and a meaningful opportunity to respond.

**COUNT I     THE FREEZING OF KINDHEARTS' ASSETS VIOLATED ITS
                    FIRST AND FIFTH AMENDMENT RIGHTS BECAUSE THERE**

Complaint – Page 29

**ARE NO SUBSTANTIVE CRITERIA FOR FREEZING ASSETS PENDING INVESTIGATION.**

80.     Plaintiff incorporates as though fully restated herein each of the allegations stated in paragraphs 1 through 79, above.

81.     The statutory provision authorizing freezing of assets pending investigation sets forth no substantive criteria for such action. It leaves the freezing decision to the unfettered discretion of OFAC, and is unconstitutionally vague on its face and as applied to KindHearts, and therefore violates its First and Fifth Amendment rights.

**COUNT II     THE FREEZING OF KINDHEARTS' ASSETS PENDING INVESTIGATION VIOLATED ITS FIFTH AMENDMENT RIGHT TO DUE PROCESS.**

82.     Plaintiff hereby incorporates as though restated each of the allegations in paragraphs 1 through 81, above.

83.     Defendants violated KindHearts' Fifth Amendment due process rights by, *inter alia*, failing to provide KindHearts with adequate notice of the basis for the freeze or a meaningful opportunity to challenge it, failing to provide for an administrative hearing and a prompt judicial determination of the legality of the freeze, failing to provide a statement of reasons, failing to provide any finding of wrongdoing, failing to impose any time limit on the freeze, failing to specify any substantive criteria for the decision to freeze, and imposing unreasonable restrictions on KindHearts' access to its own seized records, which were essential to KindHearts' defense, and imposing unreasonable restrictions on the ability of KindHearts' counsel to obtain evidence for its defense from third parties.

**COUNT III   THE FREEZING OF KINDHEARTS' ASSETS WITHOUT REASONABLE SUSPICION, PROBABLE CAUSE, OR A WARRANT VIOLATED THE FOURTH AMENDMENT.**

Complaint – Page 30

84.     Plaintiffs hereby incorporate as though restated each of the allegations in paragraphs 1 through 83, above.

85.     The freezing of KindHearts' assets for more than 31 months without reasonable suspicion, probable cause, or a warrant constitutes an unreasonable seizure, in violation of the Fourth Amendment of the United States Constitution.

**COUNT IV     THE THREATENED DESIGNATION OF KINDHEARTS VIOLATES ITS FIRST AND FIFTH AMENDMENT RIGHTS BECAUSE THE DESIGNATION AUTHORITY AND THE CRITERIA FOR DESIGNATION ARE UNCONSTITUTIONALLY VAGUE.**

86.     Plaintiff incorporates as though fully restated herein each of the allegations stated in paragraphs 1 through 85, above.

87.     The designation authority under both IEEPA and Executive Order 13,224 is unconstitutionally vague on its face and as applied to KindHearts, in violation of the First and Fifth Amendments because it does not define such critical terms as "terrorist organizations," "specially designated global terrorists," or any other term relating to "terrorism."

88.     At the time KindHearts was provisionally designated, Executive Order 13,224 allowed the designation of groups based on findings that they were "otherwise associated" with other designated entities, or had provided "material support" or "services" to designated entities, without regard to the character or intent of the association or support.  These terms are unconstitutionally vague on their face and as applied to KindHearts, and therefore violate its First and Fifth Amendment rights.

**COUNT V     THE THREATENED DESIGNATION OF KINDHEARTS VIOLATES ITS FIFTH AMENDMENT RIGHT TO DUE PROCESS AND IS ARBITRARY AND CAPRICIOUS**

Complaint – Page 31

89.     Plaintiff hereby incorporates as though restated each of the allegations in paragraphs 1 through 88, above.

90.     Defendants violated KindHearts' Fifth Amendment due process rights by, *inter alia*, failing to provide KindHearts with adequate notice of the legal and factual basis for the threatened designation or a meaningful opportunity to challenge it even though defendants' investigation has been completed for close to seventeen months, failing to explain its assessment of its own administrative record materials, relying almost exclusively on classified evidence that affords KindHearts no meaningful opportunity to respond, failing to respond to KindHearts' requests for reconsideration, imposing unreasonable restrictions on KindHearts' access to its own seized records, which are essential to KindHearts' defense, and imposing unreasonable restrictions on the ability of KindHearts' counsel to conduct any investigation.

### COUNT VI    OFAC'S RESTRICTIONS ON KINDHEARTS' USE OF ITS OWN ASSETS FOR ITS LEGAL DEFENSE VIOLATES DUE PROCESS AND IS ARBITRARY AND CAPRICIOUS.

91.     Plaintiff incorporates as though fully restated herein each of the allegations stated in paragraphs 1 through 90, above.

92.     OFAC's restrictions on KindHearts' ability to use its own assets in its own defense in connection with OFAC's freeze and threatened designation violates KindHearts' Fifth Amendment due process rights and is arbitrary, capricious, and otherwise not in accordance with the law under the Administrative Procedures Act, 5 U.S.C. § 551, et seq.

### COUNT VII   THE FREEZING OF KINDHEARTS' ASSETS AND THE THREATENED DESIGNATION ARE NOT AUTHORIZED BY STATUTE.

93.     Plaintiffs hereby incorporate as though restated each of the allegations in

Complaint – Page 32

paragraphs 1 through 92, above.

94.  IEEPA authorizes the President to freeze assets only of foreign nationals in conjunction with an economic sanction on a foreign country. E.O. 13224 imposes sanctions on individuals and organizations irrespective of any connection to any targeted foreign country, and therefore is unauthorized by IEEPA. KindHearts' freeze pending an investigation of whether it should be designated and its threatened designation under E.O. 13224 are unauthorized by statute.

### COUNT VIII THE FREEZING OF KINDHEARTS' ASSETS PENDING INVESTIGATION AND THE THREATENED DESIGNATION ARE UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND ARE ARBITRARY AND CAPRICIOUS.

95.  Plaintiffs incorporate as though fully restated herein each of the allegations stated in paragraphs 1 through 94, above.

96.  Defendants' freezing of KindHearts' assets pending investigation and its threatened designation of KindHearts are unsupported by substantial evidence, arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of the Administrative Procedure Act, 5 U.S.C. § 701, et seq., IEEPA, 50 U.S.C. § 1701(a), and E.O. 13,224, because OFAC did not have sufficient evidence to warrant such action.

### REQUESTED RELIEF

**NOW WHEREFORE**, Plaintiffs pray this court for the following relief:

1.  An injunction vacating the freeze order imposed on KindHearts;

2.  A declaratory judgment that the statutory provision authorizing freezing of assets pending investigation, without any substantive criteria, procedural safeguards, time limits, or judicial review, is unconstitutional under the First, Fourth, and Fifth Amendments to the U.S.

Complaint – Page 33

Constitution, on its face and as applied to KindHearts;

3.     A declaratory judgment that OFAC has failed to provide KindHearts with adequate process in connection with its "provisional" designation, and an injunction barring such designation until after constitutionally adequate process is provided;

4.     A declaratory judgment that Executive Order 13,224 is ultra vires because IEEPA authorizes freezing assets against organizations and individuals only in conjunction with a nation-targeted economic sanction;

5.     An injunction against Defendants requiring them to release KindHearts' funds for its legal defense;

6.     An injunction against Defendants requiring them to permit KindHearts' counsel, former officers, and former employees, unlimited access to copies of its own seized documents for purposes of preparing its own defense;

7.     An award to Plaintiffs of their costs and attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq.*, and

8.     Any other relief as the Court may deem just and proper.

DATED:  October 9, 2008


Fritz Byers, Ohio Bar No. 0002337
The Spitzer Building, Suite 824
520 Madison Avenue
Toledo, OH 43604-1343
Telephone: 419-241-8013
Fax: 419-241-4215
fbyers@cisp.com

David D. Cole (D.C. Bar No. 438355)

Complaint – Page 34

Georgetown University Law Center
600 New Jersey Avenue N.W.
Washington, D.C. 20001
Telephone: (202) 662-9078
Email: Cole@law.georgetown.edu

Lynne Bernabei (D.C. Bar No. 938936)
Alan R. Kabat (D.C. Bar No. 464258)
Bernabei & Wachtel, PLLC
1775 T Street, N.W.
Washington, D.C. 20009-7124
Telephone: (202) 745-1942
Fax: (202) 745-2627
Email: Bernabei@bernabeipllc.com;
Kabat@bernabeipllc.com

Hina Shamsi (N.Y. Bar No. 2995579)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 519-7886
Fax: (212) 549-2583
Email: hshamsi@aclu.org

Jeffrey M. Gamso (Ohio Bar No. 0043869)
Carrie L. Davis (Ohio Bar No. 0077041)
American Civil Liberties Union of Ohio Foundation,
Inc.
4506 Chester Avenue
Cleveland, Ohio 44103-3621
Telephone: (216) 472-2220
Fax: (216) 472-2210
Email: jmgamso@acluohio.org

*Counsel for KindHearts*