# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

|  |  |
|---|---|
| KINDHEARTS FOR CHARITABLE HUMANITARIAN DEVELOPMENT, INC., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
|  | ) Civil Action No. |
| HENRY M. PAULSON, in his official capacity as the Secretary of the Treasury, ADAM J. SZUBIN, in his official capacity as the Director of the Office of Foreign Assets Control, and MICHAEL B. MUKASEY, in his official capacity as the Attorney General of the United States, | ) ) ) ) ) ) |
| Defendants. | ) ) ) ) |

3 : 0 8 C V 0 2 4 0 0

JUDGE JAMES G. CARR

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

DAVID D. COLE
(D.C. Bar No. 438355)
Georgetown University Law Ctr.
600 New Jersey Ave. N.W.
Washington, DC 20001
Telephone: (202) 662-9078
cole@law.georgetown.edu

LYNNE BERNABEI
(D.C. Bar No. 938936)
ALAN R. KABAT
(D.C. Bar No. 464258)
Bernabei & Wachtel, PLLC
1775 T Street, N.W.
Washington, DC 20009
Telephone: (202) 745-1942
Fax: (202) 745-2672
bernabei@bernabeipllc.com

FRITZ BYERS
(Ohio Bar No. 0002337)
The Spitzer Building, Suite 284
520 Madison Avenue
Toledo, OH 43603
Telephone: (419) 241-8013
Fax: (419) 241-4215
fbyers@cisp.com

HINA SHAMSI
(N.Y. Bar No. 2995579)
American Civil Liberties Union
  Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 519-7886
Fax: (212) 549-2583
hshamsi@aclu.org

*additional counsel on following page*

JEFFREY M. GAMSO
(Ohio Bar No. 0043869)
CARRIE L. DAVIS
(Ohio Bar No. 0077041)
American Civil Liberties Union of Ohio
    Foundation, Inc.
4506 Chester Avenue
Cleveland, OH 44103
Telephone: (216) 472-2220
Fax: (216) 472-2210
jgamso@acluohio.org

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. i

INTRODUCTION ......................................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 5

    I.   Statutory and Regulatory Framework. ..................................................................... 5

    II.  The Freeze and Threatened Designation of KindHearts ............................................ 8

          A.  The Freeze Pending Investigation. ..................................................................... 9

          B.  The Threat to Designate KindHearts ................................................................. 10

ARGUMENT .............................................................................................................. 13

    I.   STANDARD FOR TEMPORARY RESTRAINING ORDER AND
       PRELIMINARY INJUNCTION .......................................................................... 13

    II.  KINDHEARTS IS LIKELY TO SUCCEED ON THE MERITS ......................... 14

          A.  The Authority to Freeze Assets Pending Investigation is
              Unconstitutional on Its Face and as Applied to KindHearts. ............................ 15

              1.  IEEPA Sets Forth No Substantive Criteria for Imposing a Freeze
                   Pending Investigation. ............................................................................ 15

              2.  IEEPA Contains No Procedural Safeguards for Freezes Pending
                   Investigation. ........................................................................................ 17

              3.  IEEPA Authorizes Seizures in Violation of the Fourth
                   Amendment. .......................................................................................... 20

          B.  OFAC's Threatened Designation of KindHearts as a Specially
              Designated Global Terrorist is Unconstitutional ............................................. 22

              1.  The Designation Authority Under IEEPA and the Executive Order
                   is Unconstitutionally Vague. .................................................................. 23

              2.  OFAC Has Not Given Adequate Notice with Respect to the
                   Threatened SDGT Designation. .............................................................. 25

              3.  OFAC's Reliance on Classified Evidence Violates Due Process
                   and the APA. .......................................................................................... 29

   C. OFAC's Restrictions on KindHearts' Ability to Present a Defense
       Violate Due Process and the APA ..................................................................34

   D. OFAC's Restrictions on Attorneys' Fees Violate Due Process and Are
       Arbitrary and Capricious under the APA.........................................................38

   E. KindHearts' Freeze Pending Investigation and the Designation Are
       Statutorily Unauthorized.................................................................................42

III. KINDHEARTS WILL SUFFER IRREPARABLE INJURY IF IT IS
    DESIGNATED A SPECIALLY DESIGNATED GLOBAL TERRORIST .........43

IV. A STAY ON DESIGNATION WILL CAUSE NO HARM TO THE
    GOVERNMENT BECAUSE IT HAS ALREADY BLOCKED
    KINDHEARTS' ASSETS ....................................................................................44

V. THE PUBLIC'S INTEREST WOULD BEST BE SERVED IF THIS
    COURT WERE TO ADJUDICATE THE LEGALITY OF OFAC'S
    ACTIONS AND ENSURE AN ACCURATE AND FAIR PROCESS ...............45

CONCLUSION...............................................................................................................47

## TABLE OF AUTHORITIES

**Cases**

*Abourezk v. Reagan*, 484 U.S. 1 (1987).......................................................................................... 31

*Abourezk v. Reagan*, 785 F.2d 1043 (D.C. Cir. 1986).................................................................. 31

*Al Haramain Islamic Found., Inc. v. U.S. Dep't of the Treasury*, Civ. No. 07-1155, 2008 WL 2381640 (D. Or. June 5, 2008) .............................................................................................. 46

*Am. Airways Charters, Inc. v. Regan*, 746 F.2d 865 (D.C. Cir 1984) ......................................... 38

*American-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045 (9th Cir. 1995)............. 29, 30

*Arizona v. Hicks*, 480 U.S. 321 (1987) ...................................................................................... 21

*Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d 545 (6th Cir. 2007)....... 16

*Barry v. Barchi*, 443 U.S. 55 (1979)........................................................................................... 18

*Basicomputer Corp. v. Scott*, 973 F.2d 507 (6th Cir. 1992) ........................................................ 44

*Beobanka D.D. Belgrade v. United States*, No. 95 Civ. 5138 (HB), 1997 WL 23182 (S.D.N.Y. Jan. 22, 1997)................................................................................................................... 40

*Bismullah v. Gates*, No. 06-1197 (D.C. Cir. Aug. 22, 2008)....................................................... 39

*Bismullah v. Gates*, 128 S. Ct. 2960 (June 23, 2008) ................................................................. 34

*Bismullah v. Gates*, 501 F.3d 178 (D.C. Cir. 2007)............................................................... 33, 34

*Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564 (1972)........................................................ 44

*Boddie v. Am. Broad. Cos.*, 881 F.2d 267 (6th Cir. 1989).......................................................... 16

*Boumediene v. Bush*, 128 S. Ct. 2229 (2008) ............................................................................. 33

*Bounds v. Smith*, 430 U.S. 817 (1977)........................................................................................ 38

*Brock v. Roadway Express*, 481 U.S. 252 (1987)........................................................................ 18

*Carlton v. Babbitt*, 26 F. Supp. 2d 102 (D.D.C. 1998)............................................................... 35

*Cherokee Nation of Okla. v. Norton*, 389 F.3d 1074 (10th Cir. 2005) ........................................ 40

*City of Lakewood v. Plain Dealer Publ'g*, 486 U.S. 750 (1988) ................................................... 16

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) .................................................. 25, 26

*Coates v. City of Cincinnati*, 402 U.S. 611 (1971) ......................................................... 16

*Colello v. U.S. Sec. & Exch. Comm'n*, 908 F. Supp. 738 (C.D. Cal. 1995) ................................. 21

*Connally v. Gen. Constr. Co.*, 269 U.S. 385 (1926)............................................................16

*EEOC v. Monarch Mach. Tool Co.*, 737 F.2d 1444 (6th Cir. 1980) ........................................... 29

*Esch v. Yeutter*, 876 F.2d 976 (D.C. Cir. 1989)............................................................ 35

*Fed. Deposit Ins. Corp. v. Mallen*, 486 U.S. 230 (1988)...................................................... 18, 20

*Fed. Leasing, Inc. v. Underwriters at Lloyd's*, 650 F.2d 495 (4th Cir. 1981) ............................. 44

*Fleming v. U.S. Dep't of Agric.*, 713 F.2d 179 (6th Cir. 1983) ..................................................... 16

*Foti v. City of Menlo Park*, 146 F.3d 629 (9th Cir. 1998) ........................................................ 23

*Fuentes v. Shevin*, 407 U.S. 67 (1972).................................................................................. 18, 20

*Gateway E. Ry. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134 (7th Cir. 1994) .................... 44

*Global Relief Found., Inc. v. O'Neill*, 315 F.3d 748 (7th Cir. 2002)............................... 26, 33, 46

*Glover v. Johnson*, 855 F.2d 277 (6th Cir. 1988) ........................................................ 14

*Goldberg v. Kelly*, 397 U.S. 254 (1970) ............................................................................. 26, 38

*Goss v. Lopez*, 419 U.S. 565 (1975) .................................................................................... 29

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)..............................................................16, 23

*Greene v. McElroy*, 360 U.S. 474 (1959) .................................................................................... 30

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) ..................................................................... 25, 33

*Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156 (D.C. Cir. 2003)...... 14, 18, 26, 33

*Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57 (D.D.C. 2002).................. 21

*Horton v. California*, 496 U.S. 128 (1990).................................................................................. 21

*Humanitarian Law Project v. Mukasey*, 509 F.3d 1122 (9th Cir. 2007) ...................................... 24

*Humanitarian Law Project v. Reno*, 205 F.3d 1130 (9th Cir. 2000)................................23-24

*Humanitarian Law Project v. U.S. Dep't of the Treasury*, 484 F. Supp. 2d 1099 (C.D. Cal. 2007). ................................................................................................................................................... 6

*Humanitarian Law Project v. U.S. Dep't of the Treasury*, 463 F. Supp. 2d 1049 (C.D. Cal. 2006) ............................................................................................................................................. 6, 17, 33

*Info. Providers' Coal. for Protection of the First Amendment v. FCC*, 928 F.2d 866 (9th Cir. 1991)..............................................................................................................................................23

*In re Washington Post Co.*, 807 F.2d 383 (4th Cir. 1987)............................................................ 31

*INS v. St. Cyr*, 533 U.S. 289 (2001)............................................................................................. 42

*Islamic Am. Relief Agency v. Unidentified FBI Agents*, 394 F. Supp. 2d 34 (D.D.C. 2005).. 21, 27

*Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123 (1951) ................................... 30, 31

*Kent County, Del. Levy Court v. EPA*, 963 F.2d 391 (D.C. Cir. 1992) ........................................ 35

*Kiareldeen v. Reno*, 71 F. Supp. 2d 402 (D.N.J. 1999) ........................................................... 32, 33

*Martin v. Laurer*, 686 F.2d 24 (D.C. Cir. 1982)........................................................................... 38

*Mathews v. Eldridge*, 424 U.S. 319 (1976).............................................................................. 18, 25

*Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150 (6th Cir. 1991) . 14

*Miranda v. City of Cornelius*, 429 F.3d 858 (9th Cir. 2005) ........................................................ 21

*N. Ga. Fishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601 (1975) ........................................................ 20

*Nadarajah v. Gonzales*, 443 F.3d 1069 (9th Cir. 2006) ............................................................... 42

*Nader v. Blackwell*, 230 F.3d 833 (6th Cir. 2000)........................................................................ 13

*Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192 (D.C. Cir. 2001).......... passim

*Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566 (6th Cir. 2002) ................. 14

*Parhat v. Gates*, 532 F.3d 834 (D.C. Cir. 2008).............................................................. 27, 31, 32

*Peoples Mojahedin Org. of Iran v. Dep't of State*, 327 F.3d 1238 (D.C. Cir. 2003).................... 33

*Potashnick v. Port City Constr. Co.*, 609 F.2d 1101 (5th Cir. 1980 ............................................. 38

*Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219 (6th Cir. 1996) ............................. 13-14

*Rafeedie v. INS*, 880 F.2d 506 (D.C. Cir. 1989) ........................................................................... 30

*Salmo v. United States*, No. 06-12909, 2006 WL 2975503 (E.D. Mich. Oct. 17, 2006) ............. 21

*Samuel v. Herrick Mem'l Hosp.*, 201 F.3d 830 (6th Cir. 2000) ..................................................... 13

*Sierra Club v. Glickman*, 156 F.3d 606 (5th Cir. 1998) ................................................................ 40

*Soldal v. Cook County*, 506 U.S. 56 (1992) ............................................................................. 20-21

*Staub v. City of Baxley*, 355 U.S. 313 (1958) ................................................................................ 18

*Summit County Democratic Cent. & Executive Comm. v. Blackwell*, 388 F.3d 547 (6th Cir. 2004)
............................................................................................................................................. 13

*United States v. $53,082.00 in U.S. Currency*, 985 F.2d 245 (6th Cir. 1993) .............................. 21

*United States v. Abuhamra*, 389 F.3d 309 (2d Cir. 2004) ...................................................... 30, 33

*United States v. Caseer*, 399 F.3d 828 (6th Cir. 2005) ................................................................ 16

*United States v. Jacobsen*, 466 U.S. 109 (1984) .......................................................................... 21

*United States v. Lockheed Martin Corp.*, No. 1:98-cv-00731-EGS, 1998 WL 306755 (D.D.C.
May 29, 1998) ....................................................................................................................... 34

*United States v. Place*, 462 U.S. 696 (1983) ................................................................................ 22

*United States v. Salerno*, 481 U.S. 739, 751-52 (1987) ................................................................ 18

*United States v. Wunsch*, 84 F.3d 1110 (9th Cir. 1996) ................................................................ 16

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982) ................. 23

*Vitek v. Jones*, 445 U.S. 480 (1980) .............................................................................................. 18

*Women's Med. Ctr. of Nw. Houston v. Bell*, 248 F.3d 411 (5th Cir. 2001) ................................... 16

*Zadvydas v. Davis*, 533 U.S. 678 (2001) ...................................................................................... 42

## Statutes

18 U.S.C. § 1705 .......................................................................................... 7, 23, 45

18 U.S.C. § 981 ............................................................................................... 18, 21

18 U.S.C. app. 3 (Classified Information Procedures Act) ..................................... 32, 33

18 U.S.C. § 983 (Civil Asset Forfeiture Reform Act of 2000) ..................................... 19

50 U.S.C. § 1702 ............................................................................................. passim

50 U.S.C. § 1801 .................................................................................................... 11

50 U.S.C. § 1806 .................................................................................................... 32

8 U.S.C. § 1189 ...................................................................................................... 17

8 U.S.C. § 1534 ...................................................................................................... 32

USA Patriot Act, Pub. L. No. 107-56, 115 Stat. 272 (2001) ......................................... 7

## Regulations

8 C.F.R. Part 1240 ................................................................................................ 33

31 C.F.R. Part 501 ............................................................................................. 8, 37

31 C.F.R. Part 594 ......................................................................................... passim

68 Fed. Reg. 34,196 (June 6, 2003) .......................................................................... 8

71 Fed. Reg. 39,857 (July 13, 2006) ........................................................................ 17

## Other Authorities

Exec Order No. 12,947, 60 Fed. Reg. 5,079 (Jan. 23, 1995) .......................................... 5

Exec. Order No. 13,224, 66 Fed. Reg. 49,079 (Sept. 23, 2001) ............................... passim

Markup Before the H. Comm. on Int'l Relations, 95th Congress, 1st Sess. (June 17, 1977) ....... 43

Nat'l Comm'n on Terrorist Attacks upon the United States, *Monograph on Terrorist Financing: Staff Report to the Comm'n* (2004) ..................................................................................... 3, 15

Plaintiffs' Reply Memorandum in Support of Motion for Summary Judgment at 3-6, *Al Haramain Islamic Found., Inc. v. U.S. Dep't of the Treasury*, Civ. No. 07-1155 (D. Or. June 20, 2008) ..................................................................................................................................... 46

Gov't's Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Summary Judgment, *Al Haramain Islamic Found., Inc. v. U.S. Dep't of the Treasury*, Civ. No. 07-1155 (D. Or. June 12, 2008) ........................................................................................................... 46

Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment at 9-12, *Al Haramain Islamic Found., Inc. v. U.S. Dep't of the Treasury*, Civ. No. 07-1155 (D. Or. May 8, 2008) ................................................................................................................... 46

Protective Order, *United States v. KindHearts for Charitable Humanitarian Development*, No. 3:06-7019 (N.D. Ohio Apr. 9, 2008) ............................................................................... 12, 36

# INTRODUCTION

On February 19, 2006, more than two and a half years ago, the Treasury Department's Office of Foreign Assets Control ("OFAC") froze all the assets of KindHearts for Charitable Humanitarian Development, Inc. ("KindHearts"), a non-profit corporation based in Toledo, Ohio. OFAC effectively shut KindHearts down—without notice, a hearing, a statement of reasons, any finding of wrongdoing, any time limit on the freeze, any judicial process, and without specifying or meeting any statutory criteria—simply by asserting that KindHearts was "under investigation." More than a year later, OFAC further threatened to designate KindHearts as a "specially designated global terrorist" ("SDGT"), again without providing the charity with adequate notice or a meaningful opportunity to defend itself. To this day, KindHearts' assets remain frozen and its operations shut down, even though it has never been charged with any wrongdoing. Since freezing KindHearts' assets, OFAC has taken a number of actions that make it impossible for KindHearts to defend itself, including: failing to notify KindHearts of the specific charges or factual allegations that might warrant its designation; relying almost exclusively on classified evidence without affording KindHearts a meaningful opportunity to respond; and seizing all of KindHearts' records and assets and then placing untenable restrictions on its ability to access its records, pay for its own defense, or conduct any investigation.

KindHearts seeks limited but immediate relief—a temporary restraining order and preliminary injunction barring OFAC from designating KindHearts as an SDGT before it is provided constitutionally adequate due process. Official designation as an SDGT will inflict irreparable injury on KindHearts' most valuable asset, its reputation. Because OFAC has already frozen KindHearts' assets pending investigation, a temporary restraining order and preliminary injunction will impose no burden on defendants, and will simply preserve the *status quo*. With

1

an injunction against designation in place, KindHearts will move expeditiously for summary judgment on the constitutionality both of the existing indefinite freeze pending investigation and of the threatened SDGT designation because there are no factual issues in dispute.

OFAC claims the authority to take its draconian actions against KindHearts under the International Emergency Economic Powers Act ("IEEPA") and Executive Order 13,224, in which the President assumed the power to impose economic sanctions on any organization or individual he or the Secretary of the Treasury designates an SDGT. A provision of the USA Patriot Act goes even further and authorizes OFAC to freeze an organization's assets *without* designating it or otherwise finding any wrongdoing, based on nothing more than OFAC's assertion that the entity is under investigation. Nothing in IEEPA, the Executive Order, or in the applicable regulations articulates any substantive criteria for OFAC's decision to freeze "pending investigation," or requires any procedural safeguards, or imposes any time limit on such freezes.

As interpreted and applied by defendants, IEEPA and the Executive Order give the government *carte blanche* to shut down any entity in the United States indefinitely—without a finding of wrongdoing, without even probable cause, and without any of the protections ordinarily required when the government seizes property. These authorities would indisputably be unconstitutional were they employed against individuals indicted for the most aggravated drug or organized crime offenses; yet here they have been employed against an entity that has never been charged with criminal activity of any kind.

The constitutional infirmities of the freeze and designation regime were recognized by the 9/11 Commission staff, which wrote that "[u]sing IEEPA at all against U.S. citizens and their organizations raises potentially troubling civil liberties issues . . . ." With respect to the power to freeze an organization's assets, the Commission staff added:

2

> IEEPA's provision allowing blocking "during the pendency of an investigation" is a powerful weapon with potentially dangerous applications when applied to domestic institutions. This provision lets the government shut down an organization without any formal determination of wrongdoing. It requires a single piece of paper, signed by a midlevel government official. Although in practice a number of agencies typically review and agree to the action, there is no formal administrative process, let alone any adjudication of guilt.[1]

A legal regime that gives a midlevel government official such open-ended power to shut down organizations virtually at will violates fundamental precepts of the First, Fourth, and Fifth Amendments.

KindHearts is entitled to a TRO and preliminary injunction because it is likely to succeed on the merits of its legal challenge, and because absent the requested temporary relief, it will suffer irreparable injury to its reputation. KindHearts has strong grounds for success on the merits of its challenges both to the "freeze pending investigation" ("FPI") and, specifically for purposes of this motion, to the threatened designation as an SDGT. The FPI authority violates multiple constitutional guarantees, both on its face and as applied. Because it contains no substantive criteria whatsoever, the statute is vague, forcing ordinary citizens to guess at what might prompt an FPI, and giving OFAC unfettered discretion to shut down organizations for any reason or no reason at all. Because it provides for no notice or opportunity to respond, the FPI authority violates the Fifth Amendment's procedural due process guarantees. And because IEEPA authorizes seizures without probable cause or a warrant, it also violates the Fourth Amendment. The FPI statutory provision is also unconstitutional as applied: it has been imposed on KindHearts for more than 31 months without any of the substantive criteria or procedural safeguards required by the Constitution.

---

[1] Nat'l Comm'n on Terrorist Attacks upon the United States, *Monograph on Terrorist Financing: Staff Report to the Comm'n* 112 (2004), *available at* http://www.9-11commission.gov/staff_statements/911_TerrFin_Monograph.pdf.

KindHearts is also likely to succeed on the merits of its challenge to the threatened SDGT designation as unconstitutional for many of the same reasons applicable to the FPI. The authority to designate is unconstitutionally vague; OFAC's designation process has failed to afford KindHearts adequate notice of the charges against it or a meaningful opportunity to respond. The designation would amount to an unreasonable seizure in violation of the Fourth Amendment. OFAC has never identified *either* the provisions of the Executive Order that KindHearts may be designated under, or the factual basis for its threatened designation. OFAC is relying largely on classified evidence to which KindHearts has no meaningful way to respond. And OFAC has denied KindHearts any meaningful opportunity to defend itself by placing arbitrary restrictions on its ability to use its own documents and resources in its legal defense.

Moreover, the court can grant plaintiff's motion on statutory grounds because both the freeze pending investigation and the threatened SDGT designation are not authorized by statute. IEEPA was intended to restrict the President's power to impose embargoes and economic sanctions on *nations*, not to create an unprecedented authority to blacklist organizations. It authorizes sanctions against individuals or entities only when incidental to a nation-targeted sanction. Thus, an embargo on trade with Libya may include a ban on trade with Libyan corporations and nationals. But neither KindHearts nor anyone with any interest in KindHearts is a national of any country on which the United States has imposed sanctions. Accordingly, the FPI and the threatened SDGT designation are beyond the authority granted by IEEPA.

The other elements required for a TRO and preliminary injunction are also satisfied. If KindHearts is designated as an SDGT, its reputation will suffer damage that can never be fully recovered, even if that designation is subsequently lifted. A temporary stay on designation will not undermine the government's interests because KindHearts' assets are already frozen pending

investigation. And the public interest will be served by a judicial declaration on the legality of OFAC's unprecedented and unchecked authority to freeze an entity's assets indefinitely.

## STATEMENT OF FACTS

### I. Statutory and Regulatory Framework.

Congress enacted IEEPA in 1977 to clarify and limit the President's power to impose economic sanctions on "any foreign country or a national thereof" during times of national emergency. 50 U.S.C. § 1702(a)(1)(A)(ii). Upon formal declaration of a national emergency, the President can impose economic sanctions and block or prohibit any transaction "involving . . . any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States." *Id.* § 1702(a)(1)(B).

Before IEEPA was enacted, Presidents had imposed embargoes and sanctions on nations for decades, but had never sought to use that authority against individuals or groups except when incident to a nation-targeted sanction. From its enactment in 1978 until 1995, IEEPA-authorized embargoes and sanctions were similarly imposed only on nations and their nationals as a tool of nation-to-nation diplomacy. In 1995, however, for the first time, President Clinton invoked IEEPA to impose sanctions against foreign organizations instead of a nation state. Exec. Order No. 12,947, 60 Fed. Reg. 5,079 (Jan. 23, 1995).

After the terrorist attacks of September 11, 2001, President Bush invoked his authority under IEEPA to issue Executive Order 13,224, which froze the assets of twenty-seven organizations and individuals—without any statement why any of these entities or individuals had been singled out—and blocked U.S. persons from engaging in any transaction with them. Exec. Order No. 13,224, 66 Fed. Reg. 49,079 (Sept. 23, 2001) ("E.O. 13,224" or "Executive

Order"). The term "specially designated global terrorists," or SDGTs, used for those on the list, is not defined by statute, but is a unilateral creation of the executive branch.[2]

The Executive Order also authorizes the Treasury Department to add to the designated entities list anyone "owned or controlled by," acting "for or on behalf of," or assisting or supporting in any number of ways, others on the SDGT list. More broadly, the Executive Order authorizes designation of those "otherwise associated" with designated persons. E.O. 13,224 § 1(c)-(d).

In 2006, a federal court declared unconstitutional the last criterion, which authorized designation based on mere association. *Humanitarian Law Project v. U.S. Dep't of the Treasury*, 463 F. Supp. 2d at 1049 (C.D. Cal. 2006). The Treasury Department subsequently redefined that provision as "(a) To own or control; or (b) To attempt, or to conspire with one or more persons, to act for or on behalf of or to provide financial, material, or technological support, or financial or other services, to."[3] 31 C.F.R. § 594.316 (2007). However, OFAC froze KindHearts' assets at a time when this criterion had not been narrowed, and referred to this criterion as a partial basis for its action. *See infra* Section II.

Designation as an SDGT immediately results in the blocking of all the designee's property and interests in property within the United States or in the control of U.S. persons. E.O. 13,224 § 1. In addition, the Executive Order prohibits all transactions with designated entities, including "the making or receiving of any contribution of funds, goods, or services to or for the benefit of those persons." *Id.* § 2(a). While humanitarian aid is ordinarily exempted from such

---

[2] *See* 31 C.F.R. § 594.310 (2007) (defining "specially designated global terrorist" as anyone "listed in the Annex or designated pursuant to Executive Order 13,224"); *see also* Office of Foreign Assets Control, *Specially Designated Nationals and Blocked Persons, available at* http://www.ustreas.gov/offices/enforcement/ofac/sdn/t11sdn.pdf (last visited Oct. 6, 2008) (listing designated persons and groups).

[3] The same federal court later upheld the constitutionality of the last criterion as redefined by the Treasury Department. *See Humanitarian Law Project v. U.S. Dep't of the Treasury*, 484 F. Supp. 2d 1099 (C.D. Cal. 2007). That decision is under appeal.

sanctions, E.O. 13,224 specifically prohibits all humanitarian donations. *Id.* § 4. Designation thus effectively shuts down the organization because it can no longer engage in any transactions, and it has no access to its own property.

Pursuant to an amendment to IEEPA made by the USA Patriot Act, Pub. L. No. 107-56, 115 Stat. 272 (2001), the Treasury Department may impose *all* the blocking effects of a designation—including freezing an organization's assets indefinitely and criminalizing all transactions with it—*without* designating the organization, but simply by opening an investigation into whether it should be designated. *See* 50 U.S.C. § 1702(a)(1)(B); *id.* § 1705. IEEPA does not specify any standard of suspicion necessary for such a freeze, does not require that the entity be provided with notice or a meaningful opportunity to contest the freeze, requires no judicial approval, and contains no time limit on how long a freeze pending investigation may last.

Neither IEEPA, the Executive Order, nor the implementing regulations require OFAC to inform the affected entity of the alleged factual or legal basis for the designation or the freeze pending investigation, and thus the entity must guess at the nature of the charges against it. Nor is OFAC required to provide any statement of reasons explaining its actions. OFAC's general practice is simply to announce its action in the Federal Register. When an organization has a presence in the United States and is therefore entitled to due process, OFAC provides as "notice" only a copy of the unclassified documents in its administrative record. It does not disclose the classified evidence on which it relies. As a result, entities do not know why they have been frozen and are being considered for designation, or why they have been designated, and there is no public record of what types of activities may prompt either an investigation or a designation.

The Treasury Department promulgated regulations implementing E.O. 13,224 on June 6, 2003. *See* 68 Fed. Reg. 34,196 (codified at 31 C.F.R. Part 594) (2003) (the "Regulations"). The Regulations set forth procedures for imposing civil and criminal penalties on U.S. persons who engage in any transaction with an entity that has been designated or frozen pending investigation. *See* 31 C.F.R. §§ 594.701-.704. With respect to designation only (there are no provisions procedures whatsoever for freezes), 31 C.F.R. § 501.807 permits designated entities to seek administrative reconsideration by OFAC. However, this provision provides no opportunity for notice or a hearing; does not require that OFAC consider or respond to a petitioner's request for administrative reconsideration in a timely fashion; and does not establish any standards for the reconsideration.

## II.    The Freeze and Threatened Designation of KindHearts.

KindHearts was incorporated on January 22, 2002, as a non-profit corporation under Ohio law. Declaration of Jihad Smaili, dated Oct. 8, 2008 ("Smaili Decl.") ¶ 4. Until OFAC shut it down in early 2006, KindHearts provided millions of dollars of in-kind humanitarian aid, principally directed towards needy Palestinians in the West Bank, Gaza, and refugee camps in Lebanon. Smaili Decl. ¶¶ 8, 15. KindHearts also supported relief efforts in the United States, such as after Hurricane Katrina, and in many other parts of the world. *Id.* For example, in the year before its assets were frozen, KindHearts raised substantial amounts of money for earthquake relief following a major earthquake in Pakistan. *Id.*

KindHearts was founded after several other Muslim charities were shut down by OFAC in 2001, *id.* ¶ 4, and from its inception, KindHearts' officers and directors took great care to ensure that it did not fund any designated entities or otherwise violate federal regulations and laws regarding designated terrorists. *See, e.g., id.* ¶¶ 10-12 (KindHearts' Board of Trustees

directed its employees in the United States and abroad to implement the Treasury Department's Voluntary Guidelines); *id.* ¶ 11 (KindHearts' Board specified an officer responsible for ensuring that KindHearts did not do business with designated persons or entities); *id.* ¶¶ 10-12, Exs. A, B (KindHearts' general counsel drafted memos for all KindHearts' personnel explaining and adopting as mandatory the Treasury Department's Best Practices Guidelines and Voluntary Guidelines).

## A. The Freeze Pending Investigation.

Notwithstanding KindHearts' efforts, on February 19, 2006, OFAC blocked all of its property and assets pending investigation into whether it was subject to designation under E.O. 13,224. *Id.* ¶ 16, Ex. C. The only reason OFAC gave in its Blocking Notice was a boilerplate sentence generally reiterating all of the criteria in E.O. 13,224 and stating that KindHearts was being investigated "for being controlled by, acting for or on behalf of, assisting in or providing financial or material support to, and/or otherwise being associated with Hamas." *Id.* The letter set forth no facts to support any of these allegations. *See generally id.* The letter stated that if KindHearts sought to challenge the freeze, it could send a letter to OFAC, but established no procedure for the review of such a letter. *Id.* In fact, while KindHearts promptly filed such a letter, OFAC took no action for over a year in response to it. *Id.* ¶ 23, Ex. G; Declaration of Lynne Bernabei, dated Oct. 8, 2008 ("Bernabei Decl.") Ex. A.

As a result of the FPI, all of KindHearts' assets and property were frozen indefinitely, including about $1 million in bank accounts, and the organization was effectively shut down. Smaili Decl. ¶¶ 18-19, 21, Ex. E. The FPI has now lasted more than two and a half years, without any finding of wrongdoing.

On the same day that KindHearts' assets were frozen, the government executed search warrants at KindHearts' Toledo headquarters and the personal residence of its president, and removed all of KindHearts' records, computers, and a number of boxes of publications and documents. *Id.* ¶ 17. Thirty-one months later, the government still has all of the above materials. No criminal charges have been filed against KindHearts.

KindHearts repeatedly asked OFAC for the reasons for the freeze, specification of the charges against it, and notice of the factual basis for OFAC's actions. *See, e.g., Id.* ¶ 23, Ex. G; Bernabei Decl. Exs. B, C, D. Beyond the single boilerplate sentence quoted above, OFAC has never provided any specification of reasons for its decision to block KindHearts' assets. KindHearts has tried to guess at OFAC's reasons and has sought to show why OFAC's suspicions (or what KindHearts conjectures them to be) are mistaken. *See, e.g.,* Smaili Decl. ¶ 23, Ex. G; Bernabei Decl. Ex. E. OFAC has never replied to these letters, nor has it explained why it will not do so.

### B.     The Threat to Designate KindHearts.

On May 25, 2007, OFAC informed KindHearts that it had "provisionally" decided to designate it as an SDGT. Bernabei Decl. Ex. A. To this day, however, KindHearts' assets remain frozen "pending investigation," and KindHearts has not been designated as an SDGT.

With its May 25 letter, OFAC produced 35 documents that it identified as the "unclassified and non-privileged documents" upon which it relied in provisionally deciding to designate KindHearts. *Id.* Exs. A, T.[4] Most of the documents did not even mention KindHearts, but concerned other entities altogether. None of the documents explained the specific charges

---

[4] The unclassified and non-privileged component of the administrative record accompanying OFAC's letter dated May 25, 2007 is attached as Exhibit T to the declaration of Lynne Bernabei. Citations to the administrative record are to the Bates-numbered pages of the document (e.g., CTI-1, CTI-2, etc.).

OFAC was considering against KindHearts, or why OFAC thought that the evidence supported a potential designation. *Id.* Ex. A.

OFAC stated that it had "relied upon other classified and privileged documents obtained to date which are not authorized for disclosure, including material obtained or derived pursuant to the Foreign Intelligence Surveillance Act, 50 U.S.C. § 1801 *et seq.*" *Id.* OFAC produced a three-page "Unclassified Summary" of its classified evidence that made various vague and unsourced allegations regarding support KindHearts allegedly provided to Hamas in Lebanon. *Id.* Even without the underlying documents, KindHearts has attempted to refute those allegations in detail. *Id.* Ex. E. Despite repeated requests from KindHearts, OFAC has not provided any reasonable accommodation, such as an adequately detailed summary or security clearances to KindHearts' counsel so that they may review the underlying documents. *See, e.g.,* *Id.* Exs. C, F.

In order to prepare a defense, KindHearts requested access to its own records on June 14, 2007. *Id.* Ex. G. OFAC waited eight weeks—until August 14, 2007—to respond, telling KindHearts' counsel that OFAC possessed only a few of the records, and that the remainder were in the possession of the U.S. Attorney's office. *Id.* Ex. H. The U.S. Attorney's office, in turn, refused to provide KindHearts with a copy of the documents. *Id.* Ex. I. Finally, on April 11, 2008, more than two years after KindHearts' documents were seized, the U.S. Attorney's office reversed course and provided KindHearts with an electronic copy of a subset of the seized documents—but subject to onerous conditions that have made it impossible for KindHearts to use the documents in its defense. *Id.* Ex. J. Under a protective order obtained by defendants *ex parte*, counsel can review the documents only in the Washington, D.C. office of Bernabei & Wachtel, and KindHearts' directors and staff are not permitted even to review the documents

without prior specific authorization from a court. *Id.*; Protective Order, *United States v. KindHearts for Charitable Humanitarian Development, Inc.*, No. 3:06-7019 (N.D. Ohio Apr. 9, 2008). Because KindHearts' counsel are located in Ohio, New York, and London, as well as Washington, and because KindHearts' former directors and staff are in Ohio, California, and Lebanon, these restrictions pose nearly insurmountable hurdles to KindHearts' ability to prepare an effective defense. Moreover, none of the documents are classified, and they all belong to KindHearts, and defendants have articulated no legitimate purpose for imposing such restrictions.

In July 2007, KindHearts' counsel informed OFAC that as part of KindHearts' defense, counsel would need to interview former KindHearts employees and ask them to search their own records for any documents that might assist in KindHearts' defense. Bernabei Decl. Ex. K. In response, OFAC took the position that it considered documents in the employees' possession to be blocked property, which would have to be identified to OFAC, with information on "the owner, the property, its location, [and] any reference necessary to identify the property. . . ." *Id.* Ex. L. After protests by KindHearts' counsel that OFAC's decision violated KindHearts' rights to investigate and present a defense, *see, e.g., Id.* Ex. M, OFAC clarified that only KindHearts' property would be subject to the reporting requirement, but did not explain how it would determine whether a document was an individual's property or the property of KindHearts, and whether documents with unclear provenance required reporting. *Id.* Ex. N.

For over two years, OFAC refused to permit KindHearts to use its own funds to pay attorneys' fees for its challenge to OFAC's freeze pending investigation and threatened designation. *See, e.g.*, Smaili Decl. ¶ 22, Ex. F; Bernabei Decl. Exs. O, P. After its policy on attorneys' fees was challenged in a separate lawsuit, OFAC changed the policy in 2008. It will

now permit KindHearts to use a limited amount of its funds to pay for legal expenses, but subject to restrictions that directly interfere with KindHearts' right to defend itself. Thus, KindHearts is permitted to hire only two lawyers, Bernabei Decl. Exs. Q, R, even though the government typically assigns three or four times that many to cases of this nature. Declaration of Alan Kabat, dated Oct. 7, 2008 ("Kabat Decl.") ¶¶ 9-14. In addition, OFAC set an aggregate cap of $28,000 on both administrative and judicial trial proceedings to challenge a designation, a figure that bears no relation to the amount that the government spends, or that designated entities have spent in the past. Bernabei Decl. Exs. Q, R; Kabat Decl. ¶¶ 4-5, 7-8; Declaration of John Boyd, dated Oct. 7, 2008 ("Boyd Decl.") ¶¶ 3-5. Through this policy, OFAC has put itself in the position of reviewing and authorizing legal fee expenditures, even though it is adverse to KindHearts.

**ARGUMENT**

## I.      STANDARD FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION.

The Sixth Circuit has held that in deciding whether to preserve the *status quo* through a temporary restraining order, a district court should consider the following four factors: (1) the likelihood of the movant's success on the merits; (2) whether the movant would suffer irreparable injury absent a stay; (3) whether the stay would cause substantial harm to others; and (4) whether the public interest would be served by the stay. *Summit County Democratic Cent. & Executive Comm. v. Blackwell*, 388 F.3d 547, 550 (6th Cir. 2004); *Nader v. Blackwell*, 230 F.3d 833, 834 (6th Cir. 2000); *see also Samuel v. Herrick Mem'l Hosp.*, 201 F.3d 830, 833-34 (6th Cir. 2000) (setting out same standards for preliminary injunction). "The philosophical basis of this rule is simple but sound; a Court ought to have time to determine legal issues presented to it,

and has the right in the meantime to preserve the *status quo*." *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 226 (6th Cir. 1996).

None of the four factors is dispositive; they "are not prerequisites that must be met, but are interrelated considerations that must be balanced together." *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991); *Glover v. Johnson*, 855 F.2d 277, 282 (6th Cir. 1988) (same with respect to preliminary injunctions). With respect to the second factor, the Sixth Circuit has further explained that "[a] plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 578 (6th Cir. 2002).

## II.   KINDHEARTS IS LIKELY TO SUCCEED ON THE MERITS.

KindHearts is likely to succeed on the merits of its challenge to both the initial FPI and the SDGT designation. These actions are unconstitutional for closely related reasons. In both settings, the government has assumed the authority to seize KindHearts' property and inflict irreparable injury without constitutionally required safeguards. As a U.S. corporation, KindHearts is entitled to constitutional protections when the government freezes its assets or designates it an SDGT.[5] Yet the legal regime under which OFAC is acting is deficient in multiple respects. KindHearts will first address the constitutional infirmity of the FPI, and then turn to the constitutional problems with the threatened SDGT designation.

At this stage, KindHearts seeks only to preserve the status quo and enjoin OFAC from designating it as an SDGT without due process. That injunction will then permit the court to consider the merits of all of plaintiff's challenges in an expeditious manner.

---

[5] *Holy Land Found. for Relief & Dev. v. Ashcroft* ("*Holy Land*"), 333 F.3d 156, 163 (D.C. Cir. 2003) (organization with presence in United States entitled to due process with respect to OFAC's designation of it as an SDGT); *Nat'l Council of Resistance of Iran v. Dep't of State* ("*NCRI*"), 251 F.3d 192, 205 (D.C. Cir. 2001) (same with respect to designation by Secretary of State as to foreign terrorist organization designation).

14

**A.    The Authority to Freeze Assets Pending Investigation Is Unconstitutional on its Face and as Applied to KindHearts.**

The statute pursuant to which KindHearts' assets were frozen pending investigation, 50 U.S.C. § 1702(a)(1)(B), empowers the President (and OFAC) to "block during the pendency of an investigation" virtually any transaction involving "any property in which any foreign country or a national thereof has any interest." This statute does not require any individualized suspicion that an entity has engaged in any wrongdoing of any kind, or has any relationship to terrorism. It sets forth *no substantive criteria whatsoever.* It imposes no time limits on the investigation, or the freeze that attends the investigation. It provides the affected party no notice or opportunity to respond. It requires no statement of reasons. It requires neither judicial approval nor probable cause. As the 9/11 Commission staff report stated, the provision gives a "midlevel government official" the power to "shut down an organization without any formal determination of wrongdoing."[6] Because it vests government officials with virtually unfettered authority to seize property without warrant, probable cause, or any substantive or procedural constraints, the statute violates the First, Fourth, and Fifth Amendments. OFAC's application of the statute to KindHearts in this case has only exacerbated these constitutional flaws.

**1.    IEEPA Sets Forth No Substantive Criteria for Imposing a Freeze Pending Investigation.**

Neither IEEPA, E.O. 13,224, nor the Regulations set forth any substantive criteria for imposing a freeze pending investigation. Accordingly, OFAC can impose an FPI for any reason or no reason at all. Such unfettered discretion to shut down entities indefinitely violates the First and Fifth Amendments because it is unconstitutionally vague.

---

[6] Nat'l Comm'n on Terrorist Attacks upon the United States, *Monograph on Terrorist Financing: Staff Report to the Comm'n* 112.

A law is impermissibly vague if it "cause[s] persons 'of common intelligence . . . necessarily [to] guess at its meaning and [to] differ as to its application.'" *United States v. Wunsch*, 84 F.3d 1110, 1119 (9th Cir. 1996) (omission and alterations in original) (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)); *Fleming v. U.S. Dep't of Agric.*, 713 F.2d 179, 184 (6th Cir. 1983) ("due process requires that government regulations and statutes provide adequate warning as to what they command or forbid such that persons of common intelligence will not have to guess as to their meaning and may act accordingly"); *Boddie v. Am. Broad. Cos.*, 881 F.2d 267, 270 (6th Cir. 1989). A central purpose underlying the First and Fifth Amendment prohibitions against vague statutes is to avoid subjective enforcement of the laws based on "arbitrary and discriminatory enforcement" by government officers. *Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d 545, 551 (6th Cir. 2007) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)) (internal quotation marks omitted). "Vague laws are subject to particular scrutiny when criminal sanctions are threatened or constitutional rights are at risk." *United States v. Caseer*, 399 F.3d 828, 835 (6th Cir. 2005).

Because it lacks any substantive criteria, section 1702(a)(1)(B) is unconstitutionally vague. *Women's Med. Ctr. of Nw. Houston v. Bell*, 248 F.3d 411, 421-22 (5th Cir. 2001) (striking as facially invalid, under the Due Process clause, three regulations that gave the state standardless discretion and "no objective criteria" to guide its assessment of remedies for violations of the regulations). *City of Lakewood v. Plain Dealer Publ'g*, 486 U.S. 750, 769-72 (1988) (ordinance authorizing a mayor to issue permits for newsracks found facially unconstitutional because it gave mayor unchecked discretion); *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971) (ordinance barring "annoying" conduct struck down because "no standard of conduct is specified at all"). It effectively permits OFAC to freeze the assets of any group or

individual it chooses to target, without substantive charges, without findings of wrongdoing, and without statutory guidance. *Cf. Humanitarian Law Project*, 463 F. Supp. 2d at 1067 (describing IEEPA as giving the President the power to designate anyone he chooses for merely "associating," or for "no reason" at all). Such unlimited power to shut down disfavored organizations and individuals violates the First and Fifth Amendments.

The vagueness of the FPI authority is underscored by comparing it to the Secretary of State's authority to designate "foreign terrorist organizations" under 8 U.S.C. § 1189. That statute sets forth specific criteria, requiring the Secretary to find that a group is foreign, has engaged in terrorist activity as defined in the Immigration and Nationality Act, and threatens national security. In contrast, Section 1702(a)(1)(B) permits OFAC to freeze the assets of individuals and groups *without meeting any criteria related to terrorism or wrongdoing whatsoever* and is unconstitutionally vague.[7]

### 2. IEEPA Contains No Procedural Safeguards for Freezes Pending Investigation.

Section 1702(a)(1)(B) is also unconstitutional on its face and as applied to KindHearts because it establishes *none* of the procedural safeguards generally required when the government seeks to deprive individuals of their property. The Constitution requires generally that the government afford notice and a meaningful opportunity to be heard by a neutral tribunal *before* the government deprives an individual of a property interest.[8] In extraordinary circumstances,

---

[7] The fact that an FPI requires no statement of reasons or findings of wrongdoing only exacerbates this vagueness. OFAC's decisions to freeze assets pending investigation are published in the Federal Register, but those notices simply announce the name of the entity or individual affected, and provide no indication of *why* the freeze pending investigation was imposed. *See, e.g.*, 71 Fed. Reg. 39,857 (July 13, 2006), *available at* http://frwebgate1.access.gpo.gov/cgi-bin/PDFgate.cgi?WAISdocID=32848069744+0+1+0&WAISaction=retrieve (reporting freeze on Kindhearts' assets). As a result, they provide no guidance on the types of activities that are permitted or proscribed, or that might prompt a freeze pending investigation in the future.

[8] The general rule of Fifth Amendment due process is that "*before* the government can constitutionally deprive a person of the protected liberty or property interest, it must afford him notice and a hearing." *NCRI*, 251 F.3d at 205

post-deprivation process is sufficient, but in such settings the government must provide *prompt review*.[9]

Section 1702(a)(1)(B) provides for no post-deprivation process of any kind, let alone a timely process. It does not require OFAC to notify the entity of the reasons for the FPI, to offer the entity an opportunity to respond, or to seek judicial authorization. A statute that vests unilateral power in the executive branch to shut down organizations at will, indefinitely, without *any* procedural safeguards, violates on its face the Fifth Amendment. *Cf. Vitek v. Jones*, 445 U.S. 480, 494-97 (1980) (striking statute that lacked procedural protections for prisoners involuntarily transferred to state mental hospitals and listing the constitutionally required "minimal safeguards," including timely notice, a hearing, an opportunity to defend, and a written statement of factual findings and of reasons); *United States v. Salerno*, 481 U.S. 739, 751-52 (1987) (rejecting a facial procedural due process challenge to the Bail Reform Act of 1984 because "extensive safeguards," akin to those in *Vitek*, were already in place); *Staub v. City of Baxley*, 355 U.S. 313, 322 (1958).

A useful comparison can be drawn to the civil forfeiture context. Civil forfeiture seizures may only take place if the government obtains a warrant or the seizure is supported by probable cause. 18 U.S.C. § 981(b). After the seizure has taken place, the government must follow a detailed set of procedures to ensure the person from whom property has been seized—the

---

(emphasis added) (citing *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976)); *see also Holy Land*, 333 F.3d at 163-64 (applying *NCRI* pre-deprivation due process requirement to SDGT designation); *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972) ("If the right to notice and a hearing is to serve its full purpose, then, it is clear that it must be granted at a time when the deprivation can still be prevented.").

[9] *Fed. Deposit Ins. Corp. v. Mallen*, 486 U.S. 230, 241-42 (1988) (promptness of post-deprivation review is an important consideration if no pre-deprivation review is given); *Barry v. Barchi*, 443 U.S. 55, 64, 66 (1979) (state violated due process by not providing plaintiff prompt post-deprivation review); *id.* at 74 ("To be meaningful, an opportunity for a full hearing and determination must be afforded at least at a time when the potentially irreparable and substantial harm caused by a suspension can still be avoided—*i.e.*, either before or immediately after suspension.") (Stevens, J., concurring). Where pre-deprivation review has been denied, prompt post-deprivation review becomes paramount. *Barry*, 443 U.S. at 66. Failure to provide prompt due process is, without more, a violation of the Due Process Clause. *Brock v. Roadway Express*, 481 U.S. 252, 267 (1987).

claimant—has notice and a meaningful opportunity to be heard. *See* Civil Asset Forfeiture

Reform Act of 2000 ("CAFRA"), 18 U.S.C. § 983 *et seq.* Under CAFRA, the claimant must be

sent adequate notice within 60 days of the date of a seizure. *Id.* § 983. Once received, the

claimant has 30 days to file a claim. *Id.* After a claim has been filed, the U.S. Attorney has 90

days to file a civil complaint in federal court. *Id.* If the U.S. Attorney does not file a civil

complaint in that timeframe, forfeiture is barred. *Id.* CAFRA thus requires prompt notice,

judicial review, and a prompt hearing. By contrast, section 1702(a)(1)(B) provides for no notice,

no judicial review, and no hearing whatsoever. No other statute on the books gives a

government official such unbridled authority.

OFAC's actions in this case exacerbate the statute's constitutional flaws. OFAC

provided KindHearts with no pre-deprivation process whatsoever. The only notice OFAC

actually provided to KindHearts when it imposed the FPI was a single boilerplate sentence

stating that KindHearts was being investigated for possible connections to Hamas, without any

specification as to how, when, or in what capacity it was allegedly connected. Smaili Decl. ¶ 16,

Ex. C. The only opportunity to respond that OFAC afforded KindHearts was the chance to

submit a letter in response to its wholly inadequate notice. *Id.* And when KindHearts did in fact

submit such a letter, *Id.* ¶ 23, Ex. G, OFAC simply ignored it and did nothing for more than a

year. Bernabei Decl. Ex. A. OFAC sought no judicial approval for its freeze pending

investigation, thus imposing a 31-month seizure of the entirety of KindHearts' assets.[10]

KindHearts has now had its assets frozen for more than 31 months without adequate

process. Such an extended delay violates due process in itself:

---

[10] In addition, as explained more fully below, *see infra* Sections II.B.3 and II.B.4, defendants placed unreasonable restrictions on KindHearts' ability to use its own documents and assets in its own defense, further undermining any opportunity to respond that it might have had.

In determining how long a delay is justified in affording a post-[deprivation] hearing and decision, it is appropriate to examine the importance of the private interest and the harm to this interest occasioned by delay; the justification offered by the Government for the delay and its relation to the underlying governmental interest; and the likelihood that the interim decision may have been mistaken.

*Mallen*, 486 U.S. at 242. Application of these factors to KindHearts' case makes clear that its rights have been violated.

The harm that delay has caused to KindHearts is manifest: KindHearts has been deprived of all of its property—including bank accounts—and has been effectively shut down. Smaili Decl. ¶ 16-19; *NCRI*, 251 F.3d at 205 (recognizing organization's interest in frozen bank account as property interest); *see also N. Ga. Fishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601, 606 (1975) ("[A] bank account, surely a form of property, was impounded[.]"); *Fuentes*, 407 U.S. at 84-85 ("temporary, nonfinal deprivation of property" is sufficient to trigger due process protections).

The government has provided no justification for the delay. When it initially blocked KindHearts' assets, it stated that it was dispensing with prior notice because "prior notice to you of OFAC's blocking would have rendered the sanctions in the Executive Order ineffectual." Smaili Decl. ¶ 16, Ex. C. But even if such a conclusory statement—without any evidence to support it—were sufficient to dispense with *pre*-deprivation process, it would provide no justification whatsoever for delaying adequate *post*-deprivation process for more than two and a half years. Finally, the risks of erroneous deprivation are substantial, because the OFAC process lacks *all* the safeguards generally employed to reduce error.

### 3. IEEPA Authorizes Seizures in Violation of the Fourth Amendment.

Section 1702(a)(1)(B) violates the Fourth Amendment because it authorizes seizures without a warrant, probable cause, or even reasonable suspicion. A seizure of property occurs when "there is some meaningful interference with an individual's possessory interest in that

property." *Soldal v. Cook County*, 506 U.S. 56, 61 (1992) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)); *see also Horton v. California*, 496 U.S. 128, 133 (1990) ("a seizure deprives the individual of dominion over his or her person or property").

KindHearts indisputably has a possessory interest in its assets; OFAC's action has effectively shut it down for 31 months, and the FPI is indefinite in duration. OFAC's complete bar on KindHearts' ability to access its bank accounts and other assets or to conduct its mission for such an extended period is, at the very least, "some meaningful interference" with its interest in its property, and constitutes a seizure. *Colello v. U.S. Sec. & Exch. Comm'n*, 908 F. Supp. 738, 748-55 (C.D. Cal. 1995) (freezing of a bank account was an unconstitutional seizure under the Fourth Amendment because it was not predicated on probable cause); *Salmo v. United States*, No. 06-12909, 2006 WL 2975503, at *2-3 (E.D. Mich. Oct. 17, 2006) (government freeze of bank account was seizure in violation of Fourth Amendment); *United States v. $53,082.00 in U.S. Currency*, 985 F.2d 245 (6th Cir. 1993).[11]

Nothing in IEEPA, the Executive Order, or the Regulations imposes on OFAC a requirement that it show any suspicion whatsoever of wrongdoing before it blocks an entity pending investigation, nor did OFAC make such a showing. *Cf.* 18 U.S.C. § 981(b) (requiring warrant or probable cause before civil forfeiture seizure). Absent a categorical exception such as "plain view," seizures presumptively require probable cause and a warrant. *Arizona v. Hicks*, 480 U.S. 321, 327 (1987). No categorical exception applies here to permit the government to

---

[11] In two other SDGT designation challenges, courts have cursorily applied a Fifth Amendment takings analysis to find that blocking a designated entity's assets does not constitute a seizure under the Fourth Amendment because designation is temporary and title has not passed to the government. *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 79 (D.D.C. 2002); *Islamic Am. Relief Agency v. Unidentified FBI Agents*, 394 F. Supp. 2d 34, 48 (D.D.C. 2005). This analysis simply applies the wrong standards. In the Fourth Amendment context, an unlawful seizure occurs even when, as in KindHearts' case, title to the assets does not pass to the government. *Miranda v. City of Cornelius*, 429 F.3d 858, 862 (9th Cir. 2005) (impounding of a car is a seizure within the meaning of the Fourth Amendment even though title to the vehicle did not transfer). Indeed, *most* seizures under the Fourth Amendment do not involve a transfer of title. Thus, these courts erred in conflating takings' analysis with the question whether a Fourth Amendment seizure had occurred.

dispense with the warrant and probable cause requirement. Warrant applications are typically conducted *ex parte*, and therefore they would pose no security risks in advance of freezing an entity's assets. And they would serve one of the Fourth Amendment's central purposes, which is to insert a judicial check between the state and the property and privacy of the people.

The Supreme Court has held that even a 90-minute detention of luggage is a seizure requiring probable cause. *United States v. Place*, 462 U.S. 696, 709-10 (1983) (holding individual's luggage for 90 minutes was unconstitutional "seizure" when police had only reasonable suspicion, not probable cause, of criminal activity). Surely, then, the wholesale shutting down of an entity for 31 months and the indefinite freezing of all its assets requires no less. Accordingly, the FPI is an unreasonable seizure under the Fourth Amendment.

In sum, OFAC's freeze pending investigation violates KindHearts' rights under the First, Fourth, and Fifth Amendments. The freeze was instituted under authority of a statute that is facially unconstitutional because it affords none of the safeguards the Constitution requires when the government seeks to deprive an individual or entity of its property. And OFAC's actions in this particular case have only exacerbated the constitutional violations.

## B. OFAC's Threatened Designation of KindHearts as a Specially Designated Global Terrorist Is Unconstitutional.

In addition to freezing KindHearts' assets pending investigation, OFAC has threatened to designate it as an SDGT. Bernabei Decl. Ex. A. Even though the SDGT designation includes marginally better protections, the SDGT designation process also violates the First, Fourth, and Fifth Amendments, for reasons similar to those with respect to the FPI. Here, too, OFAC has failed to provide adequate notice by failing to specify the legal and factual basis for its actions. Here, too, OFAC has denied KindHearts a meaningful opportunity to respond. Here, too, OFAC threatens to effectuate (or more accurately, prolong) a seizure without probable cause or a

22

warrant, in violation of the Fourth Amendment. And here, too, OFAC's actions with respect to KindHearts' assets and records have further undermined any chance KindHearts might have had to defend itself.

### 1. The Designation Authority Under IEEPA and the Executive Order is Unconstitutionally Vague.

Under both IEEPA and the Executive Order, the executive branch's authority to designate an organization an SDGT violates the First and Fifth Amendments on its face because the authority is so vague as to be virtually unchecked, and encompasses pure speech and advocacy. A central purpose underlying the due process and First Amendment prohibition on vague statutes is to "avoid subjective enforcement of the laws based on 'arbitrary and discriminatory enforcement' by government officers." *Foti v. City of Menlo Park*, 146 F.3d 629, 638 (9th Cir. 1998) (quoting *Grayned*, 408 U.S. at 108-09).[12]

IEEPA permits the executive branch to shut down disfavored groups and individuals, without substantive charges, without findings of wrongdoing, and without statutory guidance on such critical terms as "terrorist organizations," "specially designated global terrorists," or any other term relating to "terrorism." Designations may be made without providing any notice, any hearing, or even any statement of reasons. *Cf. Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1136-37 (9th Cir. 2000) (upholding AEDPA provision authorizing designation of foreign

---

[12] While IEEPA and E.O. 13,224 impose civil as well as criminal sanctions, the same stringent vagueness standard applies to both. First, stringent standards are required by civil laws that affect First Amendment rights: "the requirement of clarity is enhanced ... when the statute abuts upon sensitive areas of First Amendment freedoms." *Info. Providers' Coal. for Protection of the First Amendment v. FCC*, 928 F.2d 866, 874 (9th Cir. 1991) (internal quotation marks and citations omitted); *see Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982) ("perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights"). Second, stringent vagueness standards apply to civil laws that impose "quasi-criminal" penalties or have "prohibitory and stigmatizing effects." *Id.* at 499. The civil provisions at issue here are not designed to compensate the government, but explicitly to penalize. 18 U.S.C. § 1705(a) (authorizing a "civil penalty"). The designation sanction can also effectively be a death knell for an organization and thus is in many respects more draconian than a criminal penalty because it effectively shuts down the organization.

organizations because executive branch must meet specific statutory criteria requiring findings of terrorist activity). OFAC's designation authority under IEEPA is therefore unconstitutionally vague.

OFAC's authority under E.O. 13,224 to designate on the basis of "material support," "services," and "associations" is also unconstitutionally vague because these are sweeping and vague terms that encompass a substantial amount of First Amendment-protected activity. E.O. 13,224 §§ 1(d)(ii), 2(a) (authorizing designation and civil and criminal penalties if individuals or groups are deemed to have provided "material support" or "services" to designated entities, or to be "otherwise associated with" such groups); *cf. Humanitarian Law Project v. Mukasey*, 509 F.3d 1122, 1135-36 (9th Cir. 2007) (declaring unconstitutionally vague a similar ban in 18 U.S.C. § 2339B on providing "services," "training," and "expert advice or assistance" to designated foreign terrorist organizations). The Executive Order's bans are sweeping and vague for several reasons: the ban against "otherwise associating" with a designated organization is so broad as to encompass First Amendment protected speech and association;[13] the bans against the provision of material support and services apply to association with groups and individuals that have *never* engaged in or supported any terrorist activity or any group engaged in terrorist activity; the bans require *no showing of knowledge whatsoever*; designation is effectuated without a hearing, on secret evidence, without notice of any offending conduct or of the legal provisions at issue, and without a statement of reasons; and the bans could encompass services including many, such as "educational" or "public relations" or "legal" services, 31 C.F.R. § 594.406, that would consist of pure speech or advocacy. IEEPA and the Executive Order give the executive branch virtually unfettered and unconstitutional discretion.

---

[13] *Cf. infra* II.B.2 (discussing allegation that KindHearts provided support to unspecified organizations somehow "affiliated" with Hamas).

## 2. OFAC Has Not Given Adequate Notice with Respect to the Threatened SDGT Designation.

Due process requires, at a minimum, "notice of the action sought" by the government and "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews*, 424 U.S. at 333-34 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)); *see also Hamdi v. Rumsfeld*, 542 U.S. 507, 536-37 (2004) (holding that alleged enemy combatant has a due process right to notice of the factual and legal basis for the charges against him, a meaningful opportunity to rebut the charges, and a neutral fact-finder); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985). KindHearts has received neither notice nor a meaningful opportunity to respond to OFAC's threatened designation.

To this day, 31 months after its assets were frozen, and more than a year after OFAC threatened to designate it, KindHearts still does not know the most basic elements of OFAC's legal or factual case against it. When OFAC first froze KindHearts' assets "pending investigation" on February 19, 2006, it provided nothing more than a single boilerplate sentence essentially restating all of the criteria of E.O. 13,224 and stating that KindHearts' assets had been blocked because of possible, unspecified connections with Hamas. Smaili Decl. ¶ 16, Ex. C. Fifteen months later, when OFAC informed KindHearts that it had "provisionally" decided to designate it an SDGT, OFAC again failed to provide any statement of the factual or legal basis for its actions. Bernabei Decl. Ex. A. Despite repeated requests from KindHearts over the last 31 months, OFAC has still failed to provide notice that would permit KindHearts to prepare a meaningful response.

The initial February 19, 2006 "notice" to KindHearts, falls far short of constitutional requirements. If a notice does not inform an affected person of the government's charges and

evidence against him, he is unable "to present his side of the story" to rebut that evidence and the notice is constitutionally inadequate. *Loudermill*, 470 U.S. at 546; *see also Goldberg v. Kelly*, 397 U.S. 254, 267-68 (1970) (due process requires "timely and adequate notice detailing the reasons for" the action); *NCRI*, 251 F.3d at 208-09 (holding, in the context of an FTO designation, that Secretary of State must provide notice of items the Secretary plans to rely on in the designation). OFAC's initial notice did not inform KindHearts in any way of the factual or legal basis for its actions.

Despite the constitutional deficiencies in OFAC's notice, KindHearts promptly responded with a series of letters. In particular, on April 24, 2006, KindHearts sent OFAC an eight-page letter in which it asked OFAC to remove the freeze and noted that in the two months since the freeze, "not one single factual allegation has been levied against KindHearts by any governmental entity." Smaili Decl. ¶ 23, Ex. G. Even though KindHearts did not know the charges against it, it nevertheless detailed the organization's operations and sought to explain why it thought the freeze was a mistake. *Id.*

OFAC never responded to KindHearts' April 24, 2006 letter or to its requests for notice, information, and an opportunity to be heard. More than a year later, on May 25, 2007, OFAC wrote that it had "*completed* its investigation into whether KindHearts should be designated as an SDGT and has provisionally determined that designation is appropriate." Bernabei Decl. Ex. A (emphasis added). With that letter, OFAC provided KindHearts with the unclassified portions of its administrative record.

Both OFAC's letter threatening designation and the administrative record fall far short of constitutional requirements.[14] Neither the letter nor the administrative record informed

---

[14] In other designation cases courts have held that pre-deprivation notice is not required for reasons that are wholly inapplicable to KindHearts. *See, e.g., Holy Land*, 333 F.3d at 163-64; *Global Relief Found., Inc. v. O'Neill*, 315

KindHearts of the charges against it, or of the factual basis for the charges, leaving KindHearts to guess at the significance of the documents in the record, the vast majority of which do not even mention KindHearts. It is as if a plaintiff in a civil suit simply produced evidence to the defendant but never provided it with a complaint notifying it of what was at issue.

Most of the documents disclosed in the administrative record do not even refer to KindHearts. They include criminal indictments in trials having nothing to do with KindHearts, court decisions from cases having nothing to do with KindHearts, a print-out of OFAC's list of designated entities, and press releases and other accounts of the designation of other entities having nothing to do with KindHearts. *See generally* Bernabei Decl. Exs. A, T. Of course, these documents are not evidence at all, but merely reiterations of government *allegations. See Parhat v. Gates,* 532 F.3d 834, 846-50 (D.C. Cir. 2008) (government record consisting of indictments and allegations does not amount to evidence that would support the designation of an individual as an "enemy combatant"). The documents contain no allegation or evidence that KindHearts provided material support to, or engaged in transactions with, any of the entities named in these documents; indeed, KindHearts was formed well *after* most of the events discussed in the indictments and press releases.

OFAC's administrative record also contains unreliable hearsay, such as newspaper articles citing anonymous sources, website essays of questionable provenance and doubtful reliability, and selected chapters from books. *See, e.g.*, Bernabei Decl. Ex. T (CTI-1) (Feb. 25, 2004 document with no source information); *id.* (CTI-2) (Sept. 21, 2004 newspaper article); *id.* (CTI-8) (Dec. 30, 2001 website article); *id.* (CTI-14) (Dec. 7, 2005 newspaper article); *id.* (CTI-

---

F.3d 748, 754 (7th Cir. 2002); *Islamic Am. Relief Agency*, 394 F. Supp. 2d at 49-50. In these cases, the government argued against pre-deprivation notice because of concern about the destruction of records and the flight of assets. Assuming, without conceding, that these concerns pass constitutional muster, they simply cannot apply to KindHearts, whose assets were frozen and records seized more than a year before OFAC threatened to designate it, and whose assets and records have been in government custody now for more than 31 months.

25) (May 11, 2005 website article); *id.* (CTI-26 (June 14, 2006 website article); *id.* (CTI-27) (2005 magazine article); *id.* (CTI-31) (1993 book chapter). None of this is sworn testimony. Much of it relays statements by unidentified others, depriving KindHearts of an opportunity to challenge the credibility or basis of knowledge of the declarant. At least one of the translated articles is an unauthenticated translation prepared by "Google," hardly a reliable source for accurate translations. *See id.* (CTI-25) (May 11, 2005 translation).

The few documents in the administrative record that actually mention KindHearts provide no clue as to the purported basis for OFAC's provisional decision to designate. For example, the administrative record includes two copies of KindHearts' periodic newsletter, *see id.* (CTI-12) (Oct. 2003 issue); *id.* (CTI-13) (Summer 2005 issue), which demonstrate only that KindHearts funded a wide range of legitimate charitable activities, and provide no evidence that any designated entity received any support from KindHearts. A newspaper article generally discusses KindHearts' activities, but contains no inculpatory information. *See id.* (CTI-14) (D. Yonke, "Local Muslim charity denies it has any links to terrorism; U.S. Senate panel quietly drops investigation into group," *Toledo Blade*, Dec. 7, 2005). Finally the administrative record includes an exchange of emails from January 2006, between the Board of KindHearts and the former manager of the Palestine office, Ghalib Abushaban. *See id.* (CTI-22) ("Message from the Board of Trustees") (Jan. 19-25, 2006). These emails do not indicate any support of designated entities. To the contrary, they demonstrate that KindHearts' directors, concerned about a possible unauthorized financial transaction, took prompt action to investigate and remedy what they believed to be improper conduct by the former manager, over his strong objections.

In short, the letters and "documentation" OFAC sent to KindHearts during the designation process provided no notice of the conduct for which KindHearts might be

designated, and OFAC has to this day failed to provide any specification of its charges. The government has no legitimate interest in "hiding the ball" in this manner—particularly in light of the ongoing freeze of KindHearts' assets and activity—and accordingly its failure to provide adequate notice invalidates its actions.

### 3. OFAC's Reliance on Classified Evidence Violates Due Process and the APA.

In addition to producing unclassified documents, OFAC notified KindHearts that it is relying on certain classified evidence for its provisional decision to designate KindHearts. It has provided an "Unclassified Summary" of those documents, *id.* Ex. A, but the summary consists of vague and conclusory allegations and provides no detail as to the source of the allegations, their credibility, or the basis for the sources' knowledge. The use of such classified evidence independently violates KindHearts' due process rights because KindHearts has no meaningful opportunity to respond to evidence that it cannot see, and defendants have made no effort to mitigate the unfairness, by, for example, authorizing KindHearts' counsel to review the evidence subject to security clearances and a protective order.

The Sixth Circuit has long recognized that the use of secret evidence in civil disputes violates due process. *EEOC v. Monarch Mach. Tool Co.*, 737 F.2d 1444, 1448 (6th Cir. 1980) ("[I]t is error to accept evidence ex parte because it is inherently unfair to allow one party to put evidence before the court without allowing his opponent the opportunity to test its validity." (quoting *Wright v. Sw. Bank*, 554 F.2d 661, 663 (5th Cir. 1977))); *American-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1070 (9th Cir. 1995) (deprivation of property or liberty on the basis of secret evidence is "presumptively unconstitutional."); *see also Goss v. Lopez*, 419 U.S. 565, 580 (1975). OFAC's threat to designate KindHearts on the basis of classified evidence violates this fundamental principle.

Reliance on secret evidence is strongly disfavored for at least three distinct reasons, each

of which is implicated in KindHearts' case. First, secret evidence undermines the fairness of the

adversarial process. *See Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 170

(1951). As the Supreme Court explained:

> Certain principles have remained relatively immutable in our jurisprudence. One
> of these is that where governmental action seriously injures an individual, and the
> reasonableness of the action depends on fact findings, the evidence used to prove
> the Government's case must be disclosed to the individual so that he has an
> opportunity to show that it is untrue.

*Greene v. McElroy*, 360 U.S. 474, 496 (1959); *see also United States v. Abuhamra*, 389 F.3d

309, 322 (2d Cir. 2004) ("due process demands that the individual and the government each be

afforded the opportunity not only to advance their respective positions but to correct or

contradict arguments or evidence offered by the other").

The concern for fairness applies with equal force in the national security context. Thus,

the use of secret evidence to deport a foreign national violates due process because the foreign

national, "like Joseph K. in *The Trial*—can prevail . . . only if he can rebut the undisclosed

evidence against him, *i.e.*, prove that he is not a terrorist regardless of what might be implied by

the Government's confidential information. It is difficult to imagine how even someone

innocent of all wrongdoing could meet such a burden." *Rafeedie v. INS*, 880 F.2d 506, 516 (D.C.

Cir. 1989); *see also American-Arab Anti-Discrimination Comm.*, 70 F.3d at 1070 (holding that

use of secret evidence to deny an immigration benefit to foreign nationals allegedly tied to a

terrorist organization violated due process).

The second reason courts disfavor *ex parte* evidence is because it creates an intolerable

risk of error. *See e.g.*, *American-Arab Anti-Discrimination Comm.*, 70 F.3d at 1069. When

OFAC relies on classified evidence, it has no opportunity to hear KindHearts' side of the story,

because KindHearts has no idea what it should be responding to. In addition, OFAC's refusal to allow KindHearts' counsel to review the evidence subject to security clearances increases the risk of error, because it means that there is *no adversarial testing of the evidence at all*. Our system of justice relies principally on the adversarial system to reduce the risk of error. *Joint Anti-Fascist Refugee Comm.*, 341 U.S. at 171-72 (Frankfurter, J., concurring). Secret evidence short-circuits that process entirely. *Id.*

Third, the rule against consideration of *ex parte* evidence to decide the merits of a dispute furthers the vital appearance of fairness in administrative and judicial decision-making. *See, e.g.*, *Abourezk v. Reagan*, 785 F.2d 1043, 1060-61 (D.C. Cir. 1986) (open proceedings "preserve both the appearance and the reality of fairness"), *aff'd by an equally divided Court*, 484 U.S. 1 (1987). The Fourth Circuit explained the court's role in national security cases in *In re Washington Post Co.*, 807 F.2d 383, 391-92 (4th Cir. 1987):

> [T]roubled as we are by the risk that disclosure of classified information could endanger the lives of both Americans and their foreign informants, . . . [] blind acceptance by the courts of the government's insistence on the need for secrecy, without notice to others, without argument, and without a statement of reasons, would impermissibly compromise the independence of the judiciary and open the door to possible abuse.

The D.C. Circuit recently held that in order for a judge to make an independent determination of whether the government has sufficient evidence to support the designation of a Guantánamo detainee as an "enemy combatant," the government must provide the sources of its information and a basis for finding that the evidence is reliable. *Parhat*, 532 F.3d at 846-50 (rejecting, as the government's basis for designating Guantánamo detainee an unlawful enemy combatant, government assertions for which there were no independent sources identified and that could have been based on hearsay and speculation). The D.C. Circuit noted that several alternatives were available to the executive branch, including providing cleared defense counsel

access to classified information, "appropriate nonclassified substitutions under the Classified Information Protection Act," and other means that "will permit an appropriate assessment of the information's reliability while protecting the anonymity of a highly sensitive source." *Id.* at 849.[15]

KindHearts' counsel have repeatedly sought access to OFAC's classified evidence in order to understand and respond to the government's actions, to no avail. *See, e.g.*, Bernabei Decl. Exs. C, G. Instead, OFAC has provided only an "unclassified summary" that is vague, conclusory, and based on unidentified hearsay. *Id.* Ex. A; *Kiareldeen v. Reno*, 71 F. Supp. 2d 402, 414 (D.N.J. 1999) ("The court has considered the government's unclassified 'summary' evidence and finds it lacking in either detail or attribution to reliable sources which would shore up its credibility."). Without any access to the evidence "described" in the summary, KindHearts' ability to defend itself is meaningless because it is being asked to prove a negative by disproving multiple hearsay allegations without access to the evidence, without discovery, and without knowing the identity of its accusers.

For example, in the Unclassified Summary, OFAC makes the allegation that KindHearts "coordinated with Hamas leaders and made contributions to Hamas-affiliated organizations." Bernabei Decl. Ex. A. In support of this allegation, OFAC recites a phrase it frequently uses throughout the Unclassified Summary: "according to information available to the U.S." *Id.* Neither the allegation nor its purported support allow KindHearts a meaningful opportunity to defend itself. KindHearts has no means of ascertaining the identity either of the "leaders" it is

---

[15] The few other statutes that contemplate consideration of *ex parte* evidence explicitly require courts to consider alternatives that would mitigate the unfairness of secrecy. *See, e.g.*, 50 U.S.C. § 1806(f) (providing that court can order partial release of classified material previously submitted by government to FISA court); 8 U.S.C. § 1534(e)(3) (requiring an unclassified summary in summary terrorism removal proceedings and in some cases designation of counsel with security clearance); 18 U.S.C. app. 3 § 4 (requiring summaries or substitute admissions). IEEPA, in contrast, does not require the court to consider alternatives to total secrecy. As to classified evidence, the statute appears to contemplate proceedings that are entirely one-sided. 50 U.S.C. § 1702(c).

accused of supporting or of the organizations OFAC sweepingly refers to as "affiliated" with

Hamas. *See Humanitarian Law Project*, 463 F. Supp. 2d 1049 (finding unconstitutional the

"associated with" criterion applied by OFAC). Nor does the government provide even an inkling

of the basis for its accusation: KindHearts does not know who the United States obtained the

information from, when it obtained the information, or the circumstances under which the

information was acquired. *Kiareldeen*, 71 F. Supp. 2d at 413 ("The petitioner has been

compelled by the government to attempt to prove the negative in the face of anonymous 'slurs of

unseen and unsworn informers.'" (internal citation omitted)).[16]

KindHearts has proposed to OFAC reasonable alternatives to the disclosure of classified

evidence, but without success. KindHearts asked the government to conduct a "declassification

review" of its classified evidence. Bernabei Decl. Exs. C, F. OFAC agreed to do so, *see id.* Ex.

S, but in the year since then, it has reported no progress (and produced no further evidence). Nor

has the government provided an adequate summary of the evidence as a substitute for access to

the classified evidence. *See, e.g.*, *Abuhamra*, 389 F.3d at 321 (due process requires, at a

minimum, some "substitute disclosure").[17] Finally, despite repeated requests from KindHearts'

---

[16] A few D.C. Circuit cases, in the period after the September 11, 2001 tragedy, upheld the government's reliance on classified evidence for designating organizations as terrorists. *See Holy Land*, 333 F.3d at 164; *Peoples Mojahedin Org. of Iran v. Dep't of State (PMOI)*, 327 F.3d 1238 (D.C. Cir. 2003); *NCRI*, 251 F.3d 192; *see also Global Relief Found., Inc*, 315 F.3d at 754 (relying, without analysis, on decision in *Holy Land*). This Court should decline to follow these cases. In none of the cases did the D.C. Circuit give adequate consideration to the due process consequences of denying a party knowledge of the charges and evidence against it. In each of the cases, the D.C. Circuit simply deferred, with little analysis, to the power of the executive to classify information and to conduct foreign policy. Since these cases were decided, however, the Supreme Court has made clear that the courts have a critical role to play in adjudicating constitutional challenges even in the face of government claims of authority based on foreign policy and national security grounds. *Hamdi*, 542 U.S. at 536 ("a state of war is not a blank check for the President when it comes to the rights of the Nation's citizens,"); *see also Boumediene v. Bush*, 128 S. Ct. 2229 (2008). In its recent *Bismullah* decision on the detention of enemy combatants, discussed above, the D.C. Circuit itself was less deferential to the government's claimed need for secrecy, and required the government to provide security-cleared detainees' counsel access to classified documents. *Bismullah*, 501 F.3d at 180.

[17] In the immigration and criminal contexts the government is statutorily required to produce adequate summaries. *See* 18 U.S.C. app. 3 (Classified Information Procedures Act, Pub. L. No. 96-456); 8 C.F.R. § 1240.11(c)(3)(iv) (unclassified summary of evidence in immigration proceeding); *id.* § 1240.33(c)(4) (same); *id.* § 1240.49(c)(4)(iv) (same). While CIPA and the INA do not apply here, they illustrate that such an option is available. And as a matter

counsel, *see, e.g.*, Bernabei Decl. Exs. C, F, the government has made no provision for counsel to review the classified evidence pursuant to a security clearance and protective order. *Bismullah v. Gates*, 501 F.3d 178, 180 (D.C. Cir. 2007) (holding that Guantánamo detainees' counsel were entitled to review the classified evidence relating to their clients in order to ensure meaningful judicial review of the entire record), *vacated*, 128 S. Ct. 2960 (June 23, 2008), *reinstated*, No. 06-1197 (D.C. Cir. Aug. 22, 2008) (per curiam); *see also United States v. Lockheed Martin Corp.*, No. 1:98-cv-00731-EGS, 1998 WL 306755 at *1-12 (D.D.C. May 29, 1998) (setting parameters of protective order to protect any classified information that may come out in depositions of defense contractors in civil litigation).

Where, as here, the vast majority of the evidence relied upon is classified, the unclassified evidence is insufficient to permit KindHearts to understand and defend against the threatened designation, and defendants have not established that less restrictive alternatives are unavailable, OFAC's reliance on classified evidence violates due process.

### C. OFAC's Restrictions on KindHearts' Ability to Present a Defense Violate Due Process and the APA.

OFAC has also imposed unreasonable restrictions on KindHearts' ability to defend itself, further undermining its due process rights. The government has severely compromised KindHearts' ability to respond by denying it any access to its own documents for over two years, placing unreasonable restrictions on its ability to review and use the documents ever since, and requiring counsel to give the government the results of any independent investigation undertaken in furtherance of KindHearts' defense. These restrictions deprive KindHearts of its constitutional right to a meaningful opportunity to defend itself.

---

of due process, if the government were to provide an adequate unclassified summary, it would in no way undermine its interests (since by definition the information in the summary is unclassified), and would reduce the risk of error by providing an organization with *some* idea of the evidence being used against it.

In February 2006, when OFAC froze KindHearts' assets, federal agents seized all of KindHearts' records from its headquarters and from the house of its President and Chief Executive Officer. Smaili Decl. ¶ 17. Those records are the core of KindHearts' defense—they document precisely what KindHearts did with the funds that it collected, and are necessary to demonstrate that its funds were not expended for any unlawful purposes or to support terrorism or any designated organization or individual. Yet for over two years, the government refused to provide KindHearts even with copies of its own records. Bernabei Decl. Exs. C, G. To accuse a corporation of wrongdoing and then require it to defend itself without access to its own records is fundamentally unfair, and deprives KindHearts of the due process right to a meaningful opportunity to respond.

Even as the government denied KindHearts access to its own documents, OFAC itself selectively used those documents in connection with the designation process: a few of the seized documents were included in the administrative record. The government's selective reliance on KindHearts' documents violates due process because an agency may not skew the record in its favor by excluding pertinent but unfavorable information. *Kent County, Del. Levy Court v. EPA*, 963 F.2d 391, 396 (D.C. Cir. 1992) (agency cannot "exclude[] from the record evidence adverse to its position"); *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989) (supplementation of the administrative record proper when "the agency failed to consider factors which are relevant to its final decision"); *Carlton v. Babbitt*, 26 F. Supp. 2d 102, 107 (D.D.C. 1998) (ordering agency to include relevant public documents and court records that undermine the agency's administrative record).

After initially refusing to give KindHearts access to its own documents, in April 2008, the government reversed course without explanation and provided KindHearts' counsel with an

electronic copy of a subset of its own documents.[18]  Bernabei Decl. Ex. J. But it continues to
place unreasonable restrictions on counsel's storage, copying, analysis, and use of the records—
none of which are classified. *Id.* The government has obtained a Protective Order, *KindHearts
for Charitable Humanitarian Development, Inc.*, No. 3:06-7019 (N.D. Ohio Apr. 9, 2008), which
expressly states the "materials may be viewed only by KindHearts' counsel and such members of
its staff," and forbids KindHearts' members and officers from viewing any of their own
documents without further permission of the Court. The Protective Order prohibits even printing
out the documents or any electronic copying of the documents. (In a separate but related motion,
KindHearts is simultaneously moving for a modification of the Protective Order. *See*
KindHearts' Motion to Vacate or, in the alternative, to Modify *Ex Parte* Protective Order.

The Protective Order makes it impossible for all of KindHearts' counsel to review the
materials and for KindHearts' members and officers to assist in its defense. KindHearts' counsel
and former officers are scattered among several states and three countries (Washington D.C.,
New York, Ohio, California, the United Kingdom, and Lebanon), thus requiring significant
travel by both counsel and clients to review the materials, some of which are in Arabic, and
many of which pertain to financial and organizational activities that require the clients' input,
analysis, and explanation in order for counsel to understand their significance. The government
cannot justify denying KindHearts full access to its own documents, particularly where the
documents are not classified, and where KindHearts has never been found to have engaged in
any wrongdoing whatsoever, much less any wrongdoing that would, under some theory, justify
preventing it from reviewing its own business records.

---

[18] It is still unclear whether or not the government produced to KindHearts all of the records it seized. Neither the
government's cover letter accompanying the records, nor the applicable protective order, made any mention of the
documents seized during the search of KindHearts' president's residence, nor did they indicate whether all
electronic files, or only paper documents, were included in the production of materials.

The government has also unreasonably restricted KindHearts' counsel's ability to gather evidence for its defense from third parties. In July 2007, KindHearts' counsel advised OFAC that in order for KindHearts to defend itself, it would have to interview former KindHearts employees and obtain documents from them. Bernabei Decl. Ex. K. KindHearts' counsel sought OFAC's assurance that KindHearts' employees and officers had the right to engage in this activity without violating the law by "supporting" KindHearts. *Id.* OFAC responded that the employees and directors could conduct such a search, but that any documents in the possession of third parties "are considered blocked property," which would require a separate OFAC license, and that all such documents would have to be identified to OFAC with information on "the owner, the property, its location, [and] any reference necessary to identify the property . . . ." *id.* Ex. L.

Although OFAC has since appeared to modify the restriction, *id.* Ex. N, the parameters of the modification and the obligations of KindHearts' counsel remain unclear and, in any event, are subject to OFAC's unilateral determination and interpretation, which may be inconsistent with the protective order as entered by the Court. OFAC's demand that KindHearts' counsel turn over to it the fruits of counsels' investigation on their clients' behalf is an arbitrary and capricious exercise of the authority granted to it under the Regulations. 31 C.F.R. § 501.603 (governing reporting requirements with respect to blocked property). It also impermissibly interferes with KindHearts' due process right to a meaningful defense because it creates a conflict of interest for KindHearts' counsel by making them agents for the government. Declaration of Ellen Yaroshefsky ¶ 19.

**D.  OFAC's Restrictions on Attorneys' Fees Violate Due Process and Are Arbitrary and Capricious under the APA.**

OFAC has further undermined KindHearts' opportunity to present a response by arbitrarily restricting its ability to spend its own funds on its own defense. For over two years, OFAC absolutely prohibited KindHearts from using any of its own funds to pay for its legal expenses in defending itself. OFAC has now stated that it will allow KindHearts to use some of its own funds, but subject to arbitrary limits on the amount of money KindHearts can spend and the number of attorneys it can compensate. None of the restrictions on the payment of attorneys' fees has any support in IEEPA, the Executive Order, or the Regulations. By placing arbitrary restrictions on KindHearts' ability to use its own funds to defend itself and by placing itself in the position of deciding how much KindHearts can spend in administrative and judicial challenges to its own actions, OFAC has created a fundamental conflict of interest and violated KindHearts' due process right to a meaningful opportunity to respond.[19]

From OFAC's initial freeze in February 2006 to June 2008, it asserted that KindHearts could pay for legal services only if those payments did not originate from its own funds. *See, e.g.*, Smaili Decl. ¶ 22, Ex. F; Bernabei Decl. Exs. O, Q, R (claiming authority to regulate attorneys' fees as blocked funds under 50 U.S.C. § 1702(a)(1)(B) and 31 C.F.R. § 594.201). As

---

[19] Because OFAC's restrictions on KindHearts' ability to retain and compensate counsel undermine its ability to sue OFAC for its actions, they also implicate KindHearts' due process right to access to the courts. *See Bounds v. Smith*, 430 U.S. 817, 828 (1977). And representation by counsel is an important part of this access. *Am. Airways Charters, Inc. v. Regan*, 746 F.2d 865, 872-73 (D.C. Cir 1984) (stressing that "in our complex, highly adversarial legal system, an individual or entity may in fact be denied the most fundamental elements of justice without prompt access to counsel"); *Martin v. Laurer*, 686 F.2d 24, 32 (D.C. Cir. 1982) ("undeniable" right of private parties to hire an attorney to determine legal rights). A civil litigant has a constitutional right, inherent in the concept of due process, to retain counsel. *Potashnick v. Port City Constr. Co.*, 609 F.2d 1101, 1118 (5th Cir. 1980); *see also Goldberg*, 397 U.S. at 270-71 (claimant "must be allowed to retain an attorney if he so desires [because] [c]ounsel can help delineate the issues, present the factual contentions in an orderly manner, conduct cross-examination, and generally safeguard the interests" of the claimant).

a result, and although OFAC has in the past allowed designated entities to use their blocked

funds to pay attorneys' fees in similar cases, KindHearts has been unable to pay its attorneys.

In June 2008, after its attorneys' fees restrictions were challenged as unconstitutional in a

separate lawsuit, OFAC changed its policy. Bernabei Decl. Ex. Q. OFAC's new policy permits

some expenditure of blocked funds on legal expenses, but continues to impose arbitrary and

unconstitutional limits on KindHearts' ability to defend itself: (1) it has placed itself, the adverse

party in this litigation, in charge of approving plaintiff's legal expenditures, creating a

fundamental conflict of interest; (2) it limits payment by KindHearts to two attorneys, even

though the government typically employs many more attorneys in connection with issuing and

defending SDGT designations;[20] and (3) it caps the amount of fees payable to each attorney at

each stage of the proceedings at unreasonably low rates of $7,000 per attorney, rates that have no

basis in experience, logic, law, the economics of practice, or actual cost. *Id.*

A comparison to other designation cases shows that OFAC's fee restriction—an

aggregate cap of $28,000 for two attorneys to cover both the administrative designation

challenge and judicial review of designation at the district court level—simply has no relation to

the reality of time, fees, and expenses required to effectively represent a client in a designation

case. For example, in the challenge to a freeze and subsequent SDGT designation brought by

AHIF, two of the five attorneys representing AHIF have provided to date almost 650 hours of

legal services, totaling $210,802.00 in legal fees, and have incurred expenses of $10,448.13.

---

[20] Other designation cases illustrate the stark difference between the manpower the government deems necessary to defend itself and the two-attorney limit it seeks to impose on KindHearts. There are at least 13 attorneys, from both the Department of Justice and OFAC, assigned to the designation challenge brought by an Oregon-based charity, the Al Haramain Islamic Foundation, Inc. ("AHIF"). Kabat Decl. ¶¶ 9-10. Based on the court filings in three other designation challenges, the Department of Justice alone has assigned multiple attorneys to defend OFAC's designations: eight DOJ attorneys represented the government at the district court level in the challenge by the charity Benevolent International Foundation; a total of ten DOJ attorneys were assigned to the district court and appellate proceedings in the Global Relief Foundation's designation challenge; and a total of six DOJ attorneys were assigned to the district court and appellate proceedings in the Islamic American Relief Agency's designation challenge. Kabat Decl. ¶¶ 12-14.

Kabat Decl. ¶¶ 4-5. [21] These amounts reflect only the resources expended by two attorneys in the initial stages of the challenge.[22] In another example, that of the Holy Land Foundation for Relief and Development ("HLF"), which was designated an SDGT in 2001, counsel for HLF spent approximately 4,286 hours litigating the designation through to a petition to the Supreme Court for certiorari review, and incurred total fees and expenses of $898,539.41. Boyd Decl. ¶ 4. Until it changed its policy toward the end of the litigation, OFAC permitted HLF's counsel to be paid from HLF's blocked funds, at counsel's normal hourly rate. *Id.* ¶ 5.

OFAC's current fee policy violates KindHearts' due process rights by arbitrarily undermining its ability to defend itself. The policy is also an arbitrary and capricious exercise of OFAC's authority under the statutory and regulatory framework.[23] *Sierra Club v. Glickman*, 156 F.3d 606, 617 (5th Cir. 1998) (an "agency's discretion to make the final substantive decision under its program authorities does not mean that the agency has unlimited, unreviewable discretion"); *Cherokee Nation of Okla. v. Norton*, 389 F.3d 1074, 1078 (10th Cir. 2005) ("although the APA's arbitrary and capricious standard is ordinarily a deferential one, such deference is not unfettered nor always due" (citation omitted)).

First, OFAC's new policy places itself, the *defendant* in this adversary proceeding (and in the preceding administrative proceedings as well) in charge of the resources that the *plaintiff* may

[21] The legal fee amount is based on the government-calculated market rate for attorneys in private practice in Washington, D.C., where the two attorneys, Lynne Bernabei and Alan Kabat (who are also counsel to KindHearts in the instant challenge), practice. Kabat Decl. ¶ 4.

[22] The hours, fees, and expenses cover a four-year period, from May 2004 (when the attorneys were retained to challenge the initial freeze) to August 2008, by which time both parties had moved for summary judgment on the constitutionality of the designation and are now awaiting the district court's decision. Kabat Decl. ¶¶ 4-5; *see also* Plaintiffs' Reply Memorandum in Support of Motion for Summary Judgment at 3-6, *Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, Civ. No. 07-1155 (D. Or. June 20, 2008) (government designated AHIF after a seven-month long freeze; after AHIF challenged the freeze, the government designated and then "re-designated" AHIF).

[23] The one case in which OFAC's denial of a license to pay attorneys' fees from blocked funds was challenged and upheld, *Beobanka D.D. Belgrade v. United States*, No. 95 Civ. 5138 (HB), 1997 WL 23182 (S.D.N.Y. Jan. 22, 1997), does not raise the same due process issues as KindHearts does. In *Beobanka*, the designated plaintiff did not dispute its designation and instead sought blocked funds for litigation unrelated to a designation challenge.

employ against it in that very proceeding. This is an inherent conflict of interest, and as such violates due process and is arbitrary and capricious in violation of the APA. Decisions about legal expenses should be made by the courts, not the administrative agency whose actions are being challenged. Not surprisingly then, there is no precedent to support a rule that gives one party the unfettered right to determine the opposing party's ability to retain and compensate counsel in adverse proceedings. In all other attorneys' fees contexts of which counsel are aware, it is the judge who decides the fees, not the adverse party.

Second, OFAC has no legitimate basis to restrict KindHearts' use of its funds to pay attorneys' fees. The government's interest in KindHearts' assets is not to obtain them for itself (as it would be, for example, in the forfeiture context). Nor does the government have any interest in acting as a fiduciary or otherwise preserving KindHearts' assets for third parties, because there have been no allegations whatsoever that the blocked funds were obtained through illegal conduct or need to be returned to wronged donors or depositors; nor has anyone sued KindHearts. The government's sole legitimate interest is to stop the assets from being used to support terrorism. Spending KindHearts' funds on its own legal defense does not undermine that interest in any way. To the contrary, the counsel to whom fees would be paid are already licensed by OFAC, which protects the government's interest in ensuring that blocked funds are not used for improper purposes.

Finally, defendants have arbitrarily restricted KindHearts to $28,000 in aggregate, a figure that bears no relation to the amounts actually spent on designation challenges, and to compensating two attorneys, even though the government itself has no such restrictions, not for this litigation, not at the administrative level, or for any purpose whatsoever. The decision to

release funds to only two attorneys is irrational. It is merely, and purely, an interference with KindHearts' right to defend itself, a right it is entitled to pay for with its own funds.

### E. KindHearts' Freeze Pending Investigation and the Threatened Designation Are Statutorily Unauthorized.

OFAC's FPI and threatened SDGT designation are also statutorily invalid. IEEPA's language, history, and purpose make clear that it authorizes the designation of organizations and individuals only as an incident to an economic sanction against a foreign country. 50 U.S.C. § 1702(a)(1)(A), (B) (limiting sanctions authority to foreign countries and their nationals, and to properties in which a foreign country or a national thereof has an interest).

OFAC's action against KindHearts, however, is not incident to any nation-targeted economic sanction, but pursuant to E.O. 13,224, which targets no nation, but an undefined group of "terrorist" entities and those associated with them. Because IEEPA was not intended to give the President the power to target disfavored organizations and individuals except incident to a nation-targeted sanction, OFAC's designation of KindHearts is invalid on statutory grounds.

Statutes should be construed to avoid serious constitutional questions. *INS v. St. Cyr*, 533 U.S. 289, 299-300 (2001) ("if an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible,' we are obligated to construe the statute to avoid such problems" (internal citation omitted)); *Zadvydas v. Davis*, 533 U.S. 678 (2001) (same); *Nadarajah v. Gonzales*, 443 F.3d 1069, 1076 (9th Cir. 2006). The statutes at issue in *St. Cyr*, *Zadvydas*, and *Nadarajah* contained no limiting language on their face, but the courts nonetheless read limitations into the statutes to avoid the serious constitutional questions that would otherwise have been presented. Here, IEEPA contains limiting language on its face: it authorizes actions only against a "foreign country or a national thereof." Thus, 50 U.S.C. § 1702(a)(1)(B) empowers the President, *inter*

*alia*, to "prevent or prohibit[] any . . . transactions involving[] any property in which *any foreign country or a national thereof* has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States." (emphasis added). Similarly, 50 U.S.C. § 1702(a)(1)(A)(ii) empowers the President to block "transfers or payments [to the extent they] involve any interest of *any foreign country or a national thereof.*" (emphasis added). Notably, IEEPA *never* refers to foreign nationals generally, absent a connection to foreign countries, but *always* uses the phrase "foreign country or a national *thereof.*"

IEEPA was designed to codify and rein in the longstanding practice of economic sanctions on foreign nations. All the discussion in IEEPA's legislative history concerns sanctions on nations. *See, e.g., Markup Before the H. Comm. on Int'l Relations*, 95th Congress, 1st Sess. 4 (June 17, 1977) (Rep. Bingham) (providing example of a national emergency unrelated to war that would fall within IEEPA: "A very obvious example would be a case where the United States was engaged in hostilities where there was no declaration of war, such as the war in Korea, or the war in Vietnam . . . ."). No one, in any of the debates on IEEPA, even mentioned the possibility that it would empower the President to target disfavored political organizations and individuals, without any nexus to an embargo on a foreign country.

The freeze and threatened designation of KindHearts are entirely unrelated to any nation-targeted sanction; KindHearts is not a "national thereof" of any foreign country targeted by an IEEPA sanction. Accordingly, its freeze and designation is not authorized by IEEPA.

### III.     KINDHEARTS WILL SUFFER IRREPARABLE INJURY IF IT IS DESIGNATED A SPECIALLY DESIGNATED GLOBAL TERRORIST.

If OFAC designates KindHearts as an SDGT, it will do irreparable damage to KindHearts' reputation and to its ability to function as a charitable institution. The most valuable asset any charity or humanitarian organization has is its reputation: donors will not give funds if

43

they do not have confidence that the donations will be used properly and legally. *See also Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 573 (1972) ("where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential"). Without the goodwill of individual and organizational donors, KindHearts will be unable to function as a charity.

The loss of such goodwill is widely recognized as an irreparable injury. *See, e.g.*, *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511-12 (6th Cir. 1992) (loss of customer goodwill can become an irreparable injury because the resulting losses are difficult to quantify); *see also Gateway E. Ry. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994) (injury to goodwill constitutes irreparable harm and money damages may be inadequate if they are too late to save a plaintiff's business); *Fed. Leasing, Inc. v. Underwriters at Lloyd's*, 650 F.2d 495, 500 (4th Cir. 1981) (same).

The stigma of being officially designated a terrorist organization would be devastating, even if KindHearts subsequently challenged the designation successfully and was able to get it lifted. In today's highly fraught environment, in which charitable donations and humanitarian aid are under scrutiny for terrorism financing connections, few donors would want to risk giving money to an organization that had once been designated a "specially designated global terrorist" by the United States government.

## IV. A STAY ON DESIGNATION WILL CAUSE NO HARM TO THE GOVERNMENT BECAUSE IT HAS ALREADY BLOCKED KINDHEARTS' ASSETS.

The government's interest in preventing the financing of terrorism will not suffer if the Court grants KindHearts a temporary restraining order or a preliminary injunction. From the government's standpoint, there is no material difference between KindHearts' current status as

blocked pending investigation and the status it would have if OFAC were to designate it a specially designated global terrorist. In both instances, KindHearts' assets are frozen and entirely subject to the government's control. In both instances, it is a crime for anyone to enter into any transaction with KindHearts. 50 U.S.C. § 1705; 31 C.F.R. §§ 594.701-.704. From the government's perspective, then, a stay on designation simply preserves the *status quo,* protects the government's articulated interest in freezing assets, and does no harm.

## V. THE PUBLIC'S INTEREST WOULD BEST BE SERVED IF THIS COURT WERE TO ADJUDICATE THE LEGALITY OF OFAC'S ACTIONS AND ENSURE AN ACCURATE AND FAIR PROCESS.

The public has an interest in ensuring that government actions to cut off terrorism financing are conducted in accordance with lawful procedures that result in an accurate outcomes. If this Court does not issue a temporary restraining order or preliminary injunction, OFAC is almost certain to follow the course it has taken in other cases in which blocked entities have challenged its actions: OFAC will respond to the filing of this lawsuit by designating KindHearts an SDGT, and then arguing that KindHearts' challenge to the constitutionality of the FPI is moot. Absent injunctive relief, therefore, a designation will not only inflict irreparable harm on KindHearts, but may preclude this Court from adjudicating KindHearts' challenge to OFAC's FPI. It would allow OFAC to evade all accountability for the extraordinary action of freezing an entity's assets for more than two and a half years without even a finding of wrongdoing or any procedural protections. The interests of the public, including other charities like KindHearts and donors to those charities, will not be served if, once again, OFAC is able to escape judicial review of its constitutionally dubious actions. To the contrary, the public's interest in a rigorous, fair and constitutional terrorism financing sanctions regime is best served by this Court's ruling on the merits of KindHearts' challenge.

No other court has yet been able to adjudicate a challenge to an FPI, because OFAC has acted to moot the challenges. For example, after OFAC froze the assets pending investigation of the Global Relief Foundation, Inc. ("GRF"), an Illinois charity, GRF challenged the constitutionality of the FPI. *Global Relief Found., Inc.*, 315 F.3d at 750-51. The district court dismissed GRF's challenge, and GRF appealed. Shortly before oral argument on GRF's appeal, however, OFAC designated GRF as an SDGT. *Id.* The Seventh Circuit then agreed with OFAC that the challenge to the FPI had become moot. *Id.*

OFAC took a similar approach in the case of an Oregon-based charity, the Al Haramain Islamic Foundation, which OFAC blocked pending investigating in February 2004. *Al Haramain*, 2008 WL 2381640 at *1-2. After seven months without process, OFAC designated AHIF as an SDGT. Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment at 9-12, *Al Haramain*, Civ. No. 07-1155 (D. Or. May 8, 2008) ("AHIF Br."). AHIF subsequently challenged that designation on due process and other grounds, including that OFAC's administrative record did not support AHIF's designation. *See Al Haramain*, 2008 WL 2381640, at *2; AHIF Br. 16-20. In response, OFAC "redesignated" AHIF, producing a new administrative record, and argued in court that the original designation, whose constitutionality AHIF had challenged, was now moot. When AHIF's counsel pointed to various infirmities in the "redesignation," OFAC sought to moot that challenge as well, by designating AHIF yet again, the day before AHIF's reply brief on its summary judgment motion was due. Gov't's Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Summary Judgment at 3-6, *Al Haramain*, Civ. No. 07-1155 (D. Or. June 12, 2008) (arguing that the redesignation and not the original designation was the only "final agency action" that AHIF could challenge under the Administrative Procedures Act).

Where, as here, serious constitutional issues are presented by recurrent government conduct, this kind of evasion does a grave disservice to the public interest. The interests of all parties and the public will best be served if the process by which OFAC is able to apply and enforce the terrorism financing sanctions regime in cases like those of KindHearts is subjected to judicial review.

## CONCLUSION

For the foregoing reasons, KindHearts respectfully requests that this Court issue a temporary restraining order and preliminary injunction to preserve the status quo and bar defendants from designating KindHearts as "specially designated global terrorist" until KindHearts has been provided constitutionally adequate due process.

Respectfully submitted,


Fritz Byers, Ohio Bar No. 0002337
The Spitzer Building, Suite 824
520 Madison Avenue
Toledo, OH 43604-1343
Telephone: 419-241-8013
Fax: 419-241-4215
fbyers@cisp.com

David D. Cole (D.C. Bar No. 438355)
Georgetown University Law Center
600 New Jersey Avenue N.W.
Washington, D.C. 20001
Telephone: (202) 662-9078
Email: Cole@law.georgetown.edu

Lynne Bernabei (D.C. Bar No. 938936)
Alan R. Kabat (D.C. Bar No. 464258)
Bernabei & Wachtel, PLLC
1775 T Street, N.W.
Washington, D.C. 20009-7124
Telephone: (202) 745-1942
Fax: (202) 745-2627
Email: Bernabei@bernabeipllc.com;
Kabat@bernabeipllc.com

Hina Shamsi (N.Y. Bar No. 2995579)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 519-7886
Fax: (212) 549-2583
Email: hshamsi@aclu.org

Jeffrey M. Gamso (Ohio Bar No. 0043869)
Carrie L. Davis (Ohio Bar No. 0077041)
American Civil Liberties Union of Ohio
Foundation, Inc.
4506 Chester Avenue
Cleveland, Ohio 44103-3621
Telephone: (216) 472-2220
Fax: (216) 472-2210
Email: jmgamso@acluohio.org

*Counsel for KindHearts*

October 9, 2008