IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

KindHearts for Charitable                                     Case No. 3:08CV2400
     Humanitarian Development, Inc.,

         Plaintiff

     v.                                                      ORDER

Timothy Geithner, et al,

         Defendant

     Plaintiff KindHearts for Charitable Humanitarian Development, Inc. (KindHearts), an Ohio corporation, challenges a provisional determination by the Office of Foreign Assets Control [OFAC] of the United States Treasury Department that plaintiff is a Specially Designated Global Terrorist [SDGT]. KindHearts also challenges the block OFAC placed on plaintiff's assets pending a full investigation.

     OFAC alleges that KindHearts provides material support to Hamas, which is also an SDGT. OFAC's authority to designate SDGTs and block the assets of entities under investigation for supporting terrorism stems from the International Emergency Economic Powers Act [IEEPA], 50 U.S.C. § 1701-06 and Executive Order 13224 [E.O. 13224].

     KindHearts alleges that OFAC's actions are unconstitutional because: 1) OFAC's block is an unreasonable seizure in violation of the Fourth Amendment; 2) provisions authorizing OFAC to designate SDGT and block assets pending investigation are void for vagueness under the Fifth Amendment; 3) OFAC denied KindHearts procedural due process before provisionally determining

1

it to be an SDGT and blocking its assets; and 4)  OFAC has unconstitutionally restricted plaintiff's access to the resources it needs to mount a defense. KindHearts further claims that OFAC blocked KindHearts' assets without proper statutory authorization.

KindHearts asks this court to lift the OFAC blocking order or, alternatively, to require OFAC to provide KindHearts with adequate process.

The defendants – the Secretary of the Treasury, Director of OFAC, and Attorney General – are United States government officials sued in their official capacities. This court *sua sponte* substitutes as defendants Timothy Geithner, Secretary of the Treasury, and Eric H. Holder, Attorney General, for former Treasury Secretary Henry M. Paulson and former Attorney General Michael B. Mukasey, respectively. Defendants contest plaintiff's constitutional and statutory claims, and argue that claims arising from OFAC's provisional determination that KindHearts is an SDGT are not ripe for this court's review.

Pending are plaintiff's motion for partial summary judgment under Rule 56 of the Federal Rules of Civil Procedure [Doc. 31] and defendants' motion to dismiss under Rule 12(b)(6) or, in the alternative, for summary judgment on all counts under Rule 56. [Doc. 36].

## Background

KindHearts, a Toledo-based non-profit corporation, was incorporated on January 22, 2002, under Ohio law. Its stated goal is to provide humanitarian aid without regard to religious or political affiliation.

Khaled Smaili founded KindHearts after OFAC shut down several Muslim-affiliated charities which, like KindHearts had as their stated objectives humanitarian relief in the Middle East and elsewhere. KindHearts contends that from its inception, its officers and directors took great care

to ensure it did not fund any designated terrorist or terrorist-related entities or otherwise violate federal laws regarding designated terrorists. It sought guidance from the Treasury Department, and implemented the Treasury's voluntary guidelines for charitable organizations.

On February 19, 2006, OFAC froze all of KindHearts' assets pending investigation into whether it was subject to designation under IEEPA and E.O. 13224. More than a year later, on May 25, 2007, OFAC informed KindHearts it had provisionally determined to designate it a SDGT.

## Statutory and Regulatory Framework

The Executive initially used the Trading With the Enemy Act [TWEA], 50 App. U.S.C. §§ 1-44, enacted in 1917, to impose sanctions and embargoes on foreign nations. In 1977, Congress amended the TWEA and enacted the IEEPA. The IEEPA requires the President to declare a national emergency to "deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy or economy of the United States." The pertinent sections of the IEEPA are 50 U.S.C. § 1701 and 1702:

§ 1701. Unusual and extraordinary threat; declaration of national emergency; exercise of Presidential authorities

(a) Any authority granted to the President by section 1702 of this title may be exercised to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat.

(b) The authorities granted to the President by section 1702 of this title may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose. Any exercise of such authorities to deal with any new threat shall be based on a new declaration of national emergency which must be with respect to such threat.

§ 1702. Presidential authorities

3

(a)(1) At the times and to the extent specified in section 1701 of this title, the President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise–

> (A) investigate, regulate, or prohibit--
>
>> (i) any transactions in foreign exchange,
>> (ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any  interest of any foreign country or a national thereof,
>> (iii) the importing or exporting of currency or securities, by any person, or with respect to any property, subject to the jurisdiction of the United States;
>
> (B) investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States; .   .   .

50 U.S.C. §§ 1701-1702.

On September 24, 2001, President Bush issued E.O. 13224, declaring a national emergency with respect to "grave acts and threats of terrorism." He invoked his authority under the IEEPA, authorizing the Secretary of Treasury, in consultation with the Secretary of State and Attorney General, to designate "persons" (defined as individuals or entities) whose property or interests in property should be blocked because they "act for or on behalf of" or are "owned or controlled by" designated terrorists, or because they "assist in, sponsor, or provide financial, material or

4

technological support for, or financial or other services to or in support of" or are "otherwise associated" with them.[1]

Individuals or entities designated under E.O. 13224 are labeled "Specially Designated Global Terrorists." In § 10 of the Executive Order, the President states that under the Order no prior notice of a listing or designation needs to be provided to those with a presence in the United States because of the targeted organization's ability to transfer funds or assets instantaneously, which would render the blocking measures ineffectual.

In October, 2001, the Patriot Act amended the IEEPA. It added the phrase "block pending investigation" after the word "investigate" in 50 U.S.C. § 1702 (a)(1)(B). The amendment permitted the Treasury Secretary to impose all the blocking effects of a designation, including freezing an organization's assets indefinitely and criminalizing all its transactions, without designating the organization a SDGT. The Treasury only needs to assert that it is investigating whether the entity should be designated. The amendment also provided that an agency record containing classified information could be "submitted to the reviewing court *ex parte* and *in camera*."

Designation as a specially designated global terrorist immediately results in the blocking of the designee's property and interests in property within the United States or in the control of United States persons. It also prohibits all transactions with designated entities, including making or

---

[1] In *Humanitarian Law Project v. U.S. Department of Treasury*, 463 F. Supp. 2d 1049, 1070-71 (C.D. Cal. 2006), the court declared unconstitutional the "otherwise associated" criterion. The Treasury Department subsequently issued a regulation that defined that provision as "(a) To own or control; or (b) To attempt, or conspire with one or more persons, to act for or on behalf of or to provide financial, material, or technological support, or financial or other services to."

receiving any contribution of funds, goods or services to or for the benefit of those persons. Executive Order 13224 specifically prohibits all humanitarian donations.

The Treasury Department promulgated regulations implementing E.O.13224 on June 6, 2003. The regulations set forth the procedures for imposing civil and criminal penalties on United States persons who engage in any transaction with any entity that has been designated or blocked pending investigation. With respect to a designation, 31 CFR § 501.807 permits designated entities to seek administrative reconsideration by OFAC after they have been designated and had their property frozen.

### OFAC's Block Pending Investigation of KindHearts

On February 19, 2006, OFAC blocked all of KindHearts' assets and property pending investigation into whether it was subject to designation under E.O. 13224. On the same day it blocked KindHearts' assets, the government executed search warrants at KindHearts' Toledo headquarters and the residence of its President, Khaled Smaili. It removed all KindHearts' records, computers and several boxes of publications and documents. Before executing those search warrants, the Department of Justice obtained two grand jury subpoenas requiring: 1) Ernst & Young to produce documents relating to KindHearts and 2) a member of KindHearts' Board of Directors to produce all records of KindHearts from January 1, 2002, to February 17, 2006.

On issuing the block, OFAC sent a "blocking notice" to KindHearts. The notice stated:

> You are hereby notified that all property and interests in property of KindHearts .  .  . including its U.S. representative office and all other offices worldwide, are blocked pending investigation into whether KindHearts is subject to designation pursuant to Executive Order 13224 .  .  . for being controlled by, acting for or on behalf of, assisting in or providing financial or material support to, and/or otherwise being associated with Hamas.

The notice also explained KindHearts did not receive prior notice of OFAC's determination to block its assets pending investigation because it could have transferred its funds and assets, thus rendering the sanctions ineffectual. It stated that if KindHearts believed OFAC took this action in error, and wanted to challenge it, it could send a letter to the attention of the Director of OFAC explaining KindHearts' views and providing evidence.

That same day, the Treasury Department posted a press release on its website announcing the blocking of KindHearts' assets. The press release also stated that KindHearts' officials and fundraisers had "coordinated with Hamas leaders and made contributions to Hamas-affiliated organizations" including such organizations in the West Bank and Lebanon. The press release asserted that KindHearts was founded to replace the Hamas-affiliated Holy Land Foundation for Relief and Development [HLF] and the al-Qaida-affiliated Global Relief Foundation [GRF].[2]

As a result of the block, KindHearts' assets and property, including about one million dollars in bank accounts, became frozen indefinitely. Through its blocking order, OFAC effectively shut the organization down.

In April, 2006, KindHearts' attorney, Jihad Smaili [brother of Khaled Smaili], filed a letter in response to the block, but OFAC failed to respond to it. On November 29, 2006, KindHearts counsel requested a copy of the full administrative record being used by OFAC in its investigation. It received no response.

**OFAC's Provisional SGDT Designation of KindHearts**

---

[2] By prior action against HLF and GRF, the government had put those organizations out of operation prior to the founding of KindHearts.

On May 25, 2007, more than a year after Jihad Smaili's initial letter, and more than six months after his follow-up letter, OFAC notified KindHearts that OFAC had provisionally determined to designate KindHearts a specially designated global terrorist. In that letter it for the first time acknowledged receiving KindHearts' challenge to the block pending investigation. OFAC's letter stated,

> We have received Jihad Smaili's April 24, 2006 letter to . . . OFAC requesting reconsideration of OFAC's decision to block the property and property interests of KindHearts . . . pending investigation into whether KindHearts should be designated as a Specially Designated Global Terrorist . . . Since receipt of that letter, OFAC has completed its investigation into whether KindHearts should be designated as an Specially Designated Global Terrorist and has provisionally determined that designation is appropriate.

Accompanying OFAC's letter were thirty-five unclassified and non-privileged documents on which, according to OFAC, it had relied in making the provisional determination. OFAC acknowledged it also relied on other "classified and privileged documents obtained to date . . . not authorized for disclosure, including material obtained or derived pursuant to" the Foreign Intelligence Surveillance Act [FISA], 50 U.S.C. § 1801 et seq.

The OFAC letter also included an unclassified three-page summary of the classified evidence. It provided no explanation of the specific charges it was considering against KindHearts or why it thought the evidence supported a potential designation.

The letter stated KindHearts could "present to OFAC any evidence or other information that it [wanted] OFAC to consider before making a final determination with respect to designation." It explained "OFAC [would] consider any such information, as well as the information described above in making a final determination." It also noted that if it "decide[d] to consider any additional unclassified, non-privileged materials in making this determination, it [would] advise KindHearts

8

of that fact, provide KindHearts with copies of the materials, and give KindHearts an opportunity to respond to them." OFAC initially gave KindHearts thirty days to respond to its provisional determination.

KindHearts sought access to the full classified and unclassified administrative record to defend itself, and an extension of time in which to respond to OFAC's unclassified submission.

On June 14, 2007, KindHearts requested access to its own records in the government's possession. OFAC waited two months, until August 14, 2007, before notifying KindHearts' counsel that OFAC possessed only a few of the records. The United States Attorney's office had the rest of the records. That Office refused to provide KindHearts with a copy of the documents.[3]

On June 25, 2007, KindHearts' counsel sent OFAC a twenty-eight page preliminary submission in which KindHearts attempted to, in its words, "guess at and address OFAC's concerns." It attached to that a 1369-page submission of supporting evidence. OFAC never responded to this submission.[4]

---

[3] On April 11, 2008, more than two years after the search of KindHearts' office and seizure of its records, the United States Attorney's Office provided KindHearts with an electronic copy of a subset of the seized documents, but did so subject to stringent conditions. Under a protective order, KindHearts members and officers could not view the documents without court approval, and KindHearts counsel could not print or electronically copy any documents. After KindHearts filed this lawsuit, the government agreed to amend the order to permit KindHearts attorneys to have an electronic copy of the documents, and allowing former KindHearts officials to view the documents in counsels' offices.

On January 30, 2009, I granted KindHearts' motion to modify the amended protective order. I required OFAC to disclose to KindHearts copies of all documents seized by the government, without unreasonable restrictions. OFAC allowed KindHearts' counsel to receive blocked documents and removed the requirement that documents be viewed only under supervision of counsel.

[4] OFAC claims it "misplaced" the June 25, 2007, submission. It does not, however, state what constituted such "misplacing," how it happened, or may have happened, or when, if ever,

9

On June 27, 2007, KindHearts asked OFAC to perform a declassification review of the classified evidence on which it relied in issuing the blocking notice. In a letter dated August 10, 2007, OFAC agreed with KindHearts' request, and stated it would give KindHearts thirty days after the completion of declassification review to submit a response. OFAC informed counsel that it could not state when review would be completed, and denied KindHearts' counsel interim access to classified information.

OFAC reported no progress on the declassification review in the fourteen months between its June 27, 2007, agreement to conduct declassification review and the filing of this lawsuit. After KindHearts filed suit, the government, during a telephone call with KindHearts' counsel on October 20, 2008,  indicated it could complete the declassification review within thirty days.

On August 13, 2007, KindHearts requested further clarification of the charges against it and an extension of time until forty-five days after the completion of the declassification review. KindHearts stated it needed the extension to receive meaningful process.

On August 16, 2007, OFAC informed KindHearts that it could contact KindHearts' employees; it also stated that any KindHearts documents in possession of such employees constituted blocked property. Use of such documents would require a license from OFAC, and existing regulations require counsel to provide basic identifying information regarding the property.[5]

On October 26, 2007, and December 20, 2007, KindHearts' counsel objected to OFAC's requirement that it identify blocked property in its possession. Counsel did not request a license to use blocked property.

---

and how it located the submission.

[5] The parties dispute what information the government requires regarding the property.

On December 26, 2007, OFAC issued a license allowing KindHearts counsel to receive copies of blocked documents necessary for them to provide legal services to KindHearts.

For over two years, OFAC did not allow KindHearts to use its own funds to pay attorneys' fees. OFAC asserted KindHearts could pay for legal services only if those payments did not originate from its blocked funds. Immediately after the block, Jihad Smaili, KindHearts' attorney, corresponded with OFAC regarding the release of blocked funds to pay attorney fees, but OFAC maintained that KindHearts could only pay for attorneys from "fresh funds" (funds raised abroad), or by obtaining a license to create a legal defense fund. Smaili resigned, and Lynne Bernabei, of the law firm Bernabei & Wachtel PLLC, and Professor David Cole applied for and were granted licenses to represent KindHearts. OFAC denied them funding from blocked assets. In late June 2008, Bernabei & Wachtel sought the assistance of the ACLU.

As of June, 2008, after its policy on attorneys fees was challenged as unconstitutional in other litigation, OFAC, after adopting a policy change, permits KindHearts to use a limited amount of its funds to pay for legal expenses. It can pay up to two lawyers $7000 each for proceedings at the administrative level, and an additional $7000 each for trial level proceedings. It can pay up to $5000 each for appellate proceedings. In March, 2009, after Bernabei & Wachtel applied for funding, OFAC granted $27,040 from KindHearts' blocked funds for legal fees.

In December, 2008, OFAC produced declassified versions of the block and provisional determination memoranda. Since then, the government has declassified portions of block exhibits. In January, 2009, it declassified several portions of several paragraphs in the block memorandum. On March 13, 2009, OFAC declassified one of several bases for its block and threatened designation.

Since February 19, 2006, when OFAC first notified KindHearts of the block pending investigation, OFAC has not designated KindHearts a SDGT.[6] For almost three years OFAC has blocked KindHearts' property and property interests and criminalized all transactions with it. OFAC has effectively shut KindHearts down.

## STANDARD OF REVIEW

Both plaintiff and defendants move for summary judgment. A court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial responsibility of informing the district court of its motion's basis, and identifying the record's portions that demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The nonmoving party "must [then] set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed.R.Civ.P. 56(e)).

In deciding the motion for summary judgment, the court will believe the non-moving party's evidence as true, it will resolve all doubts against the non-moving party, it will construe all evidence in the light most favorable to the non-moving party, and it will draw all inferences in the non-moving party's favor. *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992).

Defendants move to dismiss plaintiff's claims under Rule 12(b)(6). A court "must accept all well-pleaded factual allegations of the complaint as true and construe the complaint in the light most

---

[6] On October 9, 2008, I enjoined OFAC from designating KindHearts a SDGT. KindHearts sought the injunction to maintain the *status quo* and avoid any possible adverse effects from such designation during the pendency of this litigation.

favorable to the plaintiff." *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002) (citing *Turker v. Ohio Dep't of Rehab. & Corr.*, 157 F.3d 453, 456 (6th Cir.1998)); *Gazette v. City of Pontiac,* 41 F.3d 1061, 1064 (6th Cir.1994). The court is not bound to accept as true unwarranted factual inferences, *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir.1987), or legal conclusions unsupported by well-pleaded facts. *Teagardener v. Republic-Franklin, Inc. Pension Plan,* 909 F.2d 947, 950 (6th Cir.1990).

A Rule 12(b)(6) motion to dismiss is directed solely to the complaint and any exhibits attached to it. *Roth Steel Products v. Sharon Steel Corp.,* 705 F.2d 134, 155 (6th Cir. 1983). The merits of the claims are not at issue. Consequently, a complaint will be dismissed pursuant to Rule 12(b)(6) only if there is no law to support the claims made, the facts alleged are insufficient to state a claim, or on the face of the complaint there is an insurmountable bar to relief. *See Rauch v. Day & Night Mfg. Corp.,* 576 F.2d 697, 702 (6th Cir.1978).

### DISCUSSION

### 1. Fourth Amendment

KindHearts argues that OFAC's block pending investigation is an unreasonable seizure in violation of the Fourth Amendment. In blocking KindHearts' assets, OFAC acted without a prior judicial warrant. It purports, however, to have acted on reasonable suspicion that KindHearts met the criteria for designation under E.O. 13224.

Neither the IEEPA nor E.O. 13224  requires a warrant or probable cause to effect a block pending investigation. The government argues that the economic sanctions authorized by that statute and the Executive Order are not "seizures" and therefore the Fourth Amendment is inapplicable

13

Alternatively, the government disputes the contention that traditional warrant and probable cause requirements apply to blocks pending investigation.

### A. The Block Pending Investigation is a Fourth Amendment "Seizure"

The first inquiry is whether OFAC's block is a "seizure" in Fourth Amendment terms. If the block is not a "seizure," the Fourth Amendment does not constrain the government's conduct.

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The government seizes property when it creates "some meaningful interference with an individual's possessory interests in that property." *Soldal v. Cook County, Ill.,* 506 U.S. 56, 61 (1992); *see also Horton v. California,* 496 U.S. 128, 133 (1990); *U.S. v. Jacobsen,* 466 U.S. 109, 113 (1984). Even "brief detentions of personal effects," such as a short investigative detention of luggage at an airport, are "seizures" subject to Fourth Amendment scrutiny. *U.S. v. Place,* 462 U.S. 696, 706 (1983).

### i. OFAC Blocking Actions Meet the *Soldal* Definition of "Seizure"

The government need not take possession of or title to property to "seize" it; interference with the target's possessory interest triggers Fourth Amendment scrutiny. *Illinois v. McArthur,* 531 U.S. 326, 330 (2001). In *McArthur,* officers, who had probable cause to believe a suspect's home contained marijuana, prevented him from re-entering his home for the two hours needed to obtain a search warrant. *Id.* at 331-332. Even though the officers had taken nothing during that period, the Court applied Fourth Amendment scrutiny to the "temporary seizure" of the suspect's home. *Id.* at 330-31.

Those courts that have considered Fourth Amendment challenges to OFAC blocking actions under the IEEPA and E.O. 13224 disagree as to whether blocks are Fourth Amendment seizures.

14

One view is that asset-blocking is not a seizure. *Islamic Am. Relief Agency v. Unidentified FBI Agents,* 394 F. Supp. 2d 34, 47-48 (D.D.C. 2005); *Holy Land Foundation for Relief and Development v. Ashcroft,* 219 F. Supp. 2d  57, 79 (D.D.C. 2002).

In upholding the government's action in those cases, the courts applied the standard for identifying a taking under the Takings Clause of the Fifth Amendment, rather than the *Soldal* standard for a Fourth Amendment seizure. In *Holy Land, supra,* 219 F. Supp. 2d at 79,  the court's analysis centered on whether an OFAC asset-blocking procedure is a permanent forfeiture or causes title to pass to the government. *Id.*

As support for its Takings Clause approach, the court In *Holy Land*, citing *Tran Qui Than v. Regan,* 658 F.2d 1296, 1301 (9th Cir. 1981), *IPT Co. v. U.S. Dept. of Treasury*, 1994 WL 613371, at *5-6 (S.D.N.Y.), and *Can v. U.S.,* 820 F. Supp. 106, 109 (S.D.N.Y. 1993), stated that, because asset blocking does not "vest" title in the government, it is not a "forfeiture." 219 F. Supp. 2d at 79. None of the cases cited by *Holy Land* involves, however, a Fourth Amendment claim.

Likewise, in *Holy Land,* the court cited *Cooperativa Multiactiva de Empleados de Distribuidores de Drogas v. Newcomb*, Civ. No. 98-0949, slip op. at 13-14 (D.D.C. Mar. 29, 1999), for the statement that "blocking bars transactions but does not confiscate property and is not tantamount to a forfeiture." *Id.* Plaintiffs in *Cooperativa Multiactiva*, however, raised no Fourth Amendment challenge to the blocking notice. *Id.* at 4. In *Cooperativa Multiactiva,* the court discussed questions of title and forfeiture to determine whether a blocking notice was a "fine" and compliance with the federal forfeiture statute, not to determine whether it was a "seizure." *Id.* at 21-22.

15

Finally, in *Holy Land,* the court cited *D.C. Precision Inc. v. U.S.*, 73 F. Supp. 2d 338, 343 n.1 (S.D.N.Y.1999), for the proposition that "assets blocked by the government are not seized." *Id.* Despite the use of the word "seized," the cited passage in *D.C. Precision* refers to a Takings Clause claim. *Id.* Plaintiffs did not raise a Fourth Amendment claim in *D.C. Precision. Id.*

In contrast to *Holy Land* and related cases*,* the court in *Al-Haramain Islamic Foundation, Inc. v. U.S. Dept. of Treasury,* 585 F. Supp. 2d 1233, 1263 (D. Or. 2008)*,* concluded that OFAC asset-blocking is a seizure subject to Fourth Amendment analysis.  Reliance on the Takings Clause was inappropriate, the court stated, because "[t]he Fourth Amendment imposes a lower threshold than does the Fifth Amendment." *Id*. at 1262. A blocking order, the court stated, would be a taking only "if it resulted in an appropriation of property for the government's use" or if the government's actions eliminated "all economically valuable use of the property." *Id.*

A Fourth Amendment seizure, in contrast, does not result in passage of title to the government or even necessarily permanent deprivation. A seizure affects a possessory interest: *Id.* at 1263. A Fourth Amendment seizure may often lead to permanent deprivation of the property "taken" by government officers, but that is not always so. Indeed, Fed. R. Crim. P. 41(g) provides a means for seeking return of seized property.

Viewing the consequences of a blocking order in a Fourth Amendment light, the court in *Al Haramain* stated that because "[e]ven a temporary deprivation of property" constitutes a seizure, an OFAC blocking action affects Fourth Amendment rights. *Id.* If merely "holding luggage for 90 minutes" constitutes a seizure, then surely placing an indefinite freeze on all an entity's assets is as well. *Id.*

16

This conclusion is not only reinforced, but, indeed, made irrefutable on consideration of the fact that the very purpose of an OFAC blocking action is to "depriv[e] the designated person of the benefit of the property, including services, that might otherwise be used to further ends that conflict with U.S. interests." *Al Haramain, supra,* 585 F. Supp. 2d at 1263. An OFAC block interferes with possessory rights, and is, in Fourth Amendment terms a seizure.

### ii. Whether the History of the IEEPA, TWEA and the Fourth Amendment Justify Excluding OFAC Blocking Actions from Fourth Amendment Scrutiny

The government offers two arguments as to why I should follow the decision in *Holy Land* and withhold Fourth Amendment scrutiny from a block pending investigation. First, the government argues that the Supreme Court historically has never applied the Fourth Amendment to imposition of economic sanctions under the TWEA or the IEEPA. Therefore, the government contends, I should not do so in this case.

Second, the government urges that deference to the executive's unique role in foreign affairs should override any judicial impulse to invoke the Fourth Amendment. The government bases this argument on the history of TWEA and IEEPA economic blocking actions.

Neither argument offers a compelling reason for foregoing Fourth Amendment analysis, much less for departing from the Supreme Court's definition of "seizure" in *Soldal*.

Looking to history for support for its first contention, the government states, "[i]n the nearly 100 years since the TWEA was passed, no Court has held that the executive must obtain a warrant to conduct an economic blocking authorized by either TWEA or IEEPA." [Doc. 36, at 63]. To undertake a Fourth Amendment analysis, the government claims, would be to disregard a

17

"systematic, unbroken, executive practice, long pursued to the knowledge of Congress [and the courts] and never before questioned." *Id*.

For support, the government cites several cases in which the Supreme Court, in the government's view, has consistently not subjected blocking actions to Fourth Amendment. *See Regan v. Wald*, 468 U.S. 222 , 235 (1994) (upholding restrictions on United States citizen travel to Cuba under the TWEA); *Dames & Moore v. Regan,* 453 U.S. 654, 654 (1981) (IEEPA authorizes the president to nullify attachments against property of the Iranian government and to transfer Iranian assets); *Orvis v. Brownell,* 345 U.S. 183 (1953) (executive order blocking assets of Japanese nationals under TWEA prevents attachment by creditor of Japanese nationals); *Propper v. Clark,* 337 U.S. 472 (1949) (upholding freeze on Austrian property under the TWEA, despite inconvenience freeze caused to American citizens).

The government accurately depicts these cases and describes their results. What is missing, though, is acknowledgment that in those cases none of the government's adversaries asserted a Fourth Amendment interest. Like lower courts, *see U.S. v. Collier,* 246 Fed. Appx. 321, 334-335 (6th Cir. 2007) (unpublished disposition) (failing *sua sponte* to consider Fourth Amendment issues not error); *Hatmann v. Prudential Ins. Co. of America,* 9 F.3d 1207, 1214 (7th Cir. 1993) ("Our system . . . is not geared to having judges take over the functions of lawyers, even when the result would be to rescue clients from their lawyers' mistakes), the Supreme Court routinely does not consider issues not raised by the parties. Absence of discussion of the Fourth Amendment in the cases cited by the government says nothing about how a Fourth Amendment analysis should come out here.

18

Failure of plaintiffs in the those cases probably did not arise from lawyerly oversight: the economic sanctions targeted foreign governments, and neither foreign governments nor non-resident foreign nationals enjoy Fourth Amendment protection. In *U.S. v. Verdugo-Uriquidez,* 484 U.S. 259, 265 (1990), the Supreme Court held that the Fourth Amendment does not apply to search by American authorities of the Mexican residence of a Mexican citizen and resident. The Court, on examining the text of the Amendment, concluded that its central motivation was to "protect the people of the United States against arbitrary action by their own government."*Id.* Thus, the Fourth Amendment, the Court stated, does not protect aliens outside United States territory, nor does it protect foreign governments. *Id.*

KindHearts' situation differs strikingly and significantly from that of the foreign governments and foreign assets at issue in the TWEA and IEEPA cases on which the government relies.[7] KindHearts is an American corporation based in Toledo, Ohio. Its assets, presumably, came from persons resident in this country. Those assets were in this country when the government seized them. This case does not involve a nation-targeted embargo.

KindHearts is indisputably one of "the people" protected by the Fourth Amendment. If the Constitution affords KindHearts no protection from unreasonable searches and seizures, whom among "the people" does it protect, and who among the people can be certain of its protection?

---

[7]In *Dames & Moore, Wald* and *Propper,* the government blocked assets of foreign governments. Its blocking actions affected American citizens, but only to the extent that they conducted business transactions involving the property of foreign governments and nationals. Because the targets of those sanctions were not clearly among "the people" whom the Fourth Amendment protects, it is unsurprising that the parties did not bring Fourth Amendment claims. *See Al-Aqeel v. Paulson,* 568 F. Supp. 2d 64, 70-71 (D.D.C. 2008) (concluding that Saudi Arabian citizen subject to OFAC asset seizure may not bring a Fourth Amendment claim because claimant alleged interference with overseas assets only).

19

The government's argument, moreover, ignores compelling parallels between the instant case and the colonial-era activities inspiring the Founders to include the Fourth Amendment in our fundamental charter of liberties. Indiscriminate customs searches, unregulated by judicial approbation or oversight, were the "first inducement" to American attitudes against such promiscuous searches and seizures, William J. Cuddihy, *The Fourth Amendment: Origins and Original Meaning,* 253 (2009). Despised writs of assistance allowing customs officials to employ unfettered discretion in their search for and seizure of smuggled goods and contraband were a "major cause of the Revolution." Tracy Maclin, *The Complexity of the Fourth Amendment: A Historical Review,* 77 B.U.L.R. 925, 945 (1997); *see also* Nelson B. Lasson, *The History & Development of the Fourth Amendment to the U.S. Constitution,* 51 (1937).

In the late 1750s and early 1760s, a controversy erupted in the Massachusetts Bay Colony over gubernatorial warrants and writs of assistance to enforce customs laws. Great Britain, embroiled from 1754-1763 in the Seven Years' War, enacted customs laws proscribing American commerce with Spanish and French colonies. Great Britain also implemented restrictive trade relationships between itself and the North American colonies. Those laws favored British interests at the expense of colonial merchants. Lasson, *supra*, at 52; Cuddihy, *supra,* at 378-380. Evasion of those laws and restriction – smuggling – became more than just a colonial pastime: for many American merchants it was the way of life. It was, as well, often of benefit to Britain's enemies commercially. Lasson, *supra,* at 52.

In response to this unacceptable situation, Governor Shirley of Massachusetts issued warrants giving customs officials authority forcibly to enter houses and other buildings, and, once inside, to exercise unfettered discretion to search for and seize contraband. Maclin, *supra,* 77

20

B.U.L.R. at 945; Cuddihy, *supra,* at 378. Public reaction to this exercise of extreme executive authority caused the Governor to require customs officers, before they could conduct such searches, to obtain Writs of Assistance from Crown judges. Maclin, *supra,* 77 B.U.L.R. at 945.

Unlike the search warrants with which every American judge, prosecutor and defense attorney is now familiar, colonial Writ of Assistance were "a continuous license and authority" valid for the "whole lifetime of a reigning sovereign . . . empower[ing] the officer his deputies and servants to search, at their will, wherever they suspected uncustomed goods to be, and to break open any receptacle or package falling under their suspecting eye." *Id.* The judges of the Superior Court of Judicature who issued Writs of Assistance lacked power to refuse to issue the writs or to review specific searches or seizures. Maclin, *supra,* 77 B.U.L.R at 946; Cuddihy, *supra,* at 379.

When King George II died in 1760, all previously-issued writs expired. Customs officers sought new writs. *Id.* at 380-381. A merchants' association, The Society for Promoting Trade and Commerce Within the Province, retained James Otis Jr. to challenge the reissuance. *Id.* at 380. This led to the decision in *Paxton's Case*. Culhuddy, *supra,* at 380. That case "intensified public antipathy to the writs of assistance" and triggered a flood of public commentary on search and seizure. *Id.* at 395.

Challenging Writs of Assistance, Otis and other critics delineated and condemned the abuses left in their wake. The Writs, as a commentator in the *Boston Gazette* wrote, allowed writ-holders to "break open doors, trunks, chests, and boxes – alms houses, brideswells, jails or churches – never mind a dwelling house" – this listing making clear that no premises were safe. *Id.* at 396. Another commentator feared that writ-holders would look unchecked "wherever he shall PLEASE to suspect uncustom'd goods are lodg'd." *Id.*

21

Despite these concerns and objections and Otis's arguments, the court re-issued the Writs of Assistance. *Id.* at 395.

Though unsuccessful, Otis's arguments were the "first recorded declaration" of the Fourth Amendment's requirement of a specific warrant. *Id.* at 382. Others in England and the colonies had criticized the writs of assistance, general warrants, and other forms of indiscriminate search and seizure. Otis first contended that specific warrants – in Fourth Amendment terms, warrants "particularly describing the place to be searched and things to be seized" – as alone appropriate if the sanctity one's home and security of one's possessions were to be assured under, as Otis argued, the "British Constitution, English common law, natural law, and the higher law." *Id.* at 387.

As with IEEPA and TWEA, the initial impetus for executive action at the outset of the era leading to *Paxton's Case* was to deprive the enemies of economic benefits: restricting trade with the enemy was the purpose of both Governor Shirley's wartime writs to customs officers and the TWEA. In time, these purposes, and the authority by which government sought to accomplish them led to a practice of far-reaching and open-ended searches for and seizures of private property.

Unlike the system under which OFAC has operated thus far, the colonial system came to involve judges in the issuance of the writs. But their participation did little to control the duration of the authority to conduct searches, and did not encompass judicial involvement or oversight during implementation of that authority.

The centrality of indiscriminate customs searches and seizures to the development, purposes and meaning of the Fourth Amendment is of special relevance to this case. Like James Otis, the attorneys for KindHearts claim for their client "the right .  .  . to be secure in their .  .  . papers and

22

effects." Also like Otis, they argue that how the government has been exercising its authority to regulate commercial affairs can violate that right and destroy that security.

To find the Fourth Amendment inapplicable to OFAC blocking actions would disregard the Amendment's history and its role as a bulwark against the abuses and excesses of unchecked governmental power.

### iii. Whether Deference to the Executive Regarding Foreign Affairs Requires Excluding OFAC Blocking Actions From Forth Amendment Scrutiny

The government's second argument is that deference to the executive should cause me to refrain from viewing its conduct through the lens of the Fourth Amendment. Courts, in the government's view, ought not involve themselves with "the exercise of the executive's most uniquely reserved powers – conducting foreign affairs and protecting national security." [Doc. 36, at 36]. Instead, I should heed Justice Jackson's statement in his concurring opinion in *Youngstown Sheet & Tube v. Sawyer,* 343 U.S. 579, 635-36 (1952), that "A seizure executed by the President pursuant to an Act of Congress would be supported by the strongest presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily on any who might attack it."[8]

The defendants claim that this means that the President's powers "can indeed be so broad and uniquely reserved to the president that questions of Fourth Amendment applicability do not come into play." [Doc. 73, at 34]. Defendants also argue that subjecting OFAC's actions to Fourth Amendment strictures is improper because when the President "execute[s] seizures with explicit

---

[8]Justice Jackson joined in the judgment of the majority that President Truman lacked constitutional authority to seize a steel company's assets *via* Executive Order.

23

authorization by congress, the President's "authority [is] at its maximum." [Doc. 73, at 35]. The government supports this assertion with a further quotation from Justice Jackson:

> In the practical working of our government we have already evolved a technique within the framework of the Constitution by which normal executive powers may be considerably expanded to meet an emergency. Congress may and has granted extraordinary authorities which lie dormant in normal times but may be called into play by the Executive in war or upon proclamation of a national emergency.

*Youngstown Sheet & Tube, supra*, 343 U.S. at 652.

Defendants also argue that *U.S. v. Curtiss-Wright*, 299 U.S. 304 (1936), stands for the principle that the "strict limitation" on federal powers over "internal affairs" does not apply in the realm of "external affairs." [Doc. 73, at 35].

The government's reliance on the propositions expressed by Justice Jackson and in *Curtiss-Wright* conflates two discrete questions about the limitations of federal executive power. The first question in evaluating the validity of executive action is whether any of the recognized sources of executive authority – Article II, powers inherent in national sovereignty or a valid delegation of authority from Congress – affirmatively empower the executive to take action, such as a block pending investigation. A second, separate question is whether a the manner in which the executive has exercised it authority in a specific instance violates any of the restrictions on federal authority protecting individual liberties.

In *Youngstown Sheet & Tube* and *Curtiss-Wright* the Court dealt exclusively with the first question. In this case, however, the first question is not at issue because the parties do not dispute that the executive has the general power to block pending investigation. The issue here – whether, in this instance, OFAC has exercised its authority in violation of the Fourth Amendment – involves the second question.

24

When Justice Jackson in *Youngstown Sheet & Tube* described the President's "authority at its maximum" and the need for "the widest latitude of judicial interpretation," he was describing the President's power to act *vis-a-vis* Congress, not restrictions on presidential power imposed by the Bill of Rights. *See* 343 U.S. at 635. This is apparent from the context of the quotation, which is that when Congress expressly authorizes the action, the President possesses all his authority "in his own right plus all that Congress may delegate." *Id.*

Justice Jackson also stated that if a court should invalidate presidential action that Congress has expressly authorized, "it usually means that the Federal Government as an undivided whole lacks power." *Id.* Legislation cannot authorize the President to ignore the Bill of Rights. Under the Fourth Amendment, the federal government "*as an undivided whole*" lacks entirely the power to conduct unreasonable searches and seizures. *Id.*

That the Court in *Youngstown Sheet & Tube* refers to the President's actions as a "seizure" in no way suggests that that case involved a Fourth Amendment search or seizure. The Steelworkers Union had announced its members would strike after unsuccessful labor-management negotiations. *Id.* at 864. On the eve of the strike, President Truman ordered the Secretary of Commerce to assume control of the steel mills and keep them running. *Id.* at 865.

The President's actions, and the government's operation of the mills temporarily did not deprive the shareholders of any of the their property interests in the company. The company did not claim that President Truman had engaged in an unreasonable seizure under the Fourth Amendment. The issue, rather, was whether the President had the authority to adopt the "technique of seizure" as a "method of solving labor disputes," even though Congress had expressly declined to incorporate this technique in the Taft-Hartley Act. *Id.* at 866. The Court noted that Congress's power to

25

authorize this method was "beyond question" because Congress may "authorize the taking of private property for public use." *Id.* at 867. In view of the absence in *Youngstown Sheet & Tube* of citation to, argument about, discussion of and adjudication on the basis of Fourth Amendment principles and doctrine, the decision in that case, not the Fourth Amendment, is inapplicable here.

Similarly, the Court's opinion in *Curtiss-Wright* likewise addressed whether the President possesses inherent, unenumerated powers over foreign affairs – not whether such powers were subject to Bill of Rights limitations. 299 U.S. at 319.

In *Curtiss-Wright,* an arms manufacturer was charged with conspiring to sell arms to Bolivia in violation of a Joint Resolution of Congress authorizing the President to criminalize such arms sales and a Presidential proclamation issued under that authority. *Id.* at 312-313. The Court rejected the company's challenge to Congress's delegation of authority to the President. *Id.* at 315-316, 333. The federal government, the Court held, has and can, with regard to the nation's foreign affairs, exercise the powers inherent in national sovereignty. Such exercise did not violate the rights inuring to the states. *Id.* at 316.

Further, because "[t]he President is the sole organ of the nation in its external relations, and its sole representative with foreign nations," he may exercise powers "in the field of international relations" without needing "a basis for its exercise in an act of Congress." *Id.* at 220-221.

The Court's opinion in *Curtiss-Wright* makes indisputably clear fundamental constitutional principles of federalism and separation of powers endow the President with extensive, and generally unilateral authority over our foreign affairs, especially with regard to our relations with other countries. Though the Court upheld the exercise of that authority against an American company and others engaged in international commerce, it did not address, much less declare, that such authority,

if it impinged on freedoms guaranteed under the Bill of Rights, was in all circumstances and for all times unrestricted and uncontrollable.

Contrary to defendants' claims, courts have held that the executive's domestic actions – even when taken in the name of national security – must comport with the Fourth Amendment.  *See, e.g. U.S. v. U.S. Dist. Court,* 407 U.S. 297, 320 (1972) ("the President's domestic security role . . . must be exercised in a manner compatible with the Fourth Amendment); *Coolidge v. New Hampshire,* 403 U.S. 443, 461 (1971) (national security "is not a talisman in whose presence the Fourth Amendment fades away and disappears."); *U.S. v. Bin Laden,* 126 F. Supp. 264, 273 (S.D.N.Y. 2000) ("even in the exercise of his foreign affairs power, the President is constrained by other provisions of the Constitution.").

OFAC's blocking action against KindHearts, therefore, is, despite the deference generally due to presidential acts relating to our foreign relations and affairs, subject to some degree of Fourth Amendment scrutiny. This case raises questions about the extent and consequences of such scrutiny.

### B. Whether OFAC Must Have a Warrant and Probable Cause for the Seizure to be Reasonable Under the Fourth Amendment

The next issue is whether OFAC satisfied the requirements of the Fourth Amendment when it blocked KindHearts' assets pending investigation. Generally, the Fourth Amendment permits seizures only on the basis of probable cause and a judicial warrant listing, with particularity, the item or items to be seized. *Place, supra,* 462 U.S. at 701. The government contends, *inter alia*, that its actions were lawful, and could be undertaken on the basis of reasonable suspicion, rather than probable cause to believe that KindHearts engaged in acts proscribed by the IEEPA and E.O. 13224.

### i. Generally, the Fourth Amendment Requires a Warrant and Probable Cause

27

Defendants argue that this court should jettison the probable cause and warrant requirements in favor of an open-ending balancing of interests. Defendants contend that courts are free to apply an indeterminate "reasonableness" inquiry in light of the doctrine that "the Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable." *Skinner v. Railway Labor Executives Ass'n*, 489 U.S. 602, 619 (1989).

The defendants base their argument on the fact that the Fourth Amendment contains two textually distinct clauses, the reasonableness clause barring "unreasonable searches and seizure" and a warrant clause stating that "no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. Reasonableness is the ultimate standard under the Fourth Amendment. *Pennsylvania v. Mimms*, 434 U.S. 106, 108-109 (1977) ("[R]easonableness in all the circumstances of the particular governmental invasion of a citizen's personal security" is the "touchstone" of Fourth Amendment analysis); *Soldal, supra,* 506 U.S. at 61-62. This does not, however, mean that courts always are free to conduct open-ended balancing of interests whenever the government has seized property.

On the contrary, searches and seizures are usually "reasonable" only when conducted with a judicial warrant supported by probable cause. *Place, supra,* 462 U.S. at 701. The reasonableness clause under the Fourth Amendment "derives content and meaning through reference to the warrant clause." *U.S. Dist. Court, supra,* 407 U.S. at 309-310. Though the ultimate inquiry is reasonableness, "the Amendment does not leave the reasonableness of most seizures to the judgment of courts or government officers: the Framers of the Amendment balanced the interests involved and decided that a seizure is reasonable only if supported by a judicial warrant based on probable cause." *Place, supra,* 462 U.S. at 722 (Blackmun, J. concurring). Under most circumstances searches and seizures conducted without a warrant are "*per se* unreasonable under the Fourth Amendment – subject only

28

to a few specifically established and well-delineated exceptions." *Katz v. U.S.,* 389 U.S. 347, 357 (1967). Thus, as stated in *Place, supra,* 462 U.S. at 701, "In the ordinary case, the Court has viewed a seizure of personal property as *per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized."

Two recognized exceptions to the warrant requirement might, however, apply in this case. First, "special needs" warrantles searches and seizures need only be reasonable under all the circumstances; no warrant or probable cause is required. *See, e.g., Griffin v. Wisconsin,* 483 U.S. 868, 873 (1987) (upholding warrantless, suspicionless searches of probationers' homes); *Illinois v. Lidster,* 540 U.S. 419, 426 (2004) (upholding warrantless, suspicionless stops at a roadblock to gather information about a hit-and-run accident). Second, if exigent circumstances exist, the warrant requirement, but not the requirement of probable cause, may be excused. *See, e.g., U.S. v. Johnson,* 22 F.3d 674, 680 (6th Cir. 1994) (describing general types of exigencies).

### ii. Whether the Block is a Special Needs Seizure

Special needs searches and seizures share at least three basic characteristics. First, they must serve a purpose above and beyond normal criminal law enforcement. *See Ferguson v. City of Charleston,* 532 U.S. 67, 81-86 (2001); *City of Indianapolis v. Edmond,* 531 U.S. 32, 41-47 (2000). Second, circumstances must make "the warrant and probable cause requirement impracticable." *See Griffin, supra,* 483 U.S. at 873. Third, the method of search or seizure must have built-in limits, such as a confined geographic scope or regular, suspicionless application, that restrict executive discretion and ensure that all citizens know the circumstances under which they are subject to a special needs search or seizure. *See New York v. Burger,* 489 U.S. 602, 702-03 (1989).

29

Administrative searches of closely-regulated industries are one type of special needs search. Officials responsible for administrative searches need engage in no prior assessment of behavior. The lack of individualized probable cause is deemed does not violate the Fourth Amendment where the search relates to a closely regulated endeavor or enterprise. Anyone engaging in such activity can reasonably expect inspection.

The Supreme Court upheld such searches In *Burger, id.* at 702, the Court upheld suspicionless, warrantless inspection of plaintiff's automobile chop shop. The Court noted that chop shops are closely regulated, reducing plaintiff's expectation of privacy and putting their operators on notice that inspections may occur. *Id.* The Court also concluded that the state's inspection program was sufficiently regular and certain because it "carefully limited [inspections] in time, place, and scope." *Id.* at 702-03. These built-in limits on executive discretion provided "a constitutionally adequate substitute for a warrant" and gave the owner with notice of when, where and to what extent he was subject to being searched. *Id.* In concluding that the inspection program was reasonable, the court noted that there was a "substantial government interest" behind the regulatory regime and that warrantless, suspicionless inspections were "necessary to further the regulatory regime." *Id. Accord, e.g., Donovan v. Dewey,* 452 U.S. 594, 600 (1981) (warrant constitutionally required when warrantless searches "are necessary to further a regulatory scheme and the . . . regulatory presence is sufficiently comprehensive and defined" that owner knows property is "subject to periodic inspections undertaken for specific purposes.").

Searches and seizures at roadblock check points are another type of warrantless special needs search that must only be "reasonable" under all the circumstances to comply with the Fourth Amendment. In *Michigan Dept. of State Police v. Sitz,* 496 U.S. 444, 455 (1990), the Court upheld

stops at a checkpoint at which police officers detained drivers briefly and tested them for sobriety. The officers stopped every vehicle and checked every driver for intoxication. *Id.* at 447. On average, the stops lasted twenty-five seconds. *Id.* at 448. *See also Lidster, supra,* 540 U.S. at 426 (extending *Sitz* to checkpoints designed to gather information after a nearby hit-and-run accident). Police may not, however, set up roadblocks to detect ordinary criminal wrongdoing. *Edmond, supra,* 531 U.S. at 37 (drug interdiction roadblock unconstitutional because police may not conduct regular suspicionless searches and seizures solely to enforce criminal laws).

A third type of special needs search and seizure occurs at border crossings. In *U.S. v. Martinez-Fuerte,* 428 U.S. 543, 551-554 (1976), the Court applied a balancing test to uphold a Border Patrol traffic-checking program on highways within one hundred miles of the Mexican border. In *U.S. v. Boumelhem,* 339 F.3d 414, 421 (6th Cir. 2003), the Sixth Circuit upheld a warrantless and suspicionless search of a railroad shipping container from abroad, noting the "power of the sovereign to protect itself by stopping and examining persons and property crossing into this country." In so holding, the court noted that warrantless entry and exit searches date back to the time of the Framers. *Id.* at 422 n.5; s*ee also U.S. v. Montoya de Hernandez,* 473 U.S. 531, 538 (1985) ("Routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant, and first-class mail may be opened without a warrant on less than probable cause. Automotive travelers may be stopped at fixed checkpoints near the border without individualized suspicion"). Border searches are restricted geographically to regions surrounding the border because individuals have a lesser expectation of privacy at the border than in the interior. *Id.* at 539.

OFAC's exercise of its blocking power lacks the characteristics that excuse the warrant and probable cause requirements as to administrative, roadblocks, and border searches and seizures. Most importantly, OFAC's blocking power entails no built-in limitations curtailing executive discretion and putting individuals on notice that they are subject to blocking.

Traffic checkpoints and border searches are focused geographically, as they occur only at he checkpoint or near the national border. In cases of administrative searches, the government may only search discrete categories of individuals – such as closely-regulated businesses – and even then the regulatory regime must be "carefully limited in time, place and scope." *Burger, supra,* 482 U.S. at 702-03.

Second, in method, OFAC's blocking power has more in common with ordinary law enforcement activity than with any of the activities considered in the special needs cases. OFAC does not block pending investigation every entity sending money overseas: it only blocks those  it suspects have violated the law. In this case, OFAC targeted KindHearts as a potential violator and conducted a preliminary investigation before imposing the block. It necessarily had gathered information in advance that it considered sufficient to justify seizure of KindHearts' assets.

No such prior determination occurs with a border crossing or checkpoint. Everyone passing through is stopped, detained and examined.

Thus, unlike traditional law enforcement investigatory activities, special needs searches expose everyone within their scope or zone of their operation to a cursory search or brief seizure in the interest of public safety and welfare or border integrity.

OFAC's blocking power, which focuses on single entities, and does so on the basis of some suspicion, more closely resembles the *modus vivendi* and *modus operandi* of traditional law

32

enforcement investigative activity than warrantless searches allowed under the special needs exception. This is true, even though, at this point, OFAC's actions may be deemed "civil," but actions violating E.O. 13224 may also become the basis for criminal sanctions.  Investigations with the potential for criminal prosecution have historically triggered the warrant and probable cause requirements. *See Edmond*, *supra,* 531 U.S. at 37-38.

Finally, for the special needs exception to apply, both the probable cause and warrant requirements must categorically be impracticable in light of the government's purpose. *Griffin, supra,* 483 U.S. at 873. The government provides no explanation as to why the probable cause warrant requirements were impracticable in this case. OFAC has shown no cause to believe or conclude that requiring it to develop probable cause and submit such cause to judicial evaluation would have impaired its enforcement efforts and ability otherwise to act in this case.

In conclusion, OFAC blocking actions do not fit within the special needs exception to the warrant and probable cause requirements.

### iii. Whether Exigency Excuses the Warrant Requirement

Even if an OFAC blocking action is not a special needs search, a showing of exigent circumstances could eliminate the need for a warrant. Judicially endorsed exigent circumstances are, however, "few in number and carefully delineated." *U.S. Dist. Court, supra*, 407 U.S.  at 318.

The Sixth Circuit has identified four general categories of exigency justifying warrantless searches: "(1) hot pursuit of a fleeing felon, (2) imminent destruction of evidence, (3) [the] need to prevent a suspect's escape, and (4) a risk of danger to police or others." *Johnson, supra,* 22 F.3d at 680. None of these situations exists here except, possibly, the need to avoid destruction of evidence

33

(or, in this case, dissipation of assets, which I discuss below). Thus, this case does not fit into a standard exigent circumstances exception to the warrant requirement.

That this is so does not answer the government's claim of exigency *in toto*. A court may still find that exigent circumstances existed on consideration of: "(1) whether immediate government action was required; (2) whether the governmental interest was sufficiently compelling to justify a warrantless intrusion; (3) whether the citizens' expectation of privacy was diminished in some way." *U.S. v. Rohrig,* 98 F.3d 1506, 1521 (6th Cir. 1996).

For "immediate government action" to be necessary, law enforcement must have an objective, factual basis to believe that "the loss or destruction of evidence is imminent." *U.S. v. Sangineto-Miranda,* 859 F.2d 1501, 1512 (6th Cir. 1988). For a warrantless search to be sustained, a "person of reasonable caution" must be able to conclude that "evidence of a federal crime would probably be found on the premises and also that such evidence would probably be destroyed within the time necessary to obtain a search warrant." *Id.*

Law enforcement, however, may not merely assume that a suspect will destroy or dispose of evidence or contraband simply because he is aware the government suspects him of an offense. Thus, in *Vale v. Louisiana,* 399 U.S. 30, 35 (1970), the Court held that an arrest outside a residence does not justify warrantless search of arrestee's house. Officers, the Court stated, could not conduct such search simply on the basis that "time is of the essence" and "officers never know whether there is anyone on the premises to be searched who could very easily destroy the evidence." *Id.* at 34.[9]

---

[9] In *Vale* the Court addressed the contention that because narcotics are "easily removed, hidden, or destroyed" it would be unreasonable to require officers to secure a warrant before entering a home following a suspect's arrest outside the residence, which could have alerted persons inside the home and led to the loss of evidence. *Id.* at 34. The Court rejected this reasoning, stating that the government bears the burden of showing that an "exceptional

The gravity of the underlying offense is also a consideration. *Rohrig, supra,* 98 F.3d at 1516. In *Welsh v. Wisconsin,* 466 U.S. 740, 742-743 (1984), the Court rejected the contention that exigency authorized warrantless entry into a driver's home to arrest him after he had left the scene of an accident. The officers' desire to ascertain the suspect's blood-alcohol level before dissipation was insufficient to justify entry without a warrant. *Id.* In so holding, the Court noted that police were investigating the suspect for a "nonjailable traffic offense that constituted only a civil violation under the applicable state law."  *Id.* at 746 n.6.

In this case, the *Rohrig* factors do not weigh in favor of an absolute exception to the warrant requirement. First, OFAC's own actions belie its claim that this situation required immediate action, making a prior judicial warrant impracticable. OFAC conducted a preliminary investigation of presently indeterminate duration. That investigation led to the blocking order. Nothing in the record supports any contention that time was of the essence. There is no basis for finding that something clearly, or to a very substantial likelihood, would have been lost by taking the time to prepare the documents for and present them to a judge and receive judicial authority for the seizure.

The second *Rohrig* factor asks whether the government had a sufficiently compelling interest in swift action to justify a warrantless intrusion. The government has an indisputably important interest in preventing the flow of funds to overseas terrorist organizations. This is so, even if those organizations, at least for now, are not directly engaged in hostile acts against the United States or its citizens. Among his other Article II powers, the President can conclude that our national interest includes working with other countries to combat terrorism within or adjacent to their borders.

---

situation" justified the warrantless entry; speculation is not enough. *Id.*  In this case there is no basis in the record for concluding that KindHearts was aware that the government was moving towards issuance of a blocking notice before it issued the notice.

At issue is not, however, the policy or its undoubted importance. At issue, rather, is whether the government has shown that the need for implementing that policy effectively and expeditiously required doing so without judicial authorization. The importance of a particular policy or program does not, without more, excuse the warrant requirement.

The exigent circumstances exception is bottomed on need for immediate action to avoid loss or destruction of evidence. To come within this exception in this case, the government has to show that reasonable grounds existed at the time of the blocking notice to apprehend that KindHearts, unless the block were implemented, was about to dispose of its assets in an unlawful manner.

The government has made no such showing. In this instance the government had time to secure a warrant.[10] Thus, the second *Rohrig* factor militates in favor of requiring a warrant.

The third factor concerns the citizen's interest. KindHearts had a strong interest in accessing its funds, remaining in operation and disbursing its funds, to the extent it was doing so, lawfully.

---

[10] I can anticipate that preparation of an application for a court order authorizing a blocking seizure may be more time-consuming and complex than preparing a complaint for an arrest or an application and affidavit for a conventional search warrant. But the time needed to prepare a blocking application would not appear to be as long as, or longer than the time needed for preparation of a Title III electronic surveillance application. Title III applications and orders are generally employed in the investigation of serious offenses, many of which involve, or potentially involve violence, injury and death. We accept, however, the need to take time to make sure that this intrusive technique is employed cautiously, and only when the government satisfies Title III's requirements. The time needed to prepare and approve an application under FISA for presentation to the Foreign Intelligence Surveillance Court likewise probably is extensive. This is so, even though FISA orders are directed at foreign-based terrorist threats against the United States. The exigencies of the circumstances being investigated by electronic surveillance would appear, on balance, usually to be greater than those present when a domestic charitable organization is suspected of diverting, or permitting the diversion of a portion of its assets to terrorist organizations overseas. Nonetheless, we accept, and properly so, the delays inherent in obtaining Title III and FISA orders.

36

The government has not shown that the need to act without a warrant was so compelling that it could do so lawfully under the exigent circumstances exception to the warrant requirement.

### iv. Alteration of Probable Cause and Warrant Requirements

The government argues that its reliance on classified information to determine whether blocking is appropriate justifies bypassing the probable cause requirement and prior judicial review. It also argues that the nature of its investigation – namely, of an organization alleged to be providing financial support to overseas terrorists – precludes judicial involvement and oversight under the separation of powers doctrine.

These arguments are a variation on similar arguments which the Court rejected in *U.S. Dist. Court, supra.* There the government argued, much as it does here, that a judicial warrant would "obstruct the President in the discharge of his constitutional duty to protect domestic security." *Id.* at 318. The government also argued that courts lack technical expertise to determine whether surveillance is appropriate, and that disclosure of the necessary information to a magistrate would "create serious potential dangers to the national security and to the lives of informants and agents." *Id.* at 319.

The Court held that these concerns did "not justify complete exemption of domestic security surveillance from prior judicial scrutiny." *Id.* at 320. Complete abnegation of the Fourth Amendment and judicial involvement in protecting Fourth Amendment interests is likewise not justifiable here. As already discussed, nothing in our Fourth Amendment jurisprudence or constitutional tradition supports complete elimination of the probable cause, prior judicial review and warrant requirements.

To the extent the government argues that its possible reliance on classified information as a basis a blocking order justifies displacement of judicial review, its contentions are not persuasive.

37

District judges increasingly handle classified information under the aegis of the Classified Information Procedures Act (CIPA). 18 U.S.C. App. 3, §§ 1-16. The government has not shown that there is something so unique about blocking of assets in circumstances such as those in this case that would make CIPA inapplicable or functionally inoperable.

The Court in *U.S. Dist. Court* suggested that Congress might adopt a modified warrant procedure that would both respond to the President's Article II exclusive responsibility and authority to protect national security from foreign dangers and accommodate Fourth Amendment interests and protections. *Id.* at 320. Declining "to detail the precise standards for domestic security warrants," *id.* at 323, the Court expressly stated, however, that some form of "prior judicial approval" was constitutionally required. *Id.* at 324.

Here, as well, in view of the effect of implementation of Fourth Amendment protections and processes on the President's Article II powers, some reformulation of the probable cause requirement may be appropriate. The same may be true with regard to variance from the conventional process for obtaining judicial warrants under the Fourth Amendment and Rule 41 of the Federal Rules of Criminal Procedure.

I agree, though, with the parties' request that I not undertake in this case to determine whether such reformulation is appropriate or necessary or, if so, to define its contours. In not undertaking these tasks, I go no further than the Supreme Court in *U.S. Dist. Court*, in which the Court left to Congress the responsibility for considering and adopting the appropriate structure. *Id.* at 320. This, in turn, led to enactment of FISA and creation of the FISC.[11]

---

[11]FISA contains an alternative probable cause formulation: "probable cause to believe that .  .  . the target of the electronic surveillance is a foreign power or an agent of a foreign power" and that "each of the facilities or places at which the electronic surveillance is directed is

I also note that provision could be made for emergency seizure of assets pending such review when, as and if truly exigent circumstances existed – as they did not in this case, and as is unlikely in other past cases of OFAC blocking orders. In any event, great care would have to be taken to ensure that what should be rare did not become routine.

That has not happened under Title III: warrantless emergency surveillance, though authorized by that statute, 18 U.S.C. § 2518(7), has hardly ever occurred in the forty years since its enactment. But circumstances might possibly arise where the time needed for even *ex parte* prior judicial review might be so risky that an emergency exception, "both limited and tailored reasonably to secure law enforcement needs while protecting privacy interests," *Illinois v. McArthur,* 531 U.S. 326, 337 (2001), would be appropriate.[12]

### C. Fourth Amendment Challenges to the Provisional and Final SDGT Designation

---

being used, or is about to be used, by a foreign power or an agent of a foreign power." 50 U.S.C. § 1805(a)(2)(A)-(B).

This standard differs from the conventional probable cause requirement not in the level of suspicion, but in what federal agents must suspect. Courts have upheld this modified probable cause standard under the Fourth Amendment. *U.S. v. Johnson*, 952 F.2d 565, 573 (1st Cir. 1991); *U.S. v. Pelton*, 835 F.2d 1067, 1075 (4th Cir. 1987); *U.S. v. Badia*, 827 F.2d 1458, 1464 (11th Cir. 1987). I note, however, that, at a minimum, the Fourth Amendment requires prior judicial review and approval, based on probable cause sufficient to justify issuance of a blocking order to seize the assets of an American corporation or American citizens. This necessitates government submission of objective and reasonably verifiable information establishing such cause to a neutral and detached judicial officer.

[12]In *McArthur,* officers prevented the defendant from entering his home for two hours until they could obtain a search warrant for marjuana. *Id.* at 329. Preventing his entry was but a "brief seizure of the premises" and permissible under the Fourth Amendment. *Id.* at 333. There was, as well, prompt judicial review of probable cause and issuance of a search warrant.

KindHearts also challenges the provisional and prospective final SDGT designations under the Fourth Amendment. This court can review neither challenge at this time. Under the Administrative Procedure Act [APA], 5 U.S.C. § 704, I may review only final agency action. Agency action becomes final when it creates a binding obligation. *Bennett v. Spear*, 520 U.S. 154, 158 (1997).

Provisional agency action is not final action. *Greater Detroit Resource Recovery Auth. v. U.S. E.P.A.*, 916 F.2d 317, 322 (6th Cir. 1990) (holding a letter of intent to hold agency proceedings contemplating revocation of a permit was not final agency action); *Den-Mat Corp. v. U.S., Food and Drug Admin.,* 1992 WL 208962, *4 (D. Md.) ("[A] statement by the FDA in a letter of what its position is on an issue, along with a threat of enforcement that does not arise to a promise to enforce, is not a final action."). The provisional designation is, by definition, not final agency action: this court cannot, therefore, review it. Final designation would be final agency action, but it has yet to occur.

### 2. Statutory Authorization for Block Pending Investigation

KindHearts argues that the IEEPA does not authorize OFAC's block on KindHearts' assets because the IEEPA requires that blocked individuals have a nexus with a nation on which the United States government has imposed economic sanctions. Defendants argue that the IEEPA requires no such nexus and that OFAC may properly block any assets in which any foreign national – not just foreign nations and foreign nationals linked to a sanctioned nation – has an interest.

### A. Whether the IEEPA Requires
### a Nexus With a Sanctioned Nation

The IEEPA authorizes the President to "investigate, block during the pendency of an investigation, regulate, . . . or prohibit . . . transactions involving . . . any property in which

40

any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States." 50 U.S.C. § 1702(a)(1)(B).

Two courts have rejected the argument that the IEEPA requires that an entity have a nexus with a sanctioned nation to be blocked. In *Al Haramain, supra*, 585 F. Supp. 2d at 1260, plaintiff argued that a blocking action "requires a nexus between a sanction against a national and a sanction against its country." Thus, the government could properly sanction a Libyan national, but not a national of a country the United States has never sanctioned. *Id.*

The court rejected this argument, concluding that "the term 'thereof' simply directs that the 'national' must be 'foreign' without imposing any other conditions." *Id.; see also Humanitarian Law Project v. U.S. Dept. of Treasury,* 463 F. Supp. 2d 1049, 1072-1073 (C.D. Cal. 2006) (rejecting contention that the IEEPA is only a "tool for nation-to-nation diplomacy" and that the power to block individual assets under IEEPA is not merely "incident to" the power to impose sanctions).

These rulings represent the better interpretation of the IEEPA. First, as the court in *Al Haramain* concluded, there is no textual reason to interpret "thereof" as a limitation; the phrase "nationals thereof" simply means foreign nationals.

Second, the executive has blocked the assets of individuals unaffiliated with sanctions in the past and received Congressional approval. This occurred after President Clinton issued executive orders under the IEEPA blocking the assets of Columbian drug cartels. E.O. 12978 (Oct. 21, 1995). In the legislative findings in the Foreign Narcotics Kingpin Designation Act, 21 U.S.C. § 1901(a)(3), Congress addressed President Clinton's actions, noting that the President "successfully applied [the IEEPA] to international narcotics traffickers in Columbia and based on that successful case study, Congress believes similar authorities should be applied worldwide." The findings specifically

41

referenced E.O. 12978. *Id.* at § 1901(a)(1).Congress amended the IEEPA in 2001 and, though aware of President Clinton's executive orders, did not limit the IEEPA to be only a tool of nation-to-nation diplomacy.

The IEEPA requires no nexus with a sanctioned nation; it only requires that blocked property be property in which any foreign country or a foreign national "has any interest." 50 U.S.C. § 1702 (a)(1)(B).

### B. Whether a Foreign National Has
### "Any Interest" in KindHearts' Assets

Even if the IEEPA mandates no nexus with a sanctioned nation, the statute requires a foreign national to have an "interest" in the corporation's assets within the meaning of  50 U.S.C. § 1702(a)(1)(B). *Id.* To satisfy the Fourth Amendment, OFAC thus must show, with regard to an entity's alleged violation of  IEEPA and E.O. 13224, probable cause to believe that a foreign national has an "interest" in the corporation's assets.[13]

The IEEPA authorizes blocking based on "any interest." *See* 50. U.S.C. § 1702(a)(1)(B); *Holy Land Found. for Relief & Dev. v. Ashcroft,* 219 F. Supp. 2d 57, 67 (D.D.C. 2002). Congress has authorized the executive to define the statutory terms of the IEEPA. 50 U.S.C. § 1704. OFAC defines "interest" to mean "an interest of any nature whatsoever, direct or indirect." 31 C.F.R. § 535.312. In contrast, OFAC defined the terms "property" and "property interest" to refer to an expansive list of legally enforceable rights, including currency, negotiable instruments, "evidences of title," "contracts of any nature whatsoever, and any other property, real, personal, or mixed,

---

[13]American citizenship does not immunize KindHearts from blocking. *Global Relief Found. v. O'Neill,* 315 F.3d 748, 753 (7th Cir. 2002).

tangible or intangible, or interest or interests therein, present, future or contingent." 31 C.F.R. §§ 535.311

Courts have endorsed broad interpretations of the phrase "any interest" as used in the IEEPA and TWEA. *E.g., Regan v. Wald,* 468 U.S. 222, 225-226, 233-34 (1984) (the phrase "any interest" must be construed broadly); *Consarc Corp. v. Iraqi Ministry,* 27 F.3d 695, 701-02 (D.D.C. Cir. 1994) (OFAC may define property interests, subject to judicial review).

The statute does not, therefore, require that a foreign national have a legally enforceable property interest in a target corporation's assets. A beneficial interest in the entity's assets may suffice. *Global Relief Found. v. O'Neill,* 315 F.3d 748, 753 (7th Cir. 2002).

To date, courts have considered the definition of "interest" in cases involving OFAC blocking actions against domestic corporations only where: 1) foreign nationals occupy key executive positions or were members of the entity's board, *Global Relief, supra,* 315 F.3d at 752-53 (two of the three members of the board were foreign nationals), *Al Haramain, supra,* 585 F. Supp. 2d at 1261 (foreign nationals served as the President and Treasurer); or 2) OFAC had already named the United States corporation as an SDGT for channeling funds to foreign terrorists. *Islamic Am. Relief, supra,* 394 F. Supp. 2d at 40, 46; *Holy Land, supra,* 219 F. Supp. 2d at 67.

Khaled Smali, President of KindHearts, is a foreign national. This satisfies the requirement of 50 U.S.C. § 1702(a)(1)(B) that a foreign national have an interest in the organization.

### 3. Void for Vagueness

Plaintiff alleges that OFAC's authority to block assets pending investigation and to designate SDGTs under the IEEPA and E.O. 13224 is unconstitutionally vague.  First, plaintiff claims neither the IEEPA nor E.O. 13224 imposes substantive or procedural constraints on the authority to block

pending investigation. Second, plaintiff claims that neither the IEEPA nor E.O. 13224 imposes a scienter requirement for designation. Third, plaintiff claims that the criteria set forth in E.O. 13224 for designation contain the unconstitutionally vague terms "material support," "services," and "otherwise associated with."

To determine whether a statute is vague, courts consider whether the statute is "sufficiently clear so as not to cause persons 'of common intelligence .  .  . necessarily [to] guess at [a statute's] meaning and [to] differ as to its application.'" *Connally v. General Const. Co.,* 269 U.S. 385, 391 (1926). Vague statutes violate the Due Process Clause of the Fifth or Fourteenth Amendments. *Kolender v. Lawson,* 461 U.S. 352, 357 (1983); *see also Coates v. City of Cincinnati,* 402 U.S. 611, 614 (1971).

Vague statutes are contrary to the "first essential of due process of law" for two reasons. *Connally, supra,* 269 U.S. at 391. First, unclear statutes deny citizens "a reasonable opportunity to know what is prohibited, so that [they] may act accordingly." *Grayned v. City of Rockford,* 408 U.S. 104, 108-09 (1972). Second, vague laws encourage arbitrary and discriminatory enforcement, because they "impermissibly delegate[] basic policy matters to policemen, judges, and juries." *Id.* at 108-109; *see also City of Chicago v. Morales,* 527 U.S. 41, 60 (1999); *Papachristou v. City of Jacksonville,* 405 U.S. 156, 162 (1972)**.**

Courts demand a greater level of certainty where a vague criminal statute "might induce individuals to forgo their rights of speech, press, and association" to avoid even a risk of prosecution. *Scull v. Com. of Va. ex rel. Comm. on Law Reform & Racial Activities*, 359 U.S. 344, 353 (1959);  *see also Ashton v. Kentucky,* 384 U.S. 195, 200 (1996);  *Am. Booksellers Found. for Free Expression v. Strickland,* 512 F. Supp. 2d 1082, 1097 (S.D. Ohio 2007), *questions certified*,

44

560 F.3d 443 (6th Cir. 2009) ("The courts will pay even closer attention when . . . a statute attempts to restrict an area of free expression through the penal code, because the threat of punitive penalties has the potential to significantly chill speech.")**.**

### A. Facial and As-Applied Vagueness Claims

A plaintiff may assert two types of vagueness claims. First, it may challenge statutes as vague as applied to plaintiff's specific conduct. An as-applied challenge "implicates the statutes' enforcement only as to the plaintiff challenging the statute" but does not "implicate the enforcement of the law against third parties." *Humanitarian Law Project, supra,* 463 F. Supp. 2d at 1058. Thus, a successful as-applied challenge "does not render the law itself invalid." *Id.*

Second, plaintiffs may claim that a statute is vague on its face, meaning that it is vague as to conduct beyond that of the individual plaintiff. *Id.* A successful facial challenge renders the law invalid; facial invalidation, therefore, is "strong medicine" that courts should use only as a "last resort." *Id.; see also Nat'l Endowment for the Arts v. Finley,* 524 U.S. 569, 580 (1998).

KindHearts asserts both facial and as-applied challenges to OFAC's designation and block pending investigation authorities.

### i. Facial Invalidity

### (a). OFAC Neither Suppresses Protected Speech Nor Imposes Criminal Sanctions

Generally, an enactment is unconstitutionally vague on is face only if it is "impermissibly vague in all its applications." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 497 (1982); *see also U.S. v. Salerno,* 481 U.S. 739, 745 (1987) (enunciating the "*Salerno* doctrine" that a successful facial challenge to a statute requires proof of invalidity in all its applications unless the statute regulates protected speech).

45

If, however, plaintiffs show that an allegedly vague criminal statute reaches a "substantial amount of constitutionally protected conduct" under the First Amendment, *Belle Maer Harbor v. Charter Twp. Of Harrison,* 170 F.3d 553, 557 (6th Cir. 1999) , the *Salerno* doctrine does not apply. *See Salerno, supra,* 481 U.S. at 745 (recognizing an exception for First Amendment claims). Despite the general rule that plaintiffs who engage in "some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others," the Supreme Court has "relaxed that requirement" in the First Amendment context to avoid chilling protected speech. *U.S. v. Williams*,     U.S.    , 128 S.Ct. 1830, 1845 (2008).

To avail themselves of this exception to *Salerno,* plaintiffs must show that the challenged enactment is: 1) criminal in nature; and 2) implicates First Amendment rights. In *Kolendar v. Lawson*, 461 U.S. 352, 353 (1983), the Supreme Court invalidated a criminal statute requiring those who "loiter or wander on the streets to provide 'credible and reliable' identification and to account for their presence when requested by a peace officer." Though the statute could be clear in some instances, the Court invalidated it on the its potential to infringe First Amendment rights and the serious criminal sanctions imposed for its violation. *Id.* at 358 n.8; *see also Morales, supra,* 527 U.S. at 55 n.22 (in dicta, declining to apply *Salerno* in void for vagueness challenge to a criminal statute implicating First Amendment rights).

Where a criminal statute is narrowly tailored to restrict only unprotected speech, it does not implicate First Amendment rights for the purposes of a void-for-vagueness challenge. *Belle Maer Harbor, supra,* 170 F.3d at 557; *see also Rendon v. Transp. Sec. Admin,* 424 F.3d 475, 480 (6th Cir. 2005). Indeed, to be invalid, a statute must reach a "substantial amount" of protected speech: not all laws restricting speech satisfy this test.

46

In *Rendon,* the Sixth Circuit concluded that a Transportation Security Administration regulation did not reach a substantial amount of protected First Amendment conduct. The regulation at issue stated that "[n]o person may interfere with, assault, threaten, or intimidate screening personnel in the performance of their screening duties." 49 C.F. R. § 1540.109. Because the statute requires that the plaintiff "interfere" with screeners in the performance of a specified task, it did not give screeners unfettered discretion to fine anyone they may find disruptive and therefore did not reach a substantial amount of protected speech. 424 F.3d at 478.

In this case, OFAC's designation authority neither implicates First Amendment rights nor is criminal in nature. Courts have uniformly held that OFAC's blocking and designation authorities do not reach a substantial amount of protected speech, and that its restrictions are narrowly tailored. *Al Haramain, supra,* 585 F. Supp. 2d at 1267 (E.O. 13224 "does not punish a substantial amount of protected free speech or associational rights."); *Islamic Am. Relief, supra,* 394 F. Supp. 2d at 52-55 (rejecting claims that OFAC blocking action violates plaintiff's First Amendment freedom of speech, freedom of association and freedom of religion, and noting that "nothing in the IEEPA or the executive order prohibits [the plaintiff] from expressing its views."); *Holy Land Found. for Relief and Dev. v. Ashcroft,* 333 F.3d 156, 166 (D.C. Cir. 2003) ("[T]here is no First Amendment right nor any other constitutional right to support terrorists."); *Holy Land, supra,* 219 F. Supp. 2d at 82 (OFAC designation and blocking did not restrict plaintiff's "ability to express its viewpoints, even if these views include an endorsement of Hamas."); *Global Relief Found., Inc., v. O'Neill,* 207 F. Supp. 2d 779, 806 (N.D. Ill. 2002), *aff'd* 315 F.3d 748 (7th Cir 2002) (Executive Order satisfies strict scrutiny and is not overbroad under in violation of the First Amendment because it neither

47

"*directly* regulates speech or expression" and does not grant discretion to "determine whether particular items of expression may be prohibited on the basis of their content.").

Even if plaintiff shows that OFAC's blocking and designation authorities reach a substantial amount of constitutionally protected conduct, the consequences are civil, rather than criminal. Even harsh civil sanctions do not justify applying heightened scrutiny. In *Columbia Natural Res. Inc. v. Tatum,* 58 F.3d 1101, 1108 (6th Cir. 1995), for example, the court held that civil provisions of the Racketeer Influenced and Corrupt Organizations Act [RICO], 18 U.S.C. § 1962(c), were not unconstitutionally vague. The court stated that it "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Id.* (citing *Hoffman Estates, supra,* 455 U.S. at 498-499).[14]

### (b). OFAC's Authority to Order Blocking Pending Investigation is Not Facially Vague

Plaintiffs argue OFAC's power to block assets pending investigation is vague on its face because neither E.O. 13224  nor the IEEPA require OFAC to establish any level of suspicion or amass any quantum of evidence before acting. If this is true, the enactments are vague because without criteria governing OFAC's actions "persons 'of common intelligence .   .  . necessarily [to] guess at [a statute's] meaning and [to] differ as to its application.'" *Connally, supra,* 268 U.S. at 391.

Defendants argue that the substantive criteria set forth in § 1 of E.O. 13224 constrain both OFAC's power to designate and to block pending investigation. Defendants further assert, "To initiate a BPI OFAC must be pursuing an investigation based upon a reasonable basis to suspect that

---

[14]The court in *Columbia Natural Resources, id.* at 1108, accurately noted that civil penalties for RICO violations are "harsh," as such penalties can include, *inter alia,* "dissolution or reorganization of any enterprise." 18 U.S.C. § 1964(a).

48

the individual or entity meets the E.O. criteria. Whereas, to designate, OFAC must have reason to believe the subject meets the designation criteria." [Doc. 36,  at 30 n.25]. Plaintiffs respond that OFAC's power to designate and power to block pending investigation have distinct sources in the text of E.O. 13224, and that the government's putative "reasonable basis to suspect" standard is wholly invented.

E.O. 13224 empowers OFAC to block and designate by delegating powers given to the President by Congress in the IEEPA. Congress, through the IEEPA, authorized the President to block certain assets and transactions in cases of declared national emergency. 50 U.S.C.A. §§ 1702(a)(1), 1701. In E.O. 13224, the President declared that "foreign terrorists" represented an "unusual and extraordinary threat to the national security" and designated several entities and persons as  "foreign terrorists."

OFAC's power to designate SDGTs derives from E.O. 13224, § 1(c)-(d). These sections permit the Secretary of Treasury, in consultation with the Secretary of State and the Attorney General, to determine that an entity is "owned or controlled by" a designated foreign terrorist,  has "assist[ed] in, sponsor[ed], or provide[d] financial, material, or technological support for, or financial or other services to or in support of" acts of terrorism by a designated foreign terrorist, or is "otherwise associated with" a designated terrorist. Under § 1 of E.O. 13224, the "property and interests in property" of entities so designated by the Treasury "are blocked." Section 1 of E.O. 13224, however, does not confer any power on the United States Treasury to block pending investigation; it only authorizes blocks on entities who have already been designated.

OFAC's power to block pending an investigation presumably stems from E.O. 13224, § 7, which authorizes the Secretary of the Treasury to "employ all powers granted to the President by

49

IEEPA . . . as may be necessary to carry out the purposes of this order." E.O. 13224 does not specifically mention any power to block pending an investigation. The catch-all provision in § 7, however, delegates the President's IEEPA authority to block pending investigation to the Treasury. IEEPA authorizes the President to "investigate [and] block during the pendency of an investigation . . . any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States." 50 U.S.C. § 1702(a)(1)(B).

With regard to statutory limits on OFAC's authority to impose blocking pending investigation, the plaintiff and defendant agree that the IEEPA places five limitations on the President's power to block pending investigation, and that these also limit OFAC's power under E.O. 13224. First, before acting under IEEPA, the President must find and declare a national emergency based on an "unusual and extraordinary threat, which has its source in whole or in substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). Second, the President may exercise his authority "to deal with an unusual and extraordinary threat to which a national emergency has been declared" and "not for any other purpose."*Id.* at 1701(b). Third, blocks pending investigation, like all blocks, must be on "property in which any foreign country or a national thereof has any interest." 50 U.S.C. § 1702(a)(1)(B). Fourth, the President may not under IEEPA regulate the export of personal communications, information such as films, artworks and news wire feeds, or transactions ordinarily incident to travel in a foreign country. *Id.* at § 1702(b). Fifth, the president must consult with Congress "in every possible instance" before exercising his authority and Congress periodically reviews the President's actions. *Id.* at §§  1703(a), 1622.

50

These limitations, however, do not require OFAC to establish any specific level of suspicion or collect any quantum of evidence before blocking an entity pending an investigation.  Plaintiffs argue that, provided the President has declared a national emergency, OFAC may block any entity it chooses to investigate on a whim. Defendants respond that OFAC may only block pending investigation if OFAC is "pursuing an investigation based upon a reasonable basis to suspect that the individual or entity meets" the criteria for designation under the E.O. [Doc. 73, at 30 n.25].

Defendants argue that this "reasonable basis to suspect" requirement derives from the judicial review provision of the Administrative Procedures Act (APA), 5 U.S.C. § 706(2)(A). This provision states that a court may overturn an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.*; *see also Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 377 (1989). Defendant cites three cases in which courts reviewed whether OFAC had a "rational basis" for issuing a final SDGT determination and block. *Holy Land Found. for Relief and Development v. Ashcroft,* 333 F.3d 156, 162 (D.C. Cir. 2003); *see also Islamic Am. Relief Agency v. Gonzales,* 477 F.3d 728, 732 (D.C. Cir. 2007)*; Al Haramain, supra,* 585 F. Supp. 2d at 1249.

Defendant's argument, however, is flawed. First, § 706(2)(A) of the APA sets forth a standard of judicial review, not a substantive standard to govern agency behavior. OFAC must comply with statutes, executive orders, and Treasury regulations governing its conduct; it should not consider whether its actions would later be reversed under the deferential "arbitrary and capricious" standard of judicial review in choosing its course of action.

Second, defendant's argument fails to establish a link between the power to block pending investigation (authorized by E.O. 13224, § 7) and the standard for designating an SDGT (described

51

in E.O. 13224, § 1). Nothing in the text of E.O. 13224 suggests that the block pending investigation power can be exercised only as a precursor to designation, nor does anything suggest how close OFAC must be to designating to impose a block. Without such a link, a reviewing court has no basis for determining whether OFAC has exercised its power reasonably in accordance with its authority.

Defendants rely on three cases involving challenges to post-designation blocking orders, not blocks pending investigation. *Islamic Am. Relief, supra,* 477 F.3d at 732; *Holy Land, supra,* 333 F.3d at 162; *Al Haramain, supra,* 585 F. Supp. 2d at 1249.

Because the cases do not deal with the power to block pending investigation, they provide no guidance as to the restrictions on this power. In all three, OFAC simultaneously designated the target entity as an SDGT and blocked its assets. In these cases, therefore, both the designation decision and the block were governed by § 1 of the Executive Order, not § 7.

Section 1 sets forth criteria for designation and the block attaches automatically on designation. Courts in these cases apply the APA's standard of review to determine whether OFAC had a "rational basis" to designate an entity under the § 1 criteria – courts do not treat "rational basis" as the criteria OFAC must abide in blocking or designating an entity. *Holy Land, supra,* 333 F.3d at 162.

Neither the IEEPA nor E.O. 13224, therefore, restrict OFAC's power to block pending investigation OFAC's authority to block pending investigation by requiring a specific quantum of evidence or level of suspicion that the targeted entity should be designated.

 Plaintiff argues that this lack of statutory criteria restricting OFAC's blocking authority makes that authority unconstitutionally vague. Because no criteria restrict OFAC's authority, all

exercise of that authority, plaintiff contends, are *ab initio* suspect, thereby rendering the IEEPA and E.O. 13224 facially vague.

Application of the Fourth Amendment to blocks pending investigation provides the criteria, otherwise unavailable under the IEEPA and E.O. 13224, for such seizures. If, to satisfy the Fourth Amendment, OFAC may only block pending investigation on a showing of probable cause that the target entity has violated prohibitions of the IEEPA and E.O. 13224, its discretion to block is not unfettered and OFAC's authority is not unconstitutionally vague on its face.[15]

### B. Whether the Criteria For Designation Are Unconstitutionally Vague

KindHearts also facially challenges OFAC's designation authority as unconstitutionally vague. I have concluded previously that challenges to OFAC's preliminary and final designation authority are not reviewable at this time, but I consider KindHeart's challenge because the designation criteria also govern the probable cause standard required to block pending investigation.

OFAC's designation authority arises from  E.O. 13224, § 1 which orders a block on "all property and interest in property" subject to United States jurisdiction of an enumerated list of foreign terrorist individuals and organizations. E.O. 13224  § 1(d)(i)-(ii) authorizes the Secretary of the Treasury to add to this list by designating additional entities that "assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of" or are "otherwise associated with" individuals or groups designated as foreign terrorists. E.O. 13224, § 2(a) further authorizes designation and blocking for "making or receiving of any contribution of funds, goods, or services to or for the benefit of" designated foreign terrorists.  KindHearts argues

---

[15]In this case, OFAC failed to follow the Fourth Amendment in imposing the block pending investigation. Thus, as applied to KindHearts, OFAC's authority under the IEEPA and E.O. 13224 was unconstitutionally vague.

that the terms "services," "otherwise associated with" and "material support" are unconstitutionally vague. KindHearts further argues that E.O. 13224 is unconstitutionally vague because it contains no scienter requirement.

To establish that these terms are unconstitutionally vague, plaintiff must show that they cause persons "of common intelligence .  .  . necessarily [to] guess at [a statute's] meaning and [to] differ as to its application." *Connally , supra,* 269 U.S. at  391. Because plaintiff's challenge is facial and, as discussed above, does not implicate First Amendment rights, plaintiff must show that the challenged provisions are "impermissibly vague in all [their] applications." *Hoffman Estates, supra,* 455 U.S. at 497**.**  To prevent arbitrary enforcement and to provide citizens with reasonable notice of what conduct is proscribed, a statue must draw "reasonably clear lines" between legal and illegal conduct. *Smith v. Goguen,* 415 U.S. 566, 573 (1974)**.**

Because E.O. 13224 and the IEEPA are federal rather than state law, this court has greater leeway to construe the enactments to remedy vagueness. The Supreme Court has rarely held federal statutes to be void for vagueness. *Columbia Natural Resources, supra,* 58 F.3d at 1108. Because federal statutes are subject to interpretation by federal courts, federal courts need not "sit passively and review only what other people have said to determine if a statute is vague." *Id.* Rather, a federal court's "own interpretations are a means of mitigating any vagueness." *Id.*

An undefined word or phrase does not necessarily render an enactment vague. Courts may ascertain an undefined term's meaning by reading it in context, *Boos v. Barry*, 485 U.S. 312, 332 (1988), or by looking to the term's common meaning. *U.S. v. Haun*, 90 F.3d 1096, 1101 (6th Cir. 1996) (If the common meaning of an undefined term provides "adequate notice of the conduct prohibited and standards for enforcement," the statute is not void for vagueness.). Courts may look

54

to other statutes and case law to determine an undefined term's meaning. *See Jordan v. De George,* 341 U.S. 223, 229-230 (1951) (upholding phrase "crime of moral turpitude" against vagueness challenge by examining meaning of term in cases and other statutes).

A statute may be facially vague if it contains language that "lends itself to subjective interpretation." *Humanitarian Law Project, supra,* 463 F. Supp. 2d at 1062. In *Coates v. City of Cincinnati,* 402 U.S. 611, 612-614 (1971), the court invalidated an ordinance prohibiting "conduct . . . annoying to persons passing by," because "[c]onduct that annoys some people does not annoy others." *See also U.S. v. Winsch,* 84 F.3d 1110 (9th Cir. 1996) (invalidating court's local disciplinary rule requiring lawyers to "abstain from all offensive personality" because it could "refer to any number of behaviors" and it would be  "impossible to know when such behavior would be offensive enough to invoke the statute.").

### i. "Services"

Plaintiff argues that the term "services" as it appears in E.O. 13224, §§ 1-2 is unconstitutionally vague. The Treasury Regulations do not provide a concise definition of "services," but they do contain a non-exhaustive list of examples: "legal, accounting, financial, brokering, freight forwarding, transportation, public relations, or other services." 31 C.F.R. § 594.406.

Other courts have concluded that the term "services" in E.O. 13324 is not unconstitutionally vague. In *Humanitarian Law Project, supra,* 463 F. Supp. 2d at 1063, the court held that the term "services" in the E.O. 13224 is not vague because it is a "word of common understanding and one that could not be used for selective or subjective enforcement." Despite the fact that the regulations list examples in place of an exact definition, the court concluded that  "any given individual would

55

be able to distinguish when he or she was providing a 'service' to a designated terrorist group, as opposed to engaging in independent activity." *Id.; see also Al Haramain, supra,* 585 F. Supp. 2d at 1270 (The term "services" in E.O. 13224 is not unconstitutionally vague because the whole phrase, "services to or in support of" an SDGT "implies cooperation between the two entities, as opposed to independent advocacy.").

Courts have also upheld the term "services" against vagueness challenges in other contexts. *See, e.g., Al Haramain, supra,* 585 F. Supp. 2d at 1269-1270 (upholding "services" as it appears in IEEPA); *U.S. v. Lindh,* 212 F. Supp. 2d 541, 547 (E.D. Va. 2002) (upholding "services" in a criminal case).

In *Humanitarian Law Project v. Mukasey,* 509 F.3d 1122, 1136 (9th Cir. 2007), the court concluded that the "service" in the Antiterrorism and Effective Death Penalty Act of 1996 [AEDPA] is unconstitutionally vague. The AEDPA, however, expressly defined "services" to include "expert advice or assistance." *Id.* The court ruled the terms "expert advice or assistance" to be unconstitutionally vague because the terms reaches protected First Amendment activity, such as training in "how to lobby or petition representative bodies such as the United nations." *Id.* The court concluded that the phrase "expert advice or assistance" was unconstitutionally vague, and that the term "services" was unconstitutionally vague because the term includes "expert advice or assistance." *Id.* at 1135-1136.

The term "service" in E.O. 13224 is not unconstitutionally vague. The common meaning of the word sufficiently constrains executive discretion. When read in context, "services to or in support of," the term clearly requires a collaborative relationship with an SDGT; independent advocacy is not covered. Moreover, neither the E.O. nor the Treasury Regulations expressly extend

the term "services" to any protected area of speech, making the Ninth Circuit's reasoning in *Humanitarian Law Project* regarding the AEDPA inapplicable here.

### ii. "Material Support"

Plaintiffs assert that the term "material support" is unconstitutionally vague. Neither the Executive Order nor the Treasury regulations provide a definition of this term. To construe the statute, courts may look to how other statutes, regulations, and case law define this term. *See Jordan, supra,* 341 U.S. at 229-230.

The Immigration and Naturalization Act [INA], 8 U.S.C. §1182 (a)(3)(B), bars aliens who "engage in terrorist activity," including those who "afford material support" to terrorists from receiving visas or entering the United States. The statute provides several examples of "material support," including "a safe house, transportation, communications, funds, transfer or other material financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training." *Id.* at §1182(a)(3)(B)(iv)(VI).

Courts have defined and applied the term "material support" from the INA using the plain meaning of the words. Thus, "material" has been held to mean "significant" or essential" and "support" has been held to mean "sustenance or maintenance; esp., articles such as food and clothing that allow one to live in the degree of comfort to which one is accustomed." *Sing-Kaur v. Ashcroft,* 385 F.3d 293, 298 (3d Cir. 2004) (construing "material support" in 8 U.S.C. § 1182 (a)(3)(B)(iv)(VI) (quoting *Black's Law Dictionary* 991, 1453 (7th Ed. 1999)) Though not addressing a vagueness challenge to the statute, the court concluded that "material support" clearly encompassed the claimant's actions, which included providing food and shelter to individuals the claimant knew had committed terrorist activities. *Id.* at 299.

The term "material support" also appears in the AEDPA, 18 U.S.C. § 2239A. Subsection (b)(1)  defines "material support or resources" to mean

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

That two different federal statutes define "material support" somewhat differently does not, as plaintiffs contend, indicate that the statute is vague. The definitions in the INA and AEDPA do not set forth an exhaustive list of examples. In addition to specific examples like  "weapons, lethal substances [and] explosives," the definition in the AEDPA includes general terms like "any property, tangible or intangible, or service." 18 U.S.C. § 2239A(b)(1). The definition in the INA uses the term "including" before the enumerated examples, indicating that Congress "intended to illustrate a broad concept rather than narrowly circumscribe a term with exclusive categories." *Sing-Kaur, supra,* 385 F.3d at 298. Even if the two statutes differ in the examples they list, there is substantial overlap: both list safe houses, funds, false documentation, financial services and weapons as examples of "material support."

Plaintiff's vagueness challenge to "material support" fails. The INA, AEDPA, existing case law and common meaning provide a "broad concept" of material support that is sufficiently clear. Statutes "need not define with mathematical precision the conduct forbidden." *Columbia Natural Res., supra,* 58 F.3d at 1108. Plaintiff, furthermore, must show that the statute is vague in all its potential applications to succeed in its facial challenge. Because existing statutes and case law identify a clear core of activities that constitute "material support" – including the giving of funds, which plaintiff allegedly did – plaintiff's facial challenge fails.

58

### iii. "Otherwise associated with"

Plaintiffs also find unconstitutional vagueness in the term "otherwise associated with" in E.O. 13224, § 1. OFAC regulations have recently defined this phrase to mean "(a) To own or control [an SDGT]; or (b) To attempt, or to conspire with one or more persons, to act for or on behalf of or to provide financial, material, or technological support, or other financial services, to [an SDGT]. 31 C.F.R. § 594.316.

Plaintiff alleges that the phrase "otherwise associated with" arguably encompasses First Amendment protected speech and association. The recently-adopted definition in 31 C.F.R. § 594.316, however, clarifies the phrase and limits its applicability to protected speech and conduct. Since the regulation was adopted, courts have twice rejected arguments identical to the plaintiff's. *See Al Haramain*, *supra*, 585 F. Supp. 2d at 1270 (term "otherwise associated with" as defined in § 594.316 is not unconstitutionally vague); *Humanitarian Law Project v. U.S. Dept of Treasury,* 484 F. Supp. 2d 1099, 1106 (C.D. Cal. 2007) (terms "on behalf of" and "to attempt, or to conspire" in § 594.316 are themselves sufficiently clear and clarify the meaning of "otherwise associated with").

Plaintiff notes that § 594.316 includes the terms "services" and "material support," which it alleges are unconstitutionally vague. For the reasons described above, neither term is vague either as it appears in E.O. 13224 or 31 C.F.R. § 594.316. Neither, therefore, makes the term "otherwise associated with" unconstitutionally vague.

### iv. Lack of a Scienter Requirement

Plaintiff claims, and the defendant does not dispute that OFAC may designate a targeted entity for providing "material support," providing "services" or "otherwise associat[ing] with" an SDGT without showing that the targeted entity knew the recipient of its resources was an SDGT or

that the targeted entity knew the resources would be used for illegal purposes. Plaintiff argues that this lack of a scienter requirement renders E.O. 13224 unconstitutionally vague.

Lack of a scienter requirement does not make an otherwise clear statute unconstitutionally vague. Even criminal statutes are not unconstitutional where the legislature did not make intent to violate the statute an element of the crime. *Lambert v. California,* 355 U.S. 225, 228 (1957) ("There is wide latitude in the lawmakers to declare an offense and to exclude elements of knowledge and diligence from its definition."). Punishing "a person for an act as a crime when ignorant of the facts making it so" is not a denial of due process of law. *Williams v. North Carolina,* 325 U.S. 226, 238 (1945). Although "a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed," *Hoffman Estates, supra,* 455 U.S. at 499, lack of such requirement does not make the statute vague.

In this case, the absence of a scienter requirement does not make OFAC's authority unconstitutionally vague.

### 4. Procedural Due Process

KindHearts asserts a due process challenge to OFAC's provisional designation of it as a SDGT.

KindHearts claims that the statute on its face does not accommodate, and in any event, OFAC failed to provide constitutionally mandated due process. As a result, according to KindHearts, it was not given – and, in its view, even yet has not received – constitutionally adequate notice of the basis and reasons for the blocking order. It also asserts that the government has failed to provide an opportunity to be heard in response to that order and the deprivation of its assets.

60

For the reasons that follow, I reject KindHearts' contentions regarding facial invalidity for want of an express description of process. I conclude, however, that the government's actions regarding the blocking order failed to provide the two fundamental requirements of due process: meaningful notice and opportunity to be heard. *Mathews v. Eldridge*, 424 U.S. 319, 333, 348 (1974).

I find, though, that I presently cannot determine the extent to which KindHearts has been prejudiced by the violation of its constitutional rights.

I also conclude that the due process challenge to the provisional SDGT designation is not ripe for adjudication.

## A. Asset Freeze - Facial Challenge

KindHearts contends that IEEPA § 1702(a)(1)(B) is unconstitutional on its face because it fails to include procedural safeguards. The law does not require notice, an opportunity to be heard or pre- or post-deprivation process. A provision of the Patriot Act amended the IEEPA and authorized OFAC to block an individual's or organization's assets based on its assertion that the individual or organization is under investigation.[16] OFAC can thus freeze an American corporation's assets just by announcing that the corporation is under investigation – under the statute it does not need to provide any process to that corporation.

§ 1702(a)(1)(B) states:

At the times and to the extent specified in § 1701 of this title, the President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise– (B) investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or

---

[16]Section 106 of the Patriot Act inserted "block during the pendency of an investigation" after "investigate" in the text of 50 U.S.C. § 1702(a)(1)(B).

transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States[.]

KindHearts argues the government must provide notice and an opportunity to be heard by a neutral tribunal. While it agrees that the government does not always have to provide pre-deprivation process, it maintains that the government must afford it prompt post-deprivation process.

The government, in response, emphasizes the flexible nature of due process requirements, and states that courts must consider the governmental interest in national security in addition to harm to private interests and risk of erroneous deprivation. The government's interest in national security, it contends, is paramount.

KindHearts correctly contends that the IEEPA contains no procedural protections. That does not mean that it meets the *Salerno* "no set of circumstances" test. 481 U.S. at 745.[17] Under *Salerno*, "a plaintiff can only succeed in a facial challenge by establishing that no set of circumstances exist under which the Act would be valid, *i.e.*, that the law is unconstitutional in all of its applications." *Washington State Grange v. Washington State Republican Party*, — U.S. –,128 S. Ct. 1184, 1190 (2008).

In *U.S. v. Al-Arian,* 308 F. Supp. 2d 1322 (M.D. Fla. 2004), the court upheld the constitutionality of the IEEPA because the statute primarily applies to foreign organizations. The court reasoned that facial analysis of the statute should include the statute's application to foreign organizations and to organizations without a substantial connection to the United States. It stated, "[i]n such limited and exceptional circumstances . . . the facial analysis of a statute, like AEDPA

---

[17] *See supra,* § 4. Nor, despite KindHearts' contention to the contrary, does the statute implicate First Amendment freedoms. *Id.*

or IEEPA, should include application to foreign organizations and individuals without a substantial connection to the United States." *Id*. at 1346. It rejected the notion that its analysis would "eviscerate the doctrine of facial invalidity." *Id*. It instead explained that its analysis prevented it "from intruding into an area that . . . belong[ed] to the domain of political power." *Id.*

No other court has explicitly addressed the constitutionality of the IEEPA under the *Salerno* "no set of circumstances" test. In *Global Relief Foundation, Inc., supra*, 207 F. Supp. 2d at 793, plaintiff argued the IEEPA did not apply to the domestic assets of a United States corporation. Plaintiff did not challenge the constitutionality of the statute under *Salerno*. In *Holy Land Foundation, supra*, 219 F. Supp. 2d at 67, plaintiff argued that under the IEEPA, the President can only block property in which a foreign country or national has an interest that is "legally enforceable." Again, plaintiff did not challenge the statute's constitutionality under *Salerno*.

In *Al-Haramain Islamic Foundation v. U.S. Dept. of Treasury*, *supra*, the plaintiff challenged the lack of procedural safeguards and regulations under the APA, arguing that OFAC's designation process was arbitrary and capricious because "none of the regulations [identified] any procedural or substantive criteria to guide the process." 585 F.Supp.2d at 1253. In response to plaintiff's complaint that the designation process lacked procedural safeguards, the court held "there is no mandatory duty requiring OFAC to adopt the regulations AHIF-Oregon demands . . . ,the agency's failure to do so cannot be deemed 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law' under the APA . . . In the absence of regulations, the requirements of due process apply." *Id*. at 1254. Thus, although the court did not specifically address the constitutionality of the statute under the *Salerno* "no set of circumstances" test, it rejected

plaintiff's challenges by noting that the requirements of due process apply to and constrain implementation of the statute.

The government argues that the IEEPA can be applied constitutionally. It asserts that its application to KindHearts is an example of a set of circumstances under which the statute is constitutional. It notes that KindHearts suggests safeguards that it believes would satisfy the constitutional standard. Thus, according to the government, KindHearts itself suggests a set of circumstances under which the IEEPA is constitutional.

In *Khouzam v. Attorney General of the U.S.*, 549 F.3d 235, 243-44 (3rd Cir. 2008), the court, considering the facial constitutionality of the Foreign Affairs Reform and Restructuring Act of 1998 [FARRA] noted that neither the statute nor its implementing regulations provided "any procedures to be afforded the alien once the Attorney General [made] a determination that a deferral [of removal] should be terminated based on diplomatic assurances." The court did not, however, fault the statute or its implementing regulations for the lack of process the petitioner received. It noted that the Act did not prohibit the Executive from acting constitutionally, and therefore was not facially unconstitutional. The court stated, "We do not attribute the lack of due process to .  .  . FARRA or its implementing regulations, for neither expressly directed the Executive to act in a manner that offends the Fifth Amendment. A statute is not facially unconstitutional unless 'no set of circumstances exists under which the Act would be valid.'" *Id*. at 258; *see also, Washington State Grange*, *supra*,     U.S. at    , 128 S.Ct. at 1194 (finding statute was not facially unconstitutional because it could "conceivably be" implemented in a constitutional manner). *But see, e.g., Wisconsin v. Constantineau*, 400 U.S. 433, 439 (1971) (finding statute that lacked provisions for notice and hearing unconstitutional); *Leslie v. Lacy*, 91 F. Supp. 2d 1182, 1186, 1193 (S.D. Ohio 2000) (finding

64

statute unconstitutional on its face where text contained "no provision for notice .   .   . or hearing prior to the transfer of title .   .   . or after the transfer of title.").

OFAC does not contend that due process requirements do not apply at all. Indeed, it contends that it has met those requirements. Thus, it implicitly acknowledges the mandate of due process: it only disputes the claim of noncompliance. Although OFAC, as discussed in the next subsection, failed to afford adequate post-deprivation due process, the statute under which it acted can, if properly administered, be implemented consonant with due process requirements. It is, therefore, not unconstitutional on its face.

### B. Asset Freeze: As-Applied Due Process Challenge

KindHearts argues OFAC provided inadequate post-deprivation process after imposting the block pending investigation in February, 2006, thereby violating KindHearts' due process rights. These violations, according to KindHearts, included OFAC's failure to specify any objective criteria for blocking KindHearts' assets and provide either pre- or post-deprivation process. Due to OFAC's alleged unconstitutional application of its blocking power, KindHearts asks that I lift the block.[18]

KindHearts claims that as notice of the block, OFAC only provided a single boilerplate sentence stating that OFAC was investigating it for possible connections to Hamas. According to KindHearts, the notice failed to specify the Executive Order criteria OFAC suspected KindHearts of violating, and instead cited all the criteria in one sentence. Although KindHearts repeatedly asked for specification of the charges against it and reasons for OFAC's freeze, OFAC ignored its requests.

---

[18] The parties agree that OFAC's block pending investigation constitutes a final agency action subject to judicial review.

65

KindHearts asked for the full administrative record OFAC was using against it, but OFAC has to date failed to provide KindHearts with the full record.[19]

OFAC notified KindHearts that it could submit a letter in response to OFAC's block. Despite KindHearts' prompt submission, OFAC failed to respond for over one year. Its response consisted of a mere acknowledgement of KindHearts' letter.

The government rejects KindHearts' assertion that it received constitutionally inadequate process following the blocking of its assets. First, the government argues that in this case, due process does not require pre-deprivation notice or an opportunity to be heard. KindHearts does not refute the contention on this point. Pre-deprivation notice is not always necessary. *See, e.g., Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 678-79 (1974) (finding that in limited circumstances a seizure can take place without pre-seizure notice and a hearing).

The government insists KindHearts cannot legitimately claim it was unaware of the legal and factual grounds for the block. The initial blocking order notice stated that OFAC blocked KindHearts' assets under E.O. 13224 and the IEEPA, as amended by the Patriot Act. It included the legal criteria supporting its investigation, stating it was investigating KindHearts for being "controlled by," "acting for or on behalf of," "assisting in or providing financial or material support to," "and/or otherwise being associated with Hamas."

OFAC notes that the blocking notice did not include every basis for blocking authorized in E.O. 13224. Thus, it disputes KindHearts' contention that it simply recited that Order's list. Due

---

[19] On May 25, 2007 (approximately one year and three months after the government initiated the block pending investigation), the government provided to KindHearts its unclassified and non-privileged record consisting of thirty-five exhibits along with its letter informing KindHearts of its provisional determination to designate KindHearts as a SDGT. The government did not, however, provide access to its classified record.

process was also provided, the government asserts, *via* its invitation to KindHearts to challenge the blocking order by sending a letter presenting its views and evidence to the attention of the director of OFAC.

The government also claims that the press release placed on its website concurrently with issuance of the blocking notice constituted adequate notice of the factual basis for its decision to block KindHearts' assets. OFAC adds that to date, it has given KindHearts its letter stating its provisional determination to designate KindHearts an SDGT and the thirty-five unclassified and non-privileged exhibits supporting that provisional determination, redacted provisional determination evidentiary memorandum, redacted block pending investigation evidentiary memorandum and portions of declassified exhibits. All this information, according to OFAC, constitutes sufficient notice for KindHearts meaningfully to challenge the block, along with its challenge to the provisional determination.

KindHearts responds that OFAC is conflating the notice it provided in conjunction with its blocking action with the notice of the provisional SDGT determination.

In response to KindHearts' complaint about the three year delay in providing the bulk of the materials now in its hands, the government contends that its original press release, issued concurrently with the blocking order, constituted sufficient notice. That, coupled with the invitation to KindHearts to send a letter challenging the blocking order, satisfied due process. The government additionally argues that whatever notice problems may have existed at the time of the blocking have been cured because KindHearts now has adequate notice and may challenge both the block and impending designation. According to OFAC, whatever process problems the delay caused will be

67

cured because the process is moving forward, and the parties are negotiating a timeline for a prompt adjudication.

### (i). Components of Adequate Notice

Constitutionally sufficient notice must be

> reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. The notice must be  .   .   .  reasonably [calculated] to convey the required information  .   .   . [W]hen notice is a person's due, process which is a mere gesture is not due process.

*Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314-15 (1950).

Constitutionally sufficient notice should give the party an understanding of the allegations against it so that it has the opportunity to make a meaningful response. The party must be able to know the conduct on which the government bases its action, so that it can explain its conduct or otherwise respond to the allegations. It must also have reasonable access to the evidence that the government is using against them. *See, e.g., Gete v. I.N.S.*, 121 F.3d 1285, 1297-98 (9th Cir. 1997) (discussing requirements of notice).

To determine whether KindHearts received constitutionally required process in conjunction with OFAC's block pending investigation, I must weigh 1) "the private interest .   .   . affected by the official action;" 2) "the risk of an erroneous deprivation of such interest through the procedures used;" and 3) "the Government's interest, including the function involved and the fiscal and administrative burdens that .   .   . additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

### (ii). What OFAC Provided as Notice

To the extent that the government has provided notice of the basis for its blocking notice, it has done so in a piecemeal and partial manner. The blocking order simply recited criteria from E.O. 13224 and referenced the IEEPA, as amended by the Patriot Act and 31 C.F.R. Part 594. According to KindHearts, OFAC simply stated all possible criteria for investigation in a single sentence. OFAC disputes this, noting that it did not mention all of the criteria listed in the Executive Order.[20] The concurrently posted press release similarly failed, according to KindHearts, to give any useful information about why the government froze all its assets and put it out of operation.

OFAC's invitation to KindHearts to send a letter in response to the blocking notice did not add to KindHearts' understanding of the reasons and basis for the government's actions. The government did not offer access to the unclassified administrative record, any part of the documents and property seized during execution of the search warrants, or funds to pay attorney fees. Nonetheless, KindHearts' attorney at that time, Jihad Smaili, promptly submitted a challenge to OFAC's blocking action.

On November 29, 2006, Lynne Bernabei, successor counsel for KindHearts, wrote OFAC requesting access to the full administrative record for the potential designation. Not only did OFAC not provide any portion of the administrative record, it did not even respond to the November 29th letter.

---

[20]KindHearts also argues that OFAC failed to state the legal criteria supporting its blocking decision. OFAC now states it acted under the "reasonable basis" standard of the APA, at times calling the standard a "reasonable basis to suspect" [Doc. 36, at 30, n.25; 37] and at other times, a "reasonable basis to believe." [Doc. 73, at 25]. As discussed in the § 3(A)(i)(b), *supra*, the government's purported legal basis improperly tries to convert the standard for judicial review into the substantive standard triggering action under the statute. Going forward, the legal criteria for initiating the block pending investigation will be probable cause under the Fourth Amendment.

On May 25, 2007, fifteen months after OFAC blocked KindHearts, and more than a year after Smali's letter to OFAC, OFAC notified KindHearts that it had provisionally determined to designate KindHearts an SDGT. OFAC's notice acknowledged receipt of Smaili's November 29, 2006, letter, and stated that since receiving his letter, it had completed its investigation, which resulted in the provisional SDGT designation.

OFAC's notice of provisional designation did not recite new or alternative grounds for the potential designation. Instead, OFAC reiterated that its blocking action was based on the IEEPA, E.O. 13224 and 31 C.F.R. Part 594. It included with the letter thirty-five unclassified, non-privileged exhibits, which constituted the unclassified administrative record on which OFAC based its provisional determination.

OFAC did not include a statement explaining how those exhibits related to its charges against KindHearts, or how those documents were relevant. *See Al-Haramain, supra*, 585 F. Supp. 2d at 1255-56 (stating that the government failed to provide constitutionally adequate process when it provided the administrative record supporting its designation /redesignation but the majority of those documents did not mention the plaintiff, and OFAC failed to explain the significance of that evidence).

Twenty of the thirty-five exhibits provided to KindHearts with the provisional determination notice do not mention KindHearts.[21] The unclassified administrative record includes court opinions

---

[21]The unclassified administrative record consists of: a list of "Charitable societies whose accounts at Arab Bank were confiscated by Israeli security forces as Part of the Struggle Against Financing Terrorism," from the Intelligence and Terrorism Information Center at the Center for Special Studies  (http://www.intelligence.org.il/eng/finance/bacnk_ap6.htm); an article in the *Cincinnati Post* describing Fawaz Damrah's sentencing to two months in prison; Treasury Department press release regarding Al-Aqsa's designation as a financier of Terror Charity linked to Hamas; Treasury Department press release regarding Global Relief's designation; indictment

and indictments in *Global Relief* and *Holy Land* cases, historical articles, a Council on Foreign Relations Backgrounder on Hamas, various OFAC press releases, newspaper articles, KindHearts' Newsletters and its organizational chart. OFAC invited KindHearts to respond to its provisional determination decision within thirty days of the date of the letter.

On June 14, 2007, KindHearts renewed its request for the full administrative record, both classified and unclassified. On June 25, 2007, KindHearts responded to OFAC's provisional determination with a twenty-eight page preliminary submission. It attached to that a 1369-page submission of supporting evidence. On June 27, 2007 KindHearts also requested that OFAC initiate declassification review.

---

in Northern District of Illinois of Marzook (2004); Treasury Department Press release: U.S. Designates 5 Charities and 6 Hamas Leaders as Terrorist Entities; indictment in *U.S. v. Holy Land Foundation* (Northern District of Texas) 2004; Article on palestine-info.net: PA Closes down Islamic Institution, Societies, Newspapers, Parties; KindHearts' Articles of Incorporation; Department of Justice Press Release: Alamoudi sentenced to Jail in Terrorism financing case; Treasury Department Press release 2004: Treasury Designates Global Network, Senior Officials of IARA for Support to Bin Laden, Others; 2003 Tax Form 990 for KindHearts; two KindHearts Newsletters describing its activities; *Toledo Blade* article regarding Senate Finance Committee's investigation of twenty-five Muslim organizations, including KindHearts, and the closing of the investigation; KindHearts' address in Palestine and Lebanon on website; E.O. 13224 annex; three page "statement of the case" - almost verbatim repeat of press release OFAC issued on February 19, 2006; Press Release from Chairman of U.S. Senate Finance Committee; KindHearts and IARA correspondence and invoices; contractual agreements for services between KindHearts and North American Professional Services, Inc., & MLC Solutions; Letter from Sanabil to KindHearts; Global Relief Program reports; Email exchanges between KindHearts employees; Letter from Welfare Association to KindHearts; Internet article: "In Deir - El Balah, the Islamic Movement of Resistance Collects the Fruits of its Work on the Ground" (World Online); Global Relief contacts; *Holy Land* DC District and Circuit opinions; *Boim v. Quaranic Literacy* opinion; articles on the "Society of Muslim Brothers" and "Muslim Brotherhood's Conquest of Europe;" Council on Foreign Relations Backgrounder on Hamas, KindHearts' Organizational Chart.

OFAC never responded to KindHearts' June 25th submission.[22] On August 10, 2007, KindHearts asked OFAC to perform a declassification review of the classified and privileged evidence on which it relied.

OFAC agreed, and said it would give KindHearts thirty days after the end of the declassification review to submit a response. For over fourteen months OFAC reported no progress with the review.[23]

On August 13, 2007, KindHearts requested further clarification of the charges against it, and an extension of time until forty-five days after the declassification review was complete. On August 15, 2007, it also asked for access to classified evidence and to its own documents, all of which had been seized. On November 6, 2008, OFAC sought declassification review of block-related documents.

On December 12, 2008, approximately thirty-four months after the block pending investigation, and approximately eighteen months after its provisional determination to designate KindHearts an SDGT, the government provided KindHearts with redacted versions of the block memorandum and evidentiary memo on which it relied in reaching its provisional determination. In its redacted provisional determination memo, OFAC indicated the significance of the unclassified records it had released nineteen months earlier.

In December, 2008, and January, 2009, OFAC declassified portions of the administrative record supporting its block. That record included seven exhibits that the government had not

------

[22] KindHearts learned about a year later that OFAC had no record of having received the submission. OFAC later admitted that it had received, but later misplaced the record. [Doc. 73].

[23] After KindHearts filed this lawsuit, OFAC told its counsel that it could complete the declassification review within thirty days.

included among the exhibits disclosed with the provisional determination decision. The additional exhibits, according to the government, had not been relied on in making that determination.[24] The December, 2008, submission included a redacted copy of the block memorandum.

On January 30, 2009, OFAC declassified portions of several paragraphs in the block memorandum. On March 13, 2009, in response to KindHearts' final brief relating to the pending pretrial motions, OFAC declassified one of the several bases for its block and provisional determination to designate KindHearts.

In sum, the "notice" KindHearts has received to date, since the government's provisional determination to designate it an SDGT, is the letter KindHearts received informing it of the government's decision, the thirty-five unclassified, non-privileged exhibits, and a redacted version of the provisional determination evidentiary memo. OFAC claims it relied on the thirty-five exhibits in making its blocking decision, in addition to seven other exhibits that it did not rely on in making its provisional determination decision. Those seven exhibits and the redacted block evidentiary memorandum have been handed over to KindHearts.

KindHearts remains largely uninformed about the basis for the government's actions. To the extent that it has become usefully informed, that information came only after long, unexplained and inexplicable delay and following multiple requests for information.[25]

### (iii). OFAC's "Notice" Was Constitutionally Inadequate

---

[24]The government also stated that it would not be relying on those exhibits in the designation proceedings.

[25]To the extent that OFAC contends, or might contend, that KindHearts knew itself what it was doing, where its funds were going and the unlawfulness of their destination, such response on its part is unavailing. Notice is to come from the government because it alone knows what *it* believes, and why what it believes justifies its actions.

OFAC's block of KindHearts resulted in the indefinite freeze of all of KindHearts' assets and property, including about one million dollars in bank accounts. The block shut KindHearts down indefinitely and its corporate existence remains in jeopardy due to OFAC's block pending investigation.

Applying the first factor from the *Mathews* balancing test – the private interest affected by OFAC's action – it is clear that the private interest is substantial. An American corporation has had all its assets seized and been put out of business without being told, in any meaningful or useful way why, or on what basis the government took that action.

Applying the second *Mathews* factor – the risk of erroneous deprivation – I conclude that the failure to provide adequate and timely notice creates a substantial risk of wrongful deprivation. This is especially so in view of the fact that the government does not contend that KindHearts was donating its funds exclusively to Hamas. But the government has not provided its estimate of the approximate amounts of such donations, or what portion of KindHearts' funds went to Hamas or individuals or entities related to Hamas.

Nor, as importantly, has the government stated which recipients, to the extent that it knows of specific recipients, were Hamas fronts or Hamas affiliated. Without this sort of information, KindHearts cannot meaningfully challenge the government's actions. Not knowing to whom, in the government's view, its funds should not have gone, it cannot rebut the government's claim that recipients were Hamas connected.

74

An inability to rebut necessarily enhances, if it does not entirely ensure, the likelihood of erroneous deprivation.[26]

Other courts have found that failure to provide meaningful notice creates a high risk of erroneous deprivation. For example, in *Gete, supra*, the Ninth Circuit held that INS' procedures following vehicle seizures violated procedural due process. The court faulted INS for failing to provide, post-seizure, its legal and factual basis for the seizure, "copies of [the] evidence to be used against them," and "statements of the reasons for its denials of relief." *Id*. at 1298. It explained that such procedures were necessary to "permit [plaintiffs] effectively to rebut the INS' claims." *Id*. at 1297. The court explained:

> [R]equiring the disclosure of the factual bases for seizures would go a long way toward preventing some of the erroneous and fundamentally unfair forfeiture decisions that inevitably flow from so haphazard a process. So, too, would requiring the giving of notice of the specific statutory provision allegedly violated, rather than allowing the mere provision, without explanation, of copies of the entire statute and regulations. Similarly, furnishing owners with copies of evidence to be used against them, such as officers' reports detailing the facts upon which the claim of probable cause is based, would permit them to understand the true nature of the INS' charges and afford them a fair opportunity to prepare a proper defense to the threatened forfeiture. Finally, requiring the INS to provide statements of the reasons for its denials of relief would enable persons whose vehicles have been declared forfeited to determine whether the agency based its decision on erroneous facts, to discover whether there is evidence not previously considered that might be submitted, and to prepare reasonably informed petitions for remission, mitigation, and reconsideration.

*Id*. at 1298.

---

[26]As discussed *infra*, § 4(F) and § 5, the government has refused KindHearts' requests for access to the blocked funds to enable it to compensate its attorneys. OFAC's refusal to let KindHearts pay its lawyers to bring its challenges to the government's actions amplifies the risks of erroneous deprivation. This is so, even though KindHearts has counsel in this lawsuit, which involves the prospect, but no guarantee of fee-shifting under the Equal Access to Justice Act, 28 U.S.C. § 2412(d).

To comply with due process requirements, OFAC should, at the very least, have promptly given KindHearts the unclassified administrative record on which it relied in taking its blocking action. *See Al Haramain, supra*, 585 F. Supp. 2d at 1255-57 (discussing the inadequacy of the record's contents, but taking for granted that the record should be provided after the block); *Global Relief Found., supra*, 207 F. Supp. 2d at 808 (noting OFAC publicly filed four binders of exhibits on March 27, 2002, approximately three months after OFAC's block of Global Relief's assets); *Holy Land Found., supra*, 333 F.3d at 164 (stating due process requires disclosure of the unclassified portions of the administrative record). Without that record, OFAC's invitation to send a letter challenging the block held out no hope that any challenge would be either comprehensive or successful.

Applying the third *Mathews* factor – the governmental interest and burden of providing additional procedural protection – I note that OFAC has not explained, either to KindHearts or this court, why it failed to provide timely notice of the basis and reasons for its blocking order, or why it took so long for it to provide the scanty information it ultimately has produced.

OFAC apparently assumes that no explanation is needed. If so, it necessarily concedes that the third *Mathews* factor indisputably favors KindHearts. Absent an explanation for its conduct and dismissive treatment of KindHearts' oft-repeated requests, it cannot claim that to have done otherwise would have been unacceptably or unduly burdensome.

In sum, consideration of the *Mathews* factors leads inescapably to the conclusion that OFAC violated KindHearts' fundamental right to be told on what basis and for what reasons the government deprived it of all access to all its assets and shut down its operations. Whether OFAC violated the Constitution deliberately or indifferently does not matter at this stage: what matters is

76

that OFAC did not meet its obligation to provide meaningful notice regarding its deprivation of KindHearts' property.

### (iv). Failure to Provide Prompt Post-Deprivation Hearing

In addition to constitutionally inadequate notice procedures, KindHearts also argues OFAC failed to provide it a meaningful opportunity to be heard. As the Supreme Court stated in *Fuentes v. Shevin*, 407 U.S. 67, 80-81 (1972) (citation omitted):

> The constitutional right to be heard is a basic aspect of the duty of government to follow a fair process of decisionmaking when it acts to deprive a person of his possessions. The purpose of this requirement is not only to ensure abstract fair play to the individual. Its purpose, more particularly, is to protect his use and possession of property from arbitrary encroachment-to minimize substantively unfair or mistaken deprivations of property, .   .   .   . So viewed, the prohibition against the deprivation of property without due process of law reflects the high value, embedded in our constitutional and political history, that we place on a person's right to enjoy what is his, free of governmental interference.

Despite the due process requirement of prompt post-deprivation hearing, KindHearts received no response to its administrative challenge for over one year. When OFAC finally responded, it merely stated it had received KindHearts' challenge and had provisionally determined to designate it an SDGT. It provided no reasons for its decision. It merely enclosed a copy of the unclassified record on which it relied in making its provisional determination and invited KindHearts to send another response.

It is unclear whether OFAC even considers its invitation to KindHearts to challenge its block and its one line response a "post-deprivation hearing."[27] OFAC did not require the challenge by a

---

[27]Adam Szubin, director of OFAC, described OFAC's response to KindHearts' challenge as an implicit denial of its challenge. He stated, "OFAC's May 25, 2007 letter informing KindHearts of its provisional determination to designate referenced KindHearts' request for reconsideration and, by implication, denied it." [Doc. 73, Att. 1].

77

certain date, nor did it agree to respond by a certain date. It waited over a year to respond. And one can hardly consider its one sentence acknowledgment of the receipt of KindHearts' letter (which KindHearts put forward without the unclassified record, its own documents or access to its funds to pay its attorneys) a due process hearing.

Even if OFAC somehow believes that its invitation to send a letter fulfilled, at least initially, its obligation to give KindHearts an opportunity to be heard, its subsequent unresponsiveness has left KindHearts without any semblance of due process.

This is particularly true in light of how long OFAC has withheld the opportunity to be heard. Partially through simple unresponsiveness, and partially through piecemeal disclosure of information, OFAC has engendered a delay of remarkable duration.

Promptness is an important aspect of the due process right to be heard. *Barry v. Barchi*, 443 U.S. 55, 64 (1979). There is, though, no bright-line gauge for determining whether the government has provided a hearing with sufficient promptness to protect against undue severity from the deprivation. Instead, the Supreme Court has created another balancing test, whereby courts are to examine the "importance of the private interest and the harm to this interest occasioned by delay; the justification offered by the government for delay and its relation to the underlying governmental interest; and the likelihood that the interim decision may have been mistaken." *Fed. Deposit Ins. Corp. v. Mallen*, 486 U.S. 230, 242 (1988).

In this case, KindHearts asserts a substantial private interest - its existence and loss of access to its assets.

OFAC asserts its dilatoriness resulted from a need to progress further with its investigation before being able to evaluate KindHearts' challenge. It argues Congress gave OFAC the power to

78

maintain the *status quo* while determining whether an organization has unlawful ties to Specially Designated Global Terrorists.

OFAC also argues that KindHearts is partly responsible for the delay, particularly any delay after May 25, 2007. OFAC notes that KindHearts has requested several extensions to respond to OFAC's piecemeal disclosure of information about its reasons for the blocking order.[28]

OFAC bears primary responsibility for the delay KindHearts has encountered in its effort to be heard: It waited fifteen months after the block to make a provisional determination and provide even the largely uninformative unclassified record to KindHearts. In the meantime, OFAC apparently lost a 1369-page submission that KindHearts attached to its preliminary response.

After OFAC agreed to declassify documents, more than fourteen months passed before KindHearts saw any results from the declassification review. OFAC took more than thirty months to give KindHearts redacted records supporting its blocking action. It also resisted giving KindHearts access to its own documents. The delays KindHearts has sought have, in contrast, been a reasonable attempt to be able to review and respond to intermittent, and still incomplete disclosure of the information on which OFAC acted.

The final element of the promptness inquiry is the likelihood that the interim decision was mistaken. OFAC presently asserts that it issued the block order and has been investigating KindHearts because: 1) from KindHearts' inception individuals have been involved in the organization who were active and influential participants in other Islamic charities that OFAC has

---

[28] The fact that KindHearts sought to enjoin final designation as a SDGT should not be held against it. KindHearts perceived that such designation would have prejudiced its position in this case. In any event, its motion for a temporary restraining order came after years had passed since the initial block order and the intervening failure by OFAC to provide it with reasonable notice.

shut down due to their support of overseas terrorist organizations, including Hamas; 2) members of KindHearts have had contacts with known members of Hamas; and 3) KindHearts' funds have gone to Hamas controlled entities in the Middle East.

The materials provided to KindHearts give rise to some reason to believe that these allegations may be so. But what matters is whether OFAC has failed to afford KindHearts with a adequate opportunity to be heard in response to those allegations. On balancing the pertinent factors, I conclude that OFAC has failed to provide a meaningful hearing, and to do so with sufficient promptness to moderate or avoid the consequences of delay. OFAC did not provide timely or sufficient notice to enable KindHearts to prepare an effective challenge. OFAC ignored KindHearts' initial response. What reply OFAC made to KindHearts' responses and requests was delayed and did not cure the deficiencies of its earlier notice. Even if OFAC may ultimately show it had an adequate basis for the blocking order, that does not justify the length of the government's delay in giving KindHearts an opportunity to be heard.[29]

### (v). Prejudice to KindHearts From the Due Process Violations

After concluding that OFAC's provision of post-block process was constitutionally deficient, I must determine whether, despite the unconstitutional procedures, I can "say any due process

---

[29] KindHearts suggests that the Director of OFAC cannot be a neutral decision-maker. The Northern District of Illinois rejected a similar argument in *Global Relief Foundation*, *supra*, 207 F. Supp. 2d at 806, in which plaintiff refused to challenge OFAC's block on the basis that the challenge amounted to little more than "window dressing because .   .   . the person .   .   . responsible for prosecuting Global Relief" would also be receiving the evidence. It cited the Supreme Court, which held that members of administrative agencies typically receive results of investigations, "approve the filing of charges or formal complaints instituting enforcement proceedings, and then .   .   . participate in the .   .   . hearings."(citing *Withrow v. Larkin*, 421 U.S. 35, 56 (1975)). The Supreme Court explained the procedure did not violate the APA or due process. Thus, a hearing before the Director of OFAC does not constitute a violation of KindHearts' due process right to a neutral decision-maker.

violation was harmless beyond a reasonable doubt." *Al Haramain, supra*, 585 F. Supp. 2d at 1257 (*citing Tennessee Secondary Sch. Athletic Ass'n v. Brentwood Academy*, 551 U.S. 291, 303, 127 S. Ct. 2489, 2497 (2007)).

The parties' briefs have not addressed this issue, and I am not certain that the record, in any event, is sufficiently developed to determine whether and to what extent KindHearts has been prejudiced, and whether any such prejudice has been cured or presently can be remedied. Further proceedings must occur before these questions can be answered.

### C. As-Applied Challenge to Provisional Designation

KindHearts also raises constitutional challenges to the process provided in conjunction with OFAC's provisional designation of KindHearts a SDGT.

OFAC does not contest KindHearts' right to have adequate pre-designation notice and an opportunity to be heard. It claims it has provided the process that is due KindHearts relative to SDGT status.

OFAC also contends that KindHearts' claim that OFAC has not provided due process with regard to such status is not ripe for judicial review. This is so, according to OFAC, because it has yet to take final agency action, in the form of final designation of KindHearts as a SDGT. Thus, it argues, its actions thus far are not judicially reviewable under the APA.

The APA limits judicial review of administrative actions to "final agency actions." 5 U.S.C. § 704. KindHearts insists, however, that, under *Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967), *abrogated on other grounds, Califano v. Sanders*, 430 U.S. 99 (1977), I can nonetheless now enjoin final SDGT designation.

81

In *Abbott Laboratories* the Court upheld pre-enforcement review of agency actions. As KindHearts reads this decision, anticipated agency action is ripe for judicial review if the court finds that the issues are "fit for judicial review" and the parties will be harmed if I withhold consideration.

The decision in *Abbott Labs* and cases applying that decision are, however, limited to cases in which petitioners seek pre-enforcement review of what courts deem "final agency actions." For agency actions to be considered final, "the action must mark the consummation of the agency's decision-making process – it must not be of a merely tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). The action must also "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id*. (citations omitted).

In *Abbott Labs*, the Supreme Court permitted pre-enforcement judicial review of an FDA regulation interpreting a statute. The Court found that pre-enforcement review was appropriate despite the fact that the regulation had not yet been enforced against a specific party. In its analysis, the Court noted that the ripeness doctrine required it to consider the "fitness of the issues for judicial decision" and the "hardship to the parties of withholding court consideration." *Id*. at 149.

In its discussion of the fitness of the issues for judicial review, the Court asserted that it considered the issuance of the regulation "final agency action" making it ripe for review under the APA. It noted that courts have "interpreted the finality element in a pragmatic way." *Id*.

In each of the examples it cited to support a pragmatic interpretation of the finality element, the Court found agency regulations and orders as final agency actions fit for judicial review. Asserting that the regulation at issue in *Abbott Labs* constituted final agency action, the Court stated, "The regulation challenged here, promulgated in a formal manner after announcement in the Federal

Register and consideration of comments by interested parties is quite clearly definitive. There is no hint that this regulation is informal." *Id*. at 151.

In *Ammex Inc. v. Cox*, 351 F.3d 697, 706 (6th Cir. 2003), the Sixth Circuit, applying *Abbott Labs*, held that ripeness in the context of pre-enforcement review of agency action requires the court to weigh three factors:

> The first two deal with the fitness of the issues for judicial determination. One aspect of the judicial fitness of the issues is the extent to which the legal analysis would benefit from having a concrete factual context. The second aspect .  .  . is the extent to which the enforcement authority's legal position is subject to change before enforcement. The third consideration deals with the hardship to the parties of withholding court consideration.

In its discussion of the second factor, the Sixth Circuit noted that in *Abbott Labs*, the court found the regulation ripe for judicial review because it represented a "final regulation that the FDA was unlikely to change." *Id*. at 708.

After noting the need for final agency action, the Sixth Circuit found no final agency action in *Ammex*, where the "Notice of Intended Action" was "at most an initiation of proceedings" and not final agency action. *Id.; see also National Park Hospitality Ass'n v. Dept. of Interior*, 538 U.S. 803, 812 (2003) (considering whether section at issue was final agency action, in addition to whether the question presented was a purely legal one, and whether "further factual development would significantly advance the court's ability to deal with the legal issues presented"); *Texas v. U.S.*, 497 F.3d 491, 498-99 (5th Cir. 2007) (finding challenge to secretarial procedures fit for judicial review in part because they constituted "final agency action, as they [were] final rules that were promulgated through a formal notice - and - comment rule-making process after announcement in the *Federal Register*").

83

It is unclear which of OFAC's actions KindHearts considers "final" and subject to review. OFAC has not formally designated KindHearts an SDGT. KindHearts argues that OFAC has, for all intents and purposes, already made a final decision regarding its designation. OFAC, however, has stated that it will consider a response from KindHearts before determining whether to designate it. I cannot assume that OFAC will designate KindHearts before it has done so.

OFAC's provisional determination to designate KindHearts is not final agency action subject to review, because it does not "mark the consummation of the agency's decision-making process." *Bennett v. Spear*, 520 U.S. 154, 177 (1997).

Another point of contention is OFAC's unwillingness to provide access to classified evidence or further notice to KindHearts. OFAC contends that it has provided sufficient due process to KindHearts. Thus, its attitude toward giving more information to KindHearts appears "final."

I have not come across a case in which a court deemed an agency's interlocutory and ongoing decisions regarding notice, where such decisions have not been formalized by agency rule, regulation, statute, order etc., as a final agency action subject to judicial review. The *Abbott Labs* line of cases permitting pre-enforcement review does not involve a due process claim similar to that which KindHearts raises. KindHearts does not seek pre-enforcement review of a formal, finalized regulation, statute or policy. KindHearts seeks, rather, pre-enforcement review of a process that it asserts has denied it due process.

I conclude, accordingly that KindHearts' due process challenge to possible final designation as a SDGT is not ripe for judicial review.

### D. Restrictions on KindHearts' Access to Its Own Documents

84

KindHearts argues that OFAC also severely restricted its due process right to meaningfully respond to allegations against it by: 1) denying it access to its own documents for over two years; 2) placing unreasonable restrictions on its ability to review and use the documents; and 3) requiring counsel to give the government results of any independent investigation taken as part of KindHearts' defense.

During its February, 2006, execution of search warrants at KindHearts' office and its president's home, the FBI seized 150 boxes of documents, paper files, computer hard drives, video tapes and other media. OFAC refused to provide KindHearts copies of those records for over two years. KindHearts claims those records constituted the core of its defense because they document how it spent its money.

KindHearts also contends that in creating its administrative record OFAC selectively used those documents, excluding information unfavorable to it and thereby skewing that record.

In 2008, OFAC gave KindHearts' counsel an electronic copy of a subset of its documents subject to a protective order. The order prohibited KindHearts members and officers from viewing the documents without court approval, and forbade KindHearts counsel from printing or electronically copying any documents. Only one representative had a copy of a subset of its own documents.

After KindHearts filed suit on October 9, 2008, the United States Attorney's office indicated a willingness to discuss amendments to the protective order. The government agreed to amend the order, permitting KindHearts attorneys to have an electronic copy of the documents, and allowing former KindHearts officials to view the documents in counsels' offices.

85

KindHearts complained that these restrictions still interfered with its ability to present a meaningful defense. Because some former officials live elsewhere than where the attorneys reside, KindHearts objected to the requirement that those officials could only review documents in counsels' offices. It similarly objected to the restriction on counsels' ability to print documents for review or to attach to pleadings.

The government acknowledged it provided counsel with an incomplete "subset" of the seized materials. It refused to provide the remainder even under the restrictive terms of the protective order, and despite the fact that the materials, having been generated by KindHearts, were not classified.

OFAC claimed these restrictions were reasonable. In its initial response, it argued the blocked documents could contain sensitive information such as donor lists, donee information, procedures to avoid detection, etc. According to OFAC, its substantive reasons for limiting access to documents trumped KindHearts' concerns.

This court, on January 30, 2009, granted KindHearts' motion to modify the amended protective order. It required OFAC to disclose to KindHearts copies of all documents seized by the government, without unreasonable restrictions. In light of the protective order, OFAC allowed KindHearts to receive blocked documents and removed the requirement that documents be viewed only under supervision of counsel. It therefore rendered moot KindHearts' complaints regarding OFAC's rule that former KindHearts officials review documents in the presence of counsel.

Though KindHearts now enjoys substantially unrestricted access to its own documents, that does not mean that the government's conduct has no due process implications. Without access to its corporate records, KindHearts would find it difficult, if not impossible to document claims that

86

OFAC either overlooked records favorable to KindHearts or misinterpreted records. Denying access by KindHearts' counsel to its client's records deprived them of an important, if not the principal means for challenging the blocking order and defending against final designation of their client as a SDGT.

This action, coupled with OFAC's delay in providing any significant information from its own files about its basis and reasons for the blocking order, left KindHearts' attorneys almost entirely unequipped to marshal and present evidence. This, in turn, would have lessened significantly the benefits from having an opportunity to be heard, had a due process hearing been afforded to KindHearts.

### E. OFAC's Limitations On KindHearts' Investigation

KindHearts argues that OFAC's requirement that it identify all documents obtained from former KindHearts officials violates its due process right to a meaningful defense by forcing it to act as agents for the government. It also argues the rule is an "arbitrary and capricious exercise of authority granted under the Regulations."

OFAC responds that it only requires generic information regarding additional documents. For example, it wants to know the number of boxes of documents acquired from former KindHearts officials, to ensure that such material is not destroyed or disseminated. KindHearts rejects this explanation, stating the "parameters of [the rule] remain impermissibly unclear and subject to OFAC's whim, especially given . . . the plain terms of the regulation – to which OFAC originally cited in support of its disclosure requirement, 31 C.F.R. 501.603(b)(ii)." This rule requires substantial details about documents obtained, such as the owner, property, location, and contact

information for the holder of the property. 31 C.F.R. § 501.603(b)(ii) requires initial reports on blocked property to,

> [D]escribe the owner or account party, the property, its location, any existing or new account number or similar reference necessary to identify the property, actual or estimated value and the date it was blocked, and shall include the name and address of the holder, along with the name and telephone number of a contact person from whom compliance information can be obtained. If the report is filed by a financial institution and involves the receipt of a payment or transfer of funds which are blocked by the financial institution, the report shall also include photocopy of the payment or transfer instructions received and shall confirm that the payment has been deposited into a new or existing blocked account which is labeled as such and is established in the name of, or contains a means of clearly identifying the interest of, the individual or entity subject to blocking pursuant to the requirements of this chapter.

OFAC states that it only requires general descriptions of the blocked property, and that such a description "need not include the contents or even the name of the source of the documents. It could satisfy its obligation by stating it was in possession of three boxes of documents." [Doc. 36]. Given OFAC's insistence that it only requires generic information so that it can carry out its mandate to provide oversight of blocked property, I find that its policy does not amount to a due process violation or an arbitrary and capricious exercise of its authority.

KindHearts does not contend that OFAC is demanding more than such generic information; nor does it argue that providing such information would violate its due process rights. Providing generic information would not compromise KindHearts' counsel, and requiring such information is not a due process violation.

### F. Restrictions on KindHearts' Access to Its Own Funds to Finance Its Defense

OFAC prohibits use of blocked funds to pay attorney fees. Initially, under its policy, OFAC required that KindHearts either pay for attorneys through "fresh funds," *i.e.,* funds raised outside of

the United States, or apply for a license from OFAC to create a legal defense fund. For over two

years OFAC kept KindHearts from using any part of the blocked funds to pay its counsel.

KindHearts' original attorney, Jihad Smaili, wrote several letters to OFAC inquiring into

methods of paying employees, ways to comply with the block and obtaining access to blocked funds

to pay for attorney fees. OFAC refused to entertain Mr. Smaili's repeated requests for access to

blocked funds, insisting instead that Smaili be compensated solely from overseas accounts or apply

for a license to start a legal defense fund.[30]

---

[30]On receiving the blocking notice, Smaili corresponded with OFAC regarding access to blocked funds to receive payment for his continued (and previous) representation of KindHearts. On February 24, 2006, Smaili sent a letter/fax to OFAC "requesting information regarding the procedure in place for receiving attorneys' fees for his representation of KindHearts." On March 1, 2006, Smaili acknowledged being informed that he would not be able to access any of the frozen funds for legal services provided, and to be provided" and protested that this "smack[ed] of inherent unfairness, especially since the government hasn't made any official accusations against KindHearts."

On March 9, 2006, Smaili applied for a license to enable him to access blocked funds so that he could "continue legal representation on behalf of KindHearts and to receive payment for legal services already provided to KindHearts both prior to the Blocking Notice and after the Blocking Notice." He added, "KindHearts has no source of funding whatsoever after its accounts were frozen and there are no prospects for raising any funds for legal representation."

On March 23, 2006, OFAC responded, issuing Smaili a license, but refusing to permit him access to blocked funds. It noted "payments authorized by the license must not originate from sources within the United States or within the possession or control of a U.S. person including overseas branches and must not be made from a blocked account or blocked property." It acknowledged "under appropriate circumstances, OFAC has authorized the creation and operation of legal defense funds to enable the channeling of nonblocked funds from U.S. persons for the purpose of supporting legal representation, provided that the fund is administered by a law firm." If KindHearts could not raise such funds, OFAC stated it would "consider other licensing options after receiving from KindHearts the report on all blocked property in KindHearts' possession or control, wherever located, required by § 501.603 of the C.F.R." Other options could include authorizing KindHearts' access to its own blocked overseas property to pay for legal services, subject to certain terms and conditions.

On March 27, 2006, Smaili reiterated his concerns, stating KindHearts has "no prospects for raising funds to support its legal efforts" and that "KindHearts' reputation in the community has

Being unable to secure compensation, Smaili resigned as counsel in May, 2006.

Successor counsel likewise sought to obtain access to blocked funds for their fees. Their efforts were unavailing until March 3, 2009, when OFAC approved payment to Bernabei & Wachtel, PLLC of $27,040.

In June, 2008, after OFAC's attorney fees restrictions were challenged as unconstitutional in a separate lawsuit, *Al Haramain*, *supra,* 585 F. Supp. 2d at 1246, OFAC implemented its new policy. The policy permits expenditure of blocked funds at rates based on the attorney compensation provisions of the Equal Access to Justice Act [EAJA], 28 U.S.C. § 2412(d), and Criminal Justice Act [CJA], 18 U.S.C. § 3006A.

The policy thus allows payments of $7000, per attorney, for up to two attorneys for administrative proceedings and district court litigation. It permits $5000, per attorney, for up to two attorneys for appellate court litigation. Although the policy states the funds are for "up to two attorneys," OFAC later explained that KindHearts and other blocked or designated charities are not limited to two attorneys, but that for purposes of OFAC's policy it distributes funds based on a hypothetical two attorneys.

_____

been forever tarnished and it would be inconceivable and unreasonable to expect that individuals or entities would donate money to a KindHearts legal fund."

On April 24, 2006, Smaili sent OFAC a letter challenging the block pending investigation, in response to the notice of February 19, 2006. On May 17, 2006, he submitted a letter to OFAC stating he was resigning as counsel for KindHearts.

In June, 2006, KindHearts retained Lynne Bernabei and David Cole. They continued to send letters requesting a license to access blocked funds. OFAC continued to deny these requests. These letters continued into October, 2006. On March 3, 2009, OFAC granted Bernabei & Wachtel, PLLC, a license to obtain $27,040.00 of blocked KindHearts funds in partial satisfaction of its attorneys' fees request.

90

KindHearts contends that OFAC's policy and failure to provide KindHearts access to its own funds to pay for attorneys violates its due process right to access the courts.[31] OFAC contends that there is no constitutional right to counsel in civil cases or access to blocked funds to pay for attorneys.

KindHearts argues that OFAC's policy prohibiting it from using its blocked funds to pay attorney fees constitutes a violation of its due process right to access to the courts. *See, e.g., Martin v. Lauer*, 686 F.2d 24, 32 (D.C. Cir. 1982) ("Meaningful access to the courts is a fundamental right of citizenship in this country . . . Indeed, all other legal rights would be illusory without it.") (citations omitted).

Courts have held that the government may not deny civil litigants their right to obtain counsel. An arbitrary refusal by a state or federal court to hear a party represented by counsel would amount to "a denial of a hearing, and, therefore, of due process in the constitutional sense." *American Airways Charters, Inc. v. Regan*, 746 F.2d 865, 873 (D.C. Cir. 1984) (quoting *Powell v. Alabama*, 287 U.S. 45, 68-69 (1932)).

Courts having considered the issue have concluded, however, that no right to access blocked funds exists. *See, e.g., id.* at 869 (D.C. Cir. 1984) (assets that were "blocked, . . . [could] not be touched without OFAC's permission"); *Beobanka D.D. Belgrade v. U.S.*, 1997 WL 23182, *1 (S.D.N.Y.) (noting that plaintiffs "cite no authority for the proposition that restrictions on the method of payment of counsel violates [sic] due process."); *Al-Haramain, supra,* 585 F. Supp. 2d at 1271 (finding no due process right to access blocked funds).

---

[31]KindHearts also claims that OFAC's actions *vis-a-vis* KindHearts' requests for release of blocked funds to compensate counsel were arbitrary and capricious. *See* § 5(B), *infra*.

OFAC correctly recites the doctrine that the Constitution does not guarantee compensation for counsel in civil cases. *E.g.*, *Ivey v. Bd. of Regents*, 673 F.2d 266, 269 (9th Cir.1982). Here, however, KindHearts seeks to compensate counsel from its own funds, not those of the government.

Even so, KindHearts has no *constitutional* claim to such funds. As the court explained in *Al Haramain:*

> The Fifth Amendment does not require access to blocked fees to pay attorneys. In both civil and criminal cases, courts have concluded that prohibitions on the use of funds for attorneys' fees do not pose a due process violation. For example, pretrial restraining orders which freeze assets, including funds which a defendant seeks to use to pay an attorney, do not arbitrarily interfere with a defendant's fair opportunity to retain counsel and violate neither the fifth nor the sixth amendments.

585 F.Supp.2d 1233, 1271 (citations omitted).

## 5. Claims OFAC Acted
## Arbitrarily and Capriciously

KindHearts claims that OFAC acted arbitrarily and capriciously in implementing its initial blocking order and refusing requests to release blocked funds to compensate its counsel.[32] OFAC denies that its decisions as to either issue were arbitrary or capricious.[33] In addition, it contends that issues relating to release of blocked funds for attorneys' fees are not ripe for judicial review.

Under the Administrative Procedure Act, "an agency action shall not be set aside unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" 5 U.S.C. § 706(2)(A).

---

[32]Details regarding KindHearts' requests for access to blocked funds to compensate its counsel are set forth in § 4(v)(F), *supra*.

[33]Having found that the block pending investigation violated the Fourth Amendment, it is not necessary to examine whether that action passes muster under the more lenient arbitrary and capricious standard.

> Agency action is arbitrary and capricious where the agency has relied on factors that Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency experience.

*National Cotton Council of America v. U.S. E.P.A.*, 553 F.3d 927, 934 (6th Cir. 2009) (citations omitted).

The arbitrary and capricious standard is deferential to the agency, and a court may not substitute its judgment for that of the agency. *See Motor Vehicles Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1989). The court restricts its review to the administrative record without additional fact-finding. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973). If the agency decision is supported by a rational basis in the administrative record, the decision survives arbitrary and capricious review. *See Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 290 (1974). Although arbitrary and capricious review is highly deferential to agencies, the government asserts an even higher degree of deference in the realm of foreign affairs. *See Regan v. Wald*, 468 U.S. 222, 242 (1984).

The Sixth Circuit has explained that "when conducting this form of review, [the court] ensure[s] that the agency examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts and the choice made." *National Cotton Council of America, supra*, 553 F.3d at 934 (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)). "While [the court] may not supply a reasoned basis for the agency's action that the agency itself has not given, [it] will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc., supra*, 419 U.S. at 285-86.

### A. Ripeness

93

OFAC's attorney fees policy and its application to KindHearts' attorneys is ripe for review. The policy and decision in response to counsel's application for fees, which was granted in the amount of $27,040 for nearly three years' work, represents a final agency action. After formally announcing the policy in June, 2008, OFAC applied the policy to KindHearts' counsel. Though it released some blocked funds, the amount released was far less than the $46,000 counsel sought.

KindHearts has been affected directly by the policy and continues to be so affected. Its original counsel, Jihad Smaili, had to resign after multiple attempts to access blocked funds to receive payment for his work. Current retained counsel have had to seek and secure *pro bono* assistance from counsel from the American Civil Liberties Union.[34]

### B. Whether OFAC's Policy on Attorney Fees is Arbitrary and Capricious

### (i). Adoption of OFAC's Policy
### Was Not Arbitrary and Capricious

In its policy statement on attorney fees, OFAC explains that its policy "is aimed at enhancing the ability of a blocked party that lacks alternative access to funds to acquire legal representation in connection with its designation or the blocking of its property and interests in property." [AR 1704-06]. In its arguments in this court, OFAC states that it caps fees to preserve blocked funds. Preserving blocked funds, according to OFAC, serves such important governmental interests as 1) depriving a sanctioned entity of the benefit of its property and preventing it from using its assets to further ends conflicting with United States interests; 2) preserving blocked funds as a negotiating tool for use by the President in addressing the relevant national emergency; and 3) preserving the blocked assets for legal judgments.

---

[34]Other private counsel, Fritz Byers and Professor David Cole, have pending fee petitions to OFAC.

94

OFAC states that, after the terrorist attacks on 9/11, it "granted licenses for payment of attorney fees to Holy Land Foundation, Benevolence International Foundation and Global Relief Foundation, all of which were challenging blocking actions taken against them." Those licenses permitted payment of attorney fees from blocked funds. According to OFAC, the three organizations used more than $ 3 million from the blocked accounts, which "evoked substantial criticism from various sources, including Congress. Congress enacted the Terrorism Risk Insurance Act of 2002, which authorized victims of terrorism to satisfy judgments by attaching the blocked assets of terrorist organizations and their supporters." [Doc. 73]. This enactment, in OFAC's view, enhanced the need to preserve assets, once it has blocked them.

Given OFAC's explanation for its attorney fee policy, I cannot find, under the arbitrary and capricious standard of review, that adoption of OFAC's policy was arbitrary or capricious, or that the policy is arbitrary and capricious on its face. Limiting of the amount of attorney fees paid with blocked funds "is rationally related to the advancement of legitimate governmental interests." *Beobanka, supra*, 1997 WL 23182, * 2; *see also Al Haramain*, *supra*, 585 F. Supp. 2d at 1271-72. I may not substitute my judgment for that of the agency or order the agency to adopt a more generous policy.

### (ii) OFAC Applied its Policy to KindHearts Arbitrarily and Capriciously

I find, however, that OFAC's application of its policy to KindHearts in this case has been arbitrary and capricious. This is so because: 1) OFAC has provided no sufficient statement of reasons for authorizing payment of $27,040, rather than the full and still rather modest, amount requested, or some amount in between; 2) OFAC has not addressed the effect on the generation of attorneys' fees of certain special circumstances in this case, such as its delay in responding to

communications on behalf of KindHearts, and its general unresponsiveness, in any event, to the requests in those communications, and the complexity of nearly all the manifold issues; and 3) there is a disconnect between the facts underlying the request for access to blocked funds for attorneys' fees and the purposes, as described by OFAC, underlying its June, 2008, attorney fee policy.

OFAC gives no satisfactory reasons for its authorization of $27,040. It may be that it applied the EAJA/CJA cap of $7,000 per attorney for two attorneys for proceedings first before the agency and then before this court. But the amount authorized is $960 less than the caps. OFAC does not explain how it arrived at the amount of $27,040, rather than authorizing the "full" award of $28,000.[35]

More importantly, there is nothing in the record to indicate that OFAC took into account any of the circumstances that would justify awarding the full amount requested – $46,000 – to counsel. As already noted, that is, in absolute and relative terms, a modest amount given the work that counsel appears to have done both before the agency and in this court.[36] Three years had passed

---

[35] In its license, OFAC merely states that it calculated the amount "with reference to OFAC's published policy entitled 'Guidance on the Release of Limited Amounts of Blocked Funds for Payment of Legal Fees and Costs Incurred in Challenging the Blocking of U.S. Persons in Administrative or Civil Proceedings (available at http://www.treas.gov/offices/enforcement/ofac/licensing/guidance/legal_fee_guide.pdf)." [Doc. 74, Att. 2].

[36] Bernabei & Wachtel provided, as requested by OFAC, an "Itemized statement of the hourly rate and number of hours billed per attorney for legal services directly related to the request for administrative reconsideration of the blocking and proposed designation, and the legal challenge thereto" [June 2006 - December 2008] and an "Itemized statement and description of costs incurred in seeking administrative reconsideration or judicial review of the blocking and proposed designation, divided by each phase of the case" [June 2006 - December 2008]. OFAC should have explained what it found wanting when it decided not to grant the petition in full.

before counsel received a nickel. There is no reason to doubt that the amount requested was for services actually performed.

Most of the delay, as noted, resulted from OFAC's failure to respond to repeated inquires and requests by KindHearts' counsel. Not compensating counsel for work done as a result of OFAC-caused delay is an abuse of OFAC's discretion, and supports a finding of arbitrary agency action.[37]

The issues raised in this case have been and remain complex.[38] The amount of the award suggests quite strongly that OFAC failed to take the complexities into account when it decided to approve $27,040, rather than the $46,000 requested.

There is, moreover, a disconnect between OFAC's response to the fee requests in this case and the legitimate governmental interests it states its policy furthers. No apparent, much less

---

[37]One aspect of the delay is particularly remarkable, and, perhaps, emblematic. Once OFAC agreed in August, 2007, to conduct a declassification review, KindHearts heard no updates or information regarding the review until November, 2008, after KindHearts filed this suit. OFAC agreed to complete such review within thirty days of a telephone conference which took place shortly after OFAC filed this suit. OFAC states it received the declassified documents back from the originating agencies shortly before this lawsuit was filed and that it reviewed them for accuracy, incorporated them into the administrative record, and produced them to KindHearts. OFAC's failure to inform KindHearts of the status of the declassification process, and sudden readiness to provide the documents after KindHearts filed suit, contributed to the delay in this case and supports the finding that it acted arbitrarily and capriciously with regard to the attorney fee requests.

[38]Though looking to the EAJA and CJA as templates for OFAC's June, 2008, policy was not arbitrary and capricious, the fit is far from exact and tight, especially with regard to the CJA. Relatively few federal criminal cases involve complexities similar to those present in these proceedings. When they do, approval of petitions for excess compensation is routine. Under both the CJA and EAJA, moreover, a judge – not one's adversary – determines the amount of compensation, whether within or above the cap. Indeed, under the CJA, both the District Judge and a Circuit Judge must independently approve any request for excess compensation. Under the OFAC policy, it, rather than a judicial officer, decides how much of the blocked funds to release to counsel. While there does not appear to be anything inherently unlawful about this structure, it can, if not implemented in good faith, impartially and fairly, result in the kind of arbitrary and capricious "award" made here.

manifest risk of dissipation of the *corpus* would or could result from granting the requested amount. According to my understanding, the government has approximately $1 million of KindHearts' funds. Allocation of about five percent of the sequestered assets for attorney fees would hardly endanger the integrity of the balance of those assets or the government's ability permanently to retain them when and if it became entitled to do so.

Preserving the funds to pay possible future judgments against KindHearts is a worthy goal – provided there is some likelihood of claims being asserted, verdicts being entered and judgments being enforced. There is nothing to indicate whether OFAC took such likelihood, or lack thereof, into account in reaching its decision to award $27,040, rather than the requested $46,000.

Preserving the funds for use by the President as a negotiating tool does not seem at all likely in this case. These funds belong to an American corporation, not a foreign government, or even a foreign private entity with influence over relations with the United States.

Even if a risk exists that funds will be needed for either of these purposes, that risk should be weighed against the risk that private counsel will no longer be able or agree to represent KindHearts. As a corporation, KindHearts cannot represent itself. To gain access to the courts to contest OFAC's actions and allegations KindHearts can only appear through counsel. Denying a corporation access to counsel is tantamount to depriving it of the right to defend itself. *American Airways Charters, Inc., supra,* 746 F.2d at 873, n.14.

Finally, paying counsel for putting OFAC to the test of the Constitution and laws of the United States hardly harms United States interests. Indeed, it furthers them, regardless of the outcome of that test. To the extent OFAC fails the test, it can and no doubt will correct its procedures. Doing so will improve its operations, while eliminating the distraction of further

litigation. To the extent that OFAC passes the test, it can continue operating as it has, with the constitutionality of its operations having received a judicial imprimatur.

In light of the foregoing, I conclude that OFAC's handling thus far of KindHearts' request for access to blocked assets to compensate counsel has been arbitrary and capricious. From all that appears in the record, OFAC's decision was reached mechanistically, and without individualized consideration of the facts and circumstances of this case. If the basis for OFAC's decision was otherwise, it has not said so.

### Conclusion

For the foregoing reasons, it is

ORDERED THAT:

1. Secretary of the Treasury Timothy Geithner and Attorney General Eric H. Holder are hereby substituted as defendants for former Secretary of the Treasury Henry M. Paulson and former Attorney General Michael B. Mukasey, respectively.

2. Defendant's motion to dismiss [Doc. 36] be and hereby is granted with regard to plaintiff's claims that:

    A. The Fourth Amendment precludes final designation of plaintiff as a Specially Designated Global Terrorist, without prejudice;

    B. OFAC's authority is void for vagueness;

    C. OFAC's block pending investigation of plaintiff's assets contravened due process of law on its face;

    D. As applied, OFAC's provisional designation of KindHearts as a Specially Designated Global Terrorist contravened due process , without prejudice;

E. OFAC's impairment of plaintiff's investigation violated due process;

F. OFAC's restriction of access to blocked funds to compensate counsel, and otherwise be and hereby is denied.

Defendant's motion to dismiss is otherwise denied.

3. Plaintiff's motion for partial summary judgment [Doc. 31] be and hereby is granted with regard to its claims:

A. That OFAC violated the Fourth Amendment claim when it seized plaintiff's assets without probable cause and prior judicial review and issuance of a warrant for such seizure;

B. OFAC's failure to provide notice, and an opportunity to be heard, and its restrictions on plaintiff's access to its documents; and

C. OFAC's limitation on the extent to which plaintiffs' blocked funds are available to it to compensate its counsel was arbitrary and capricious and violated the Administrative Procedure Act.

Plaintiff's motion for summary judgment is otherwise denied.

4. A status/scheduling conference is set for September 21, 2009 at 3:30 p.m.; not later than one week before the conference the parties shall submit an agreed or separate status report[s] specifying issues needing further consideration and suggesting a timetable for adjudication or other disposition of such issues.

So ordered.

/a/ James G. Carr
James G. Carr
Chief Judge

100